IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

|  |  |
|---|---|
| STATE OF NEW JERSEY, et al.<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>DONALD J. TRUMP, et al.<br><br>Defendants-Appellants. | No. 25-1898 |

**UPDATE ON SUPREME COURT DECISION
IN *TRUMP v. BARBARA***

Pursuant to this Court's November 3, 2025 order holding this appeal in abeyance, the government writes to notify the Court of the Supreme Court's recent decision in *Trump v. Barbara.* A copy of the slip opinion is attached to this update.

Within 14 days, the government will provide an update on the status of this appeal in light of the Supreme Court's *Barbara* decision.

Respectfully submitted,

/s/ *Derek Weiss*

DEREK WEISS
(202) 616-5365
Attorney, Appellate Staff
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Room 7230
Washington, D.C.  20530

July 2026

2

## CERTIFICATE OF COMPLIANCE

This filing complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 64 words.  The filing also complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally-spaced typeface.

/s/ *Derek Weiss*
Derek Weiss

(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* BARBARA ET AL.

### CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 25–365.  Argued April 1, 2026—Decided June 30, 2026

The question presented is whether the Constitution guarantees citizenship to children born in the United States of parents who are unlawfully or temporarily present in the country.  Under the Citizenship Clause of the Fourteenth Amendment, "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  On January 20, 2025, President Trump issued Executive Order No. 14160, titled Protecting the Meaning and Value of American Citizenship.  The Order provides that children born in the United States of parents who are unlawfully or temporarily present here are not "subject to the jurisdiction" of the United States—and thus do not qualify for citizenship under the Fourteenth Amendment or the Immigration and Nationality Act (INA), which uses the same language.  90 Fed. Reg. 8449.  Several parents filed suit, some in the name of their children, arguing that the Executive Order violates the Fourteenth Amendment and the INA.  The District Court agreed, provisionally certified a nationwide class of children who would be denied citizenship by the Order, and preliminarily enjoined the Order's enforcement.  This Court granted certiorari before judgment.

*Held*: Children born in the United States to parents unlawfully or temporarily present are "subject to the jurisdiction" of the United States and are citizens at birth under the Fourteenth Amendment's Citizenship Clause.  Pp. 2–26.

(a) The Citizenship Clause must be understood in light of its historical context, from the English common law to the widespread condemnation of the Court's decision in *Dred Scott* v. *Sandford*, 19 How. 393.

2                              TRUMP *v.* BARBARA

Syllabus

Pp. 2–9.

(1) Under the English common law, children "born within the [sovereign's] dominions" owed a natural "allegiance" to the sovereign who protected them at birth, 1 W. Blackstone, Commentaries on the Laws of England 354, 356 (Blackstone), regardless of how "momentary and uncertain" their presence, *Calvin's Case*, 7 Co. Rep. 1a, 6a, 77 Eng. Rep. 377, 384. Such children were therefore "natural-born subject[s]." *Doe* v. *Jones*, 4 T. R. 300, 308, 100 Eng. Rep. 1031, 1035. The same rule applied to children born of parents subject to expulsion. See, *e.g.*, 4 Blackstone 166. The rule's exceptions were narrow: children born in lands the sovereign did not control, children born in areas temporarily outside the sovereign's control, and children of foreign ministers (by a fiction of extraterritoriality). *Calvin's Case*, 7 Co. Rep., at 18a–18b, 77 Eng. Rep., at 399.

This common law of citizenship—known as *jus soli*, or right of the soil—crossed the Atlantic and prevailed in "each and all of the states" after American independence. 2 J. Kent, Commentaries on American Law 39, n. a (Kent). The rule was applied even to the novel situation of quasi-sovereign Indian tribes, who maintained "dominion[s]" of their own such that Indians born under those dominions were not "citizens" but members of "alien and sovereign tribes." *Goodell* v. *Jackson ex dem. Smith*, 20 Johns. 693, 714–715 (N. Y. Ct. Corr. Errors). In a Nation of immigrants, *jus soli*'s broad scope took on particular importance, assuring that children of foreigners—including those here on a "temporary sojourn," *Lynch* v. *Clarke*, 1 Sand. Ch. 583, 638, 663–664 (N. Y. Ch.)—would be American citizens by birth alone. Pp. 2–6.

(2) In *Dred Scott* v. *Sandford*, the Court departed from the common law and adopted the view that blood, not soil, determined citizenship; it held that those descended from slaves could not be citizens. 19 How., at 419. The decision was met with shock, see D. Potter, The Impending Crisis, 1848–1861, p. 281; 3 Writings of Abraham Lincoln 55, and abolitionists swore to undo what the Court had done, see 2 Life and Writings of Frederick Douglass 259, 415, 424. Pp. 6–8.

(3) In the midst of the Civil War, Attorney General Edward Bates issued a landmark opinion citing key authorities, including *Calvin's Case* and Kent's Commentaries, rejecting the premise that "citizenship is ever hereditary," and declaring that "every person born in the country is, at the moment of birth, *prima facie* a citizen, . . . without any reference to race or color." 10 Op. Atty Gen. 382, 394, 399. The exceptions were "few"—"the small and admitted class of the *natural-born* composed of the children of foreign ministers and the like." *Id.*, at 397.

Following the war, Congress sought to turn Bates's opinion into law by enacting the Civil Rights Act of 1866, which made citizens of "all persons born in the United States and not subject to any foreign power,

excluding Indians not taxed." §1, 14 Stat. 27. The Act was simply assumed to invoke the common law rule. See Cong. Globe, 39th Cong., 1st Sess., 1116 (Rep. Wilson); *id.*, at 1832 (Rep. Lawrence). Pp. 8–9.

(b) What the Civil Rights Act began, the Fourteenth Amendment, and its repudiation of *Dred Scott*, would finish. Pp. 9–12.

(1) The Fourteenth Amendment's Citizenship Clause mirrored the common law's criteria for citizenship, starting with territory (a child must be "born . . . in the United States") and ending with sovereign power (a child must be "subject to the jurisdiction" of the United States). A child born on American soil and subject to American law was made an American citizen. Even the *language* of the Clause is that of the common law, echoing cases and treatises that described the common law rule. See, *e.g.*, *Lynch*, 1 Sand. Ch., at 668; Kent 38 and n. a. And its principal author explained that its language was "simply declaratory of . . . the law of the land already." Cong. Globe, 39th Cong., 1st Sess., 2890 (Sen. Howard). Pp. 9–10.

(2) The Citizenship Clause's key phrase—"subject to the jurisdiction"—refers to the power of the United States to govern those within its territory. N. Webster, An American Dictionary of the English Language 732 (def. "jurisdiction"); J. Worcester, Dictionary of the English Language 1435 (def. "subject"). The scope of that power was settled largely by *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, where Chief Justice Marshall explained that "jurisdiction" referred to "the full and complete power of a nation within its own territories," "susceptible of no limitation not imposed" by the nation itself. *Id.*, at 136. The narrow exceptions to jurisdiction arose where exercising jurisdiction would "degrade the dignity" of "foreign sovereigns"—most frequently in the case of "foreign ministers." *Id.*, at 136–139. But private individuals who traveled to the United States for "business or caprice" were "amenable to the jurisdiction of the country." *Id.*, at 144. Children born in the United States to parents unlawfully or temporarily present here are thus subject to the Nation's jurisdiction. Pp. 10–12.

(c) The Court's precedent in *United States* v. *Wong Kim Ark*, 169 U. S. 649, confirms this rule. Pp. 13–16.

(1) For nearly two decades after the Amendment's ratification, the Executive Branch viewed the Citizenship Clause as "simply an affirmance of the common law," with the limited exception of "the children of foreign ministers," and others "with rights of extraterritoriality." Memorandum of Secretary of State H. Fish to Mr. Marsh (May 19, 1871), in 2 Digest of the International Law of the United States §183, p. 394. But the end of the Reconstruction era brought uncertainty. Around that time, the State Department began to deny citizenship to those with "dual or doubtful allegiance," *id.*, at 402, and several scholars proposed a new international-law based theory of the Citizenship

4                          TRUMP *v.* BARBARA

Syllabus

Clause, focused on the *parents'* status, not the *child's*, F. Wharton,
Conflict of Laws §10, p. 35. Only if a child's parents were "domiciled
in the United States" was the child "*internationally* subject to the ju-
risdiction of the United States," as the Citizenship Clause (they said)
required. *Id.*, §12, at 41–42 (emphasis added). Acknowledging that
the common law took a different view, these writers insisted that *jus
soli* had not been made part of the Constitution. Pp. 13–14.

   (2) In *Wong Kim Ark*, the Court held that the Fourteenth Amend-
ment was "declaratory" of the "fundamental rule of citizenship by
birth" that prevailed at common law, 169 U. S., at 688, excluding only
those recognized as exempt "from the jurisdiction of this country"—the
"children of ambassadors" and those born in the nations of Indian
tribes, *id.*, at 675, 681–683, 693. All others were citizens at birth,
whether born to permanent residents or temporary visitors. See *id.*,
at 676, 687–688. The Court wrote that the words "'subject to the ju-
risdiction thereof'" "must be presumed to have been understood . . . in
the same sense" as Chief Justice Marshall used them in *Schooner Ex-
change. Wong Kim Ark*, 169 U. S., at 687. Under that understanding,
aliens who traveled to the United States for "business or pleasure" re-
ceived no "exemption from the jurisdiction of the country." *Id.*, at 686.
To the contrary, they were subject to that jurisdiction for as long as
they remained here—and any children born to them were American
citizens under the Fourteenth Amendment. See *id.*, at 682–688.
Pp. 14–16.

  (d) Arguments for limiting birthright citizenship to those domiciled
in the United States fail. These arguments err in their definition of
"allegiance," contending that natural allegiance was no longer suffi-
cient for citizenship and that some greater quantum of allegiance
(based on domicile) was required. There is scant evidence for this dra-
matically revisionist view; sources from 1776 to 1868 defined "alle-
giance by birth" just as the British did—as "the tie or duty" owed by
one who is "born within the dominions and under the protection of a
particular sovereign." *Inglis* v. *Trustees of Sailor's Snug Harbour in
City of New York*, 3 Pet. 99, 155.

  Domicile and national citizenship are distinct concepts; one who es-
tablishes a domicile in a new country does not automatically become a
citizen thereof, nor does he automatically lose his prior citizenship.

  The congressional debates over the Civil Rights Act of 1866 and the
Fourteenth Amendment confirm the common law rule. Statements
embracing the common law rule were far more frequent and explicit
than ambiguous references to "temporary sojourners." See, *e.g.*, Cong.
Globe, 39th Cong., 1st Sess., 1117. For a Congress intent on putting
the question of citizenship "once and forever [to] rest," Cong. Globe,
42d Cong., 1st Sess. 575, a domicile-based qualification would have

Syllabus

introduced significant uncertainty. Yet the word "domicile" appears just twice in the discussion of the relevant provision of the Civil Rights Act, see Cong. Globe, 39th Cong., 1st Sess. 1160; *id.*, at 1117, and in only one speech from the Citizenship Clause debates, see *id.*, at 3031–3032. Sources from after the ratification of the Fourteenth Amendment do not put in doubt the understanding of the Citizenship Clause at the time of (and after) its ratification. In any case, postenactment history cannot override the text. If Congress intended to limit American citizenship to the children of those domiciled in the United States, nothing in the succinct language of the Citizenship Clause conveyed that design; words appearing frequently in the Executive Order—"mother," "father," "lawful," "temporary"—are absent from the Clause.

Attempts to narrow *Wong Kim Ark* by noting that the Court's opinion repeatedly referred to the domicile of Wong's parents fail because the holding's underlying reasoning cannot be squared with a domicile requirement; the Court exhaustively canvassed the text and history of the Citizenship Clause and at no point identified any evidence that the ratifiers thought themselves to be imposing a domicile limitation. Pp. 17–26.

Affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SOTOMAYOR, KAGAN, BARRETT, and JACKSON, JJ., joined. JACKSON, J., filed a concurring opinion, in which SOTOMAYOR, J., joined as to the introduction and Part I. KAVANAUGH, J., filed an opinion concurring in the judgment and dissenting in part. THOMAS, J., filed a dissenting opinion, in which GORSUCH, J., joined. ALITO, J., and GORSUCH, J., filed dissenting opinions.

Cite as: 609 U. S. \_\_\_\_ (2026)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 25–365

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* BARBARA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 30, 2026]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

At issue in this case is whether the Constitution guarantees citizenship to children born of parents unlawfully or temporarily present in the United States.

I

The Fourteenth Amendment provides:

> "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

On January 20, 2025, President Trump issued Executive Order No. 14160, titled Protecting the Meaning and Value of American Citizenship. The Order provides that children born of persons unlawfully or temporarily present in the United States are not "subject to the jurisdiction" of the United States—and thus do not qualify for citizenship under the Fourteenth Amendment or the Immigration and

Opinion of the Court

Nationality Act (INA), which uses the same language. 90 Fed. Reg. 8449.[1]

Several parents filed suit, some on their own behalf, others on behalf of (and in the name of) their children. They argued that the Executive Order violates the Fourteenth Amendment and the INA. The District Court agreed. 790 F. Supp. 3d 80, 101–102 (NH 2025). It provisionally certified a nationwide class of children who would be denied citizenship by the Order and preliminarily enjoined the Order's enforcement. *Id.*, at 105–106. We granted certiorari before judgment. 607 U. S. 1079 (2025).

## II

To understand the Citizenship Clause of the Fourteenth Amendment, it is first necessary to understand the context in which it arose—and the opinion of this Court, *Dred Scott* v. *Sandford*, 19 How. 393 (1857), that it rejected.

## A

The story of citizenship in the United States begins with the English common law. Before the Revolution, the American colonists—like all in the British Empire—were considered subjects of the sovereign. See *Inglis* v. *Trustees of Sailor's Snug Harbour in City of New York*, 3 Pet. 99, 120–121 (1830). That arose not from royal fiat, but from what the common law conceived as the relationship between the sovereign and the people. The King, Blackstone explained, owes those "born within the dominions" a duty of

―――――――――
[1] In full, the Executive Order declares that "the privilege of United States citizenship does not automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." Exec. Order No. 14160, 90 Fed. Reg. 8449 (2025).

Opinion of the Court

"protection." 1 W. Blackstone, Commentaries on the Laws of England 354 (1765) (Blackstone); see also *id*., at 358. And "in return for that protection," those "born within the dominions" owe the King a "duty" of "allegiance" (sometimes rendered "ligeance"). *Id*., at 354, 356. Children born with that allegiance were "natural-born subject[s]." *Doe* v. *Jones*, 4 T. R. 300, 308, 100 Eng. Rep. 1031, 1035 (K. B. 1791) (Kenyon, C. J.). As Lord Coke put it in the celebrated *Calvin's Case*, 7 Co. Rep. 1a, 77 Eng. Rep. 377 (K. B. 1608), a "dual and reciprocal tie" thus connects "the Sovereign and [his] subject[s]." *Id*., at 4b–5a, 77 Eng. Rep., at 382 (translated from Latin).

Because the sovereign's power (and thus his duty) was limited in various respects, so too was the scope of this rule. He could not demand allegiance from—for he could not protect—those born in lands that he did not control. *Id*., at 18a, 77 Eng. Rep., at 399. (Among that group were the people born in the King's lost dominions—"France, Aquitain, Normandy, &c."—over which he claimed an "absolute right" but had no actual power to rule. *Ibid.*) The same held true even in discrete areas within his kingdom that were temporarily outside his control. See *id*., at 18a–18b, 77 Eng. Rep., at 399 (if "enemies" were to "possess" a "castle or fort," their children would not be born "under the King's ligeance"). And the same held true for ambassadors (and their families), who were considered—by a fiction of extraterritoriality—to remain on foreign soil and thus "under the ligeance" of their home country. *Id*., at 18a, 77 Eng. Rep., at 399; see also *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 138–139 (1812) (Marshall, C. J., for the Court).

In all other respects, however, the sovereign's power—and his claim to the people's allegiance—was complete. A foreign mother could enter the British Isles, give birth, and leave with her child the very next day, and that child would remain a British subject. Why? Because the child owed an implied allegiance to the sovereign who protected him at his

birth—no matter how "momentary and uncertain" his presence in the King's realms.[2] *Calvin's Case*, 7 Co. Rep., at 6a, 77 Eng. Rep., at 384; see also *Doe*, 4 T. R., at 308, 100 Eng. Rep., at 1035. The same rule applied to children born in the realm of parents subject to expulsion. For example, children of "gypsies" (today, called Romani or Roma people) born in the realm were natural-born subjects, notwithstanding that British law at the time "directed" the Roma people "to avoid the realm" under "pain of imprisonment" or even death. 4 Blackstone 166 (1769); see Brief for Gerard N. Magliocca as *Amicus Curiae* 2–4; cf. H. Hirota, Expelling the Poor 114–115 (2017) (describing outcry in 1855 when Massachusetts deported a pauper Irish mother with her American-born infant, who was acknowledged to be a "native born citizen"). For those children, and all others born in Britain, the rule was the same: With protection came allegiance, and with allegiance came the status of a natural-born subject.

This view crossed the Atlantic with the colonists—and was adopted with little fanfare after the Revolution, as "subject[s]" of the sovereign became "citizens" of the States. See *State* v. *Manuel*, 20 N. C. 144, 152 (1838). This common law of citizenship—known as *jus soli*, or right of the soil—prevailed in "each and all of the states" after American independence, and continued to emphasize reciprocal "allegiance" and "protection." 2 J. Kent, Commentaries on American Law 38–39, n. a, 40 (6th ed. 1848) (Kent). By "the doctrine of natural allegiance," all "who [we]re born within the jurisdiction of a State" were citizens. W. Yates, Rights

———————

[2] The mother, too, owed the British King allegiance "for so long [a] time as [she] continue[d]" in his territory. 1 Blackstone 358. But her allegiance was just "local and temporary"—the product of her presence in the British realm. J. Wharton, Law Lexicon 40 (E. Hopper ed., 2d Am. ed. 1860). Unlike the lasting allegiance of her natural-born son, the mother's allegiance was extinguished as soon as she left the British dominions.

of Colored Men 36 (1838) (Yates); see W. Rawle, A View of the Constitution of the United States of America 86 (2d ed. 1829).

When the newly independent Americans confronted a novel situation, unknown to England—that of the quasi-sovereign Indian tribes—they turned to the principles of the common law. Did the tribes truly govern their people? Or were their people wholly subsumed within the United States? Echoing Coke and Blackstone, Chancellor Kent answered with the common law. "We have purchased the greater part of their lands, destroyed their hunting grounds, . . . and gradually abridged their native independence," Kent acknowledged. *Goodell* v. *Jackson ex dem. Smith*, 20 Johns. 693, 711 (N. Y. Ct. Corr. Errors 1823). Even so, he reasoned, the "*United States* ha[s] never dealt with those people, within our national limits, as if they were extinguished sovereignties." *Id.*, at 714. They were instead "dependent nations" that maintained "dominion[s]" of their own. *Id.*, at 712, 714. Indians born under those dominions, he concluded, were not "citizens or subjects of the *United States*," but members of "alien and sovereign tribes." *Id.*, at 715. Others followed Kent's lead, see J. Kettner, The Development of American Citizenship, 1608–1870, pp. 294–296 (1978) (Kettner), all the while emphasizing that the "very few exceptions" to the sovereign's power were narrow indeed, H. Binney, Alienigenae of the United States 16 (2d ed. 1853) (Binney).

In a Nation of immigrants—an "asylum for mankind," in Thomas Paine's words—*jus soli*'s broad scope took on particular importance. Common Sense (1776), in 1 Writings of Thomas Paine 101 (M. Conway ed. 1894). The young Republic attracted tens of thousands of émigrés from the Old World—Scotch-Irish, French, German, Welsh, and many more, some of whom hoped to stay only a short time, others of whom hoped never to leave. See M. Jones, American Immigration 64–91 (1960). No matter their intentions,

6                         TRUMP *v.* BARBARA

however, they could be assured that their children would be American citizens by birth alone. As Justice Story said, "[n]othing is better settled." *Inglis*, 3 Pet., at 164 (opinion concurring in part and dissenting in part). The very first American legal treatise agreed. See 1 Z. Swift, A System of the Laws of the State of Connecticut 164, 167 (1795) ("children of aliens" are citizens, for they owe a "duty" at birth to the "government, under whose protection [they] came into existence"). As did the antebellum era's foremost case on the topic, *Lynch* v. *Clarke*, 1 Sand. Ch. 583 (N. Y. Ch. 1844). *Lynch* reiterated that "the common law rule was the law of the land" for the children of "citizens" and "foreigners" alike—including those foreigners here merely on a "temporary sojourn." *Id.*, at 638, 663–664. The promise of American citizenship, *Lynch* declared, extends to "all persons born within the jurisdiction of the United States." *Id.*, at 668 (internal quotation marks omitted).

B

The common law "made no distinction on account of race or color." *United States* v. *Rhodes*, 27 F. Cas. 785, 789 (No. 16,151) (CC Ky. 1866) (Swayne, J.). But the slave States did. As the Civil War approached, more and more Southern States sought to deny citizenship to black Americans—and openly rejected the common law to reach that result. See Kettner 320–324. It was "not the place of a man's birth" that made him a citizen, these States said, "but the rights and privileges he may be entitled to enjoy." *Amy* v. *Smith*, 11 Ky. 326, 332 (1822). On that view, "[t]he prejudice . . . of caste" was "unconquerable." *Bryan* v. *Walton*, 14 Ga. 185, 202 (1853). Not even emancipation could "confer *citizenship*," these States held, because free African Americans still suffered from "social and civil degradation" based on "the taint of blood." *Id.*, at 198. With the common law abandoned, almost 500,000 free black Americans in the South were left little more than "strangers." *African Methodist*

Opinion of the Court

*Episcopal Church* v. *New Orleans*, 15 La. 441, 443 (1860); see I. Berlin, Slaves Without Masters 136–137 (1974).

In the odious decision of *Dred Scott* v. *Sandford*, this Court imposed the Southern States' beliefs onto the Nation. 19 How. 393. Chief Justice Taney, writing for the Court, concluded that "the words 'people of the United States' and 'citizen[s]'" had an unexpressed (and atextual) racial component—one that excluded all those descended from slaves. *Id.*, at 419. Even if Massachusetts or Connecticut chose to grant citizenship to the freedmen, they still could not participate in national affairs. See *id.*, at 422–423. They were "born in the country," Chief Justice Taney acknowledged, and thus "did owe allegiance to the Government"—the precise criteria for citizenship at common law. *Id.*, at 420. But they were "not included, and were not intended to be included, under the word 'citizens' in the Constitution." *Id.,* at 404. For them, blood, not soil, was made the rule.

*Dred Scott* was met with shock. Ever since "the Declaration of Independence," Justice Curtis wrote, "the received general doctrine has been, in conformity with the common law"—that all "free persons born within" a State are "citizens of the United States." *Id.*, at 576–577 (dissenting opinion). Justice McLean said much the same. "Being born under our Constitution and laws," he explained, "make[s] him a citizen." *Id.*, at 531 (dissenting opinion). Northern newspapers condemned *Dred Scott* as "a wicked and false judgment," "an atrocious doctrine," "a deliberate iniquity," and a "willful perversion." D. Potter, The Impending Crisis, 1848–1861, p. 281 (1976). The decision was, in Lincoln's famous words, an "astonisher in legal history." 3 Writings of Abraham Lincoln 55 (A. Lapsley ed. 1905).

Abolitionists swore to undo what the Court had done. "By birth," Frederick Douglass insisted, "we are American citizens." 2 Life and Writings of Frederick Douglass 259 (P. Foner ed. 1950). "The Constitution knows all the human inhabitants of this country as 'the people,'" he explained, no

matter their "color, class, or clime." *Id*., at 415, 424. "[A]ll I ask of the American people is, that they live up to the Constitution, adopt its principles, imbibe its spirit, and enforce its provisions." *Id*., at 424. "When this is done," Douglass predicted, "the glorious birthright of our common humanity" will once again "become the inheritance of all the inhabitants of this highly favored country." *Ibid.*

C

The Court had overruled the common law, but the people—eventually—would overrule the Court. It took more than a decade—and the addition of names such as Antietam, Gettysburg, and Chancellorsville to our national canon—but Douglass's vision of "our common humanity" would be fulfilled.

The Reconstruction Congress did not start from scratch. In the midst of the Civil War, President Lincoln's Attorney General, Edward Bates, had issued a landmark opinion that sought to displace *Dred Scott* in favor of the common law. Citing the key authorities (among them *Calvin's Case* and Kent's Commentaries), Bates rejected the premise that "citizenship is ever hereditary." 10 Op. Atty. Gen. 382, 399 (1862). "[E]very person born in the country," he wrote, "is, at the moment of birth, *prima facie* a citizen . . . without any reference to race or color, or any other accidental circumstances." *Id*., at 394. He acknowledged that there were some limits—hence "*prima facie*," not "conclusive." See *id*., at 394, 396–397. But those exceptions were "few," simply "the small and admitted class of the *natural-born* composed of the children of foreign ministers and the like." *Id*., at 397. To Bates, it was soil—not blood—that "furnishes the rule, both of duty and of right." *Id*., at 394; see also 10 Op. Atty. Gen. 328, 328–329 (1862) (referring to *Lynch* for its "full and clear statement" of the common law).

A year after General Lee's surrender at Appomattox, Congress sought to turn Bates's opinion into law. The

result was the Civil Rights Act of 1866. The Act declared that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby . . . citizens of the United States." §1, 14 Stat. 27. To the Reconstruction Congress, the Act was simply assumed to invoke the common law rule—as Bates had in his "ablest and most exhaustive opinion," Cong. Globe, 39th Cong., 1st Sess., 1116 (1866) (Rep. Wilson), and as the New York Court of Chancery had "[i]n the great case of *Lynch* vs. *Clarke*," *id.*, at 1832 (Rep. Lawrence). Indeed, the bill's sponsor, Senator Lyman Trumbull, enthusiastically agreed with the bill's critics that it would make citizens of "the children of Chinese and Gypsies born in this country." *Id.*, at 498. "[E]ven the infant child of a foreigner born in this land is a citizen" under this bill, Trumbull declared. *Id.*, at 1757.

The specter of *Dred Scott*, however, loomed over Congress's efforts. Opponents of the Act contended that Congress could not grant such expansive citizenship (and set aside this Court's precedent) by statute alone. See, *e.g.*, Cong. Globe, 39th Cong., 1st Sess., at 497–498 (Sen. Van Winkle); *id.*, at 499 (Sen. Cowan). To quiet those concerns—and to permanently enshrine the common law in the Constitution—Congress turned to the Fourteenth Amendment.

## III

### A

What the Civil Rights Act began, the Fourteenth Amendment would finish. Like the Act, the Fourteenth Amendment was intended to repudiate *Dred Scott*. This time, however, the goal was even grander—to put the "great question of citizenship" "beyond the legislative power" altogether, to settle the issue once and for all. Cong. Globe, 39th Cong., 1st Sess., at 2891, 2896 (Sen. Howard).

The Fourteenth Amendment achieved its aim. The Citizenship Clause mirrored the common law's criteria for

citizenship.  The Clause starts, like the common law, with territory—a child must be "born . . . in the United States," not elsewhere (even to American parents).  And the Clause ends, again like the common law, with sovereign power—a child must be "subject to the jurisdiction" of the United States, unlike (say) the families of foreign ministers.  A child born on American soil and subject to American law was made an American citizen.

Even the *language* of the Clause is that of the common law.  *Lynch* held that American citizenship extended to "all persons born within the jurisdiction of the United States." 1 Sand. Ch., at 668.  So did Chancellor Kent.  See Kent 38, and n. a ("all persons born within the jurisdiction and allegiance of the United states" are citizens).  So did the first legal treatise on the rights of free black Americans.  See Yates 36 (all "who are born within the jurisdiction of a State" are citizens).  And so did the famed antebellum lawyer Horace Binney.  See Binney 20 (children "born within the limits and under the jurisdiction of the United States" are citizens).  Little wonder, then, that the Citizenship Clause's principal author would explain that its language was "simply declaratory of . . . the law of the land already." Cong. Globe, 39th Cong., 1st Sess., at 2890 (Sen. Howard).

That law was clear.  Any child who was born "under the protection of" the United States—that is, any child for whom no extraterritorial fiction applied—was made a citizen, for he owed a natural "allegiance" (and thus "obedience") to the Nation.  *Lynch*, 1 Sand. Ch., at 668; see Cong. Globe, 39th Cong., 1st Sess., at 570 (Sen. Morrill) (the "essential elements of citizenship" are "allegiance on the one side and protection on the other").

B

Even putting the common law to one side, the Citizenship Clause's key phrase—"subject to the jurisdiction"—requires the same result.  The word "jurisdiction" was hardly

Opinion of the Court

unknown to the drafters and ratifiers of the Fourteenth Amendment. Congress chose to use an established legal term and the Clause must be interpreted in that light.

In 1868, as today, "jurisdiction" (in the context of a sovereign) refers to the "[p]ower of governing or legislating." N. Webster, An American Dictionary of the English Language 732 (C. Goodrich & N. Porter eds. 1865); see also, *e.g.*, 1 B. Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 671 (1879) ("The authority of government; the sway of a sovereign power"). To be "subject to" the jurisdiction of the United States, then, is to "liv[e] under" its "dominion," J. Worcester, Dictionary of the English Language 1435 (1860), a meaning reinforced by the Clause's territorial focus on those born "in" the United States. The Citizenship Clause uses jurisdiction in its ordinary sense—referring to the power of the United States to govern those within its territory.

The scope of that power was well settled in 1868, largely by "the celebrated case" of *Schooner Exchange* v. *McFaddon*, 7 Cranch 116. See H. Wheaton, Elements of International Law §96, p. 154 (8th ed. 1866). Expounding on "general principles," Chief Justice Marshall explained that "jurisdiction" referred to "the full and complete power of a nation within its own territories." 7 Cranch, at 136. That "absolute" power was "susceptible of no limitation not imposed" by the nation itself. *Ibid.* All sovereigns, however, were understood to have impliedly waived their jurisdiction in "certain peculiar circumstances"—in essence, where exercising jurisdiction would "degrade the dignity" of "foreign sovereigns." *Id.*, at 136–137. As in the context of *jus soli*, those peculiar circumstances arose most frequently in the case of "foreign ministers." See *id.*, at 138–139. "[E]very sovereign would hazard his own dignity," after all, if his officials abroad were made to "owe temporary and local allegiance to a foreign prince." *Id.*, at 139.

The limits of that exception were carefully defined. Still within the United States' power were the "private individuals" of a foreign nation who had "spread themselves through [our territory] as business or caprice may direct." *Id.*, at 144. "[I]t would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction," Chief Justice Marshall explained, "if such individuals or merchants . . . were not amenable to the jurisdiction of the country." *Ibid.* "Nor can the foreign sovereign have any motive for wishing such exemption," he continued, with respect to its sojourning subjects who were "not employed by" the sovereign or "engaged in national pursuits." *Ibid.* Just like *jus soli*, a sovereign's jurisdiction made no exception for those only temporarily present within the sovereign's territory. Instead, nearly everyone within the territorial boundaries of the United States was "amenable to" the Nation's jurisdiction. *Ibid.*

The ordinary legal meaning of the text of the Clause thus neatly captures the common law rule, with its broad reach and narrow exceptions. The same groups included (and excluded) by *jus soli* were included (and excluded) by the conventional understanding of jurisdiction. Excluded by both were the children of foreign ministers and members of 19th-century Indian tribes over whom the United States had ceded a part of its territorial jurisdiction to preserve its relationship with a foreign sovereign (or quasi-sovereign).

No such intersovereign concerns apply to children born of parents unlawfully or temporarily present in the United States; no foreign sovereign would "have any motive for wishing" them outside this Nation's authority. *Ibid.* Those children are thus subject to the jurisdiction of the United States. They satisfy both elements of the Citizenship Clause: they are "born . . . in the United States" and "subject to the jurisdiction thereof." Under the Constitution, they are citizens at birth.

Opinion of the Court

## IV

Our precedent—the seminal case of *United States* v. *Wong Kim Ark*, 169 U. S. 649 (1898)—confirms this rule.

### A

For nearly two decades after the Fourteenth Amendment's ratification, the Executive Branch viewed the Citizenship Clause as "simply an affirmance of the common law of England and of this country." Memorandum of Secretary of State H. Fish to Mr. Marsh (May 19, 1871), in 2 Digest of the International Law of the United States §183, p. 394 (F. Wharton ed. 2d ed. 1887) (Digest). Under that view, "the status of citizenship" was "fixed by the place of nativity, irrespective of parentage"—with the limited exception of "the children of foreign ministers, and of other persons who may be within our territory with rights of extraterritoriality." *Ibid.*

In 1872, for instance, Attorney General George Williams was called upon to determine the citizenship of a child born of Austrian parents only "temporarily residing" in New York City. 14 Op. Atty. Gen. 154. Citing the Citizenship Clause (and Bates's 1862 opinion), Williams explained that "a person born in this country, though of alien parents who have never been naturalized, is, under our law, deemed a citizen of the United States by reason of the place of his birth." *Id.*, at 155. Thus the child "is a native of this country," Williams concluded, "and as such was originally clothed with American nationality." *Ibid.* Secretary of State Hamilton Fish agreed. See Memorandum to Baron Lederer (Dec. 24, 1872), in 2 Digest 395–396. So did federal courts. Like the Executive Branch, they saw the Clause as merely "declaratory of the rule of the common law." *McKay* v. *Campbell*, 16 F. Cas. 161, 165 (No. 8,840) (DC Ore. 1871); see also *In re Look Tin Sing*, 21 F. 905, 908–910 (CC Cal. 1884) (Field, J.); *Ex parte Chin King*, 35 F. 354, 355–356 (CC Ore. 1888).

14              TRUMP *v.* BARBARA

Opinion of the Court

As the era of Reconstruction faded, however, so too did the promise of birthright citizenship. Uncertainty came with the first Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58, and the election of President Cleveland, the first Democrat to hold the office since the Civil War. See F. Douglass, Speech (Apr. 16, 1885), in 4 Life and Writings of Frederick Douglass 413 (1955). It was around this time that the State Department began to deny citizenship to those with "dual or doubtful allegiance," 2 Digest 402; and it was around this time that several scholars proposed a new theory of the Clause, one based on "international law," F. Wharton, Conflict of Laws §10, p. 35 (2d ed. 1881) (Wharton).

This new theory focused on the *parents'* status, not the *child's*. It was only if a child's parents were "domiciled in the United States," they argued, that the child was "*internationally* subject to the jurisdiction of the United States," as the Citizenship Clause (they said) required. *Id.*, §12, at 41–42 (emphasis added); see also A. Morse, A Treatise on Citizenship 248 (1881). These writers acknowledged that the common law took a different view, see *id.*, at 238, and n. 1, and acknowledged "that the language of the [F]ourteenth [A]mendment . . . is very broad," A. Morse, Citizenship of Children of Aliens Born in the United States, 30 Albany L. J. 420 (1884). But they insisted that *jus soli* had been "universally" rejected by other nations and had not been made part of the Constitution. *Ibid.*

B

In *Wong Kim Ark*, this Court rejected that view, concluding that no "rule of international law" had qualified "the ancient rule of citizenship by birth within the dominion." 169 U. S., at 667.

At issue was the citizenship of Wong Kim Ark, born in San Francisco to Chinese parents. See *id.*, at 652. In Wong's telling, the case was not close. "[T]here can be no

Opinion of the Court

just doubt," he argued, "that the Amendment was intended to be based upon the doctrine derived from the common law, that the character of a natural born citizen is incidental to birth only." Brief for Appellee in *United States* v. *Wong Kim Ark*, O. T. 1896, No. 132, p. 78 (filed by Counselor Ashton); see also *id.*, at 38 (discussing "the celebrated case of *Lynch vs. Clark*"). The Government disagreed. It admitted that "the opinions of the Attorneys-General, the decisions of the Federal and State courts, and, up to 1885, the rulings of the State Department all concurred in the view that birth in the United States conferred citizenship," based on "the common law doctrine of allegiance" and "the authority of the decision of Chancellor Sandford in *Lynch* v. *Clarke*." Brief for United States in *United States* v. *Wong Kim Ark*, O. T. 1896, No. 132, p. 28. But the Executive no longer endorsed that view. "[T]he common-law doctrine of England," it argued, had in fact never been "the doctrine of the United States," and was not made the law by virtue of the Citizenship Clause. *Id.*, at 6.

In an opinion by Justice Gray, the Court rejected the Government's position. Justice Gray explained that the Fourteenth Amendment was merely "declaratory" of the "fundamental rule of citizenship by birth" that prevailed at common law. 169 U. S., at 688. That "same rule," he wrote, "was in force in all the English Colonies"—"and continued to prevail under the Constitution." *Id.*, at 658. And its contours were clear. It excluded those recognized as exempt "from the jurisdiction of this country"—the "children of ambassadors" and other representatives of foreign sovereigns, as well as those born in the "alien nations" of Indian tribes. *Id.*, at 675, 681–683, 693.

All others were citizens at birth, whether born to permanent residents or temporary visitors. See *id.*, at 676, 687–688. Indeed, Justice Gray noted, no one had even "contested" this conclusion for "more than fifty years after the adoption of the Constitution"—until the matter was

Opinion of the Court

"elaborately argued" before the New York Court of Chancery in *Lynch* v. *Clarke.* 169 U. S., at 664. And there the question was "decided upon full consideration by Vice Chancellor Sandford in favor of their citizenship." *Ibid.* "The same doctrine was repeatedly affirmed in the executive departments," Justice Gray wrote, not to mention by Kent and Binney—each of whom affirmed that "[t]he child of an alien, if born in the country, is as much a citizen as the natural-born child of a citizen." *Id.*, at 664–665. In adopting the common law, Justice Gray explained, the Citizenship Clause adopted this same rule. See *id.*, at 676.

Justice Gray then turned to *Schooner Exchange* to confirm what the common law made clear. "The words . . . 'subject to the jurisdiction thereof,'" he wrote, "must be presumed to have been understood and intended by the Congress . . . in the same sense in which the like words had been used by Chief Justice Marshall in the well known case of *The Exchange.*" 169 U. S., at 687. On that understanding, aliens who traveled to the United States for "business or pleasure" received no "exemption from the jurisdiction of the country." *Id.*, at 686. To the contrary, they were subject to that jurisdiction for as long as they remained here—and any children born to them were American citizens under the Fourteenth Amendment. See *id.*, at 682–688.

What the Court held in *Wong Kim Ark* was simple: the Citizenship Clause incorporated the common law and granted citizenship to nearly all children born in the United States. Not surprisingly, then, in the 128 years since, we have repeatedly understood the rule of *Wong Kim Ark* to guarantee citizenship to all children born in the United States and subject to its power. See, *e.g.*, *United States ex rel. Hintopoulos* v. *Shaughnessy*, 353 U. S. 72, 73 (1957); *INS* v. *Rios-Pineda*, 471 U. S. 444, 446 (1985). We see no reason to depart from that view today.

Opinion of the Court

## V

The Government and the principal dissent share many of our premises. They agree that the Citizenship Clause was intended to incorporate the "background principles" of the common law. Brief for Petitioners 15–16; see, *e.g.*, *post*, at 2–3, 86 (THOMAS, J., dissenting). They agree that, under the common law, "citizenship turns on allegiance." Brief for Petitioners 40; see, *e.g.*, *post*, at 1, 17–18 (THOMAS, J., dissenting). And they agree that "*Dred Scott* departed from that traditional, allegiance-based view of citizenship"—a departure that Congress "repudiated" in the Clause. Brief for Petitioners 16–17; see, *e.g.*, *post*, at 1–2, 26–27 (THOMAS, J., dissenting).

Where the Government and the principal dissent err is with their definition of "allegiance." They concede that *Calvin's Case* and Blackstone state the rule that prevailed before the Declaration of Independence—that a natural "allegiance" arises for all children who are "born here . . . under the protection of the sovereign." Tr. of Oral Arg. 64–65, 136; see *post*, at 75–76 (THOMAS, J., dissenting). Yet according to the Government and the principal dissent, "the United States' conception of allegiance"—at some unspecified point in time—broke "from Great Britain's." Brief for Petitioners 16. (The Government has variously dated this change to the late-18th century, see Tr. of Oral Arg. 137, the early-19th century, see *id.*, at 26, 76, and the Reconstruction era, see *id.*, at 3; the principal dissent declines to offer a date.) Natural allegiance, they contend, was no longer sufficient for citizenship; some greater quantum of allegiance was required.

How much? The Government offers a smorgasbord of formulations: "primary allegiance," "sufficient allegiance," "full allegiance," "requisite allegiance." Brief for Petitioners 12, 14, 15, 17, 19, 21, 23, 29, 32, 42. (The principal dissent, for its part, seems to have settled on "primary allegiance." *Post*, at 17, 22, 25, 29, 58.) What all these formulations

18                    TRUMP *v.* BARBARA

Opinion of the Court

supposedly share is that they turn on domicile—the place of one's permanent home. At some point before the ratification of the Fourteenth Amendment, the argument goes, it became "deeply rooted" in this country that "[d]omicile is the key concept that creates allegiance." Tr. of Oral Arg. 26.

The trouble is that there is scant evidence for this dramatically revisionist view. Certainly no one said that such a change had occurred. Indeed, even as the antebellum Americans hotly debated whether the Declaration of Independence had abrogated one aspect of the British common law—that natural allegiance was indefeasible, no matter a person's desire to expatriate—all agreed that such allegiance was owed in the first place. See *Lynch*, 1 Sand. Ch., at 657 ("perpetual allegiance . . . does not stand upon the same reason or principle as the common law doctrine of allegiance by birth"); *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 120 (1804) (noting unsettled question of whether an American citizen "can divest himself absolutely of" his citizenship, but simply presuming that any "person born within the *United States*" was a natural-born citizen).

The only evidence the Government and the principal dissent can muster to show that some alternative ("primary") conception of allegiance displaced the common law is a "funeral oration" for President Lincoln. Brief for Petitioners 23; see *post*, at 22–23. Ahistorical modifiers aside, the Government and the dissent identify no source that defined allegiance at birth as being based on domicile in the period from 1776 to 1868.[3] Sources from that period instead defined "allegiance by birth" just as the British did—as "the tie or duty" owed by one who is "born within the dominions

————————

[3] The principal dissent comes closest with the decision of New York's intermediate appellate court in *Ludlam* v. *Ludlam*, 31 Barb. 486 (N. Y. Gen. Term 1860). When New York's highest court heard the case, however, it did not follow the lower court's reasoning; it relied instead on *Lynch* v. *Clarke*. See *Ludlam* v. *Ludlam*, 26 N. Y. 356, 376 (1863).

Opinion of the Court

and under the protection of a particular sovereign." *Inglis*, 3 Pet., at 155 (opinion of Story, J.); see also, *e.g.*, 1 N. Webster, An American Dictionary of the English Language (1828) ("[e]very native" owes a "*natural* or *implied* allegiance" "to the government under which he is born").

Of course, some wished to change the rule. But even those who wished to limit *jus soli* did not deny that children born of temporary visitors owed *natural allegiance* to the United States. They instead thought that domicile might serve as a "reasonable qualification" to the common law rule (namely, that citizenship derives solely from the "[n]atural allegiance" owed "to the government of the territory of a man's birth"). J. Story, Commentaries on the Conflict of Laws §§21, 48, pp. 22, 48 (1834) (Story).

The principal dissent (but not the Government) at times seems to directly equate domicile and national citizenship. See *post*, at 9–10, 12–14, 40–41. That is wrong. "It is, in fact, a general axiom of international law, that there may be domicil where there is no nationality, and nationality where there is no domicil." F. Wharton, Conflict of Laws §40a, p. 47 (1872); see also A. Cockburn, Nationality 204 (1869). After all, one who establishes a domicile in a new country does not automatically become a citizen thereof. (He has to be naturalized.) Nor does he automatically lose his prior citizenship. (He has to expatriate.) Thus, the principal dissent ultimately acknowledges that domicile alone was insufficient to make someone "formally" a "citizen." *Post*, at 9.

Of course, domicile was relevant to naturalization and expatriation. But that by no means suggests it was a prerequisite to national citizenship at birth. The principal dissent's reliance on cases concerning *changes* to a person's *state* citizenship is thus misplaced. See, *e.g.*, *post*, at 6–7. And the Government's remaining support for the idea that a domicile "qualification" to birthright citizenship was "widely accepted" in the United States before the Civil War,

Opinion of the Court

Brief for Petitioners 22, consists of a single state-court case about citizenship in the Republic of Texas, a proposed (but never adopted) model code for the State of New York, and another treatise that discussed the subject only in terms of "the principles of natural reason," which it expressly distinguished from "[t]he *common law*," 1 H. Tucker, Commentaries on the Laws of Virginia 57–58 (1836).

The congressional debates over the Civil Rights Act of 1866 and the Fourteenth Amendment confirm our view. The principal dissent (and the Government) lean heavily on a handful of ambiguous floor statements referencing "temporary sojourners" and "foreigners."  See, *e.g.*, Cong. Globe, 39th Cong., 1st Sess., at 1117 (Rep. Wilson) ("*it may be* that children born on our soil to temporary sojourners" do not fall within the Act's scope (emphasis added)); *id.*, at 2890 (Sen. Howard) (the Citizenship Clause "w[ould] not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of embassadors or foreign ministers").  Far more frequent and explicit, however, were statements embracing the common law.  See, *e.g.*, *id.*, at 498 (Sen. Trumbull); *id.*, at 570 (Sen. Morrill); *id.*, at 1124 (Rep. Cook); *id.*, at 1832 (Rep. Lawrence); *id.*, at 2768 (Sen. Wade); *id.*, at 2891 (Sen. Conness); *id.*, at 3032 (Sen. Henderson).  And the debates make clear that no member of Congress seriously grappled with a domicile-based carveout to the "fixed, certain, and intelligible rule[]" of the common law.  *Lynch*, 1 Sand. Ch., at 658.

For a Congress intent on putting the question of citizenship "once and forever [to] rest," Cong. Globe, 42d Cong., 1st Sess. 575 (1871) (Sen. Trumbull), a domicile-based qualification would have introduced significant uncertainty.  Unlike the easy-to-apply common law, it would be "difficult, if not impossible, to lay down any general rule" of domicile-based citizenship, as domicile "often depend[s] upon the circumstances of each case, the combinations of which are

Opinion of the Court

infinite." *Inhabitants of Abington* v. *Inhabitants of North Bridgewater*, 40 Mass. 170, 177 (1839).

If Congress intended to hinge citizenship on each individual's domicile—a question that "is sometimes a matter of great difficulty to decide," Story §45, at 43—it is reasonable to expect there would have been at least *some* discussion of the topic. Yet the word "domicile" appears just twice in the discussion of the relevant provision of the Civil Rights Act. See Cong. Globe, 39th Cong., 1st Sess., at 1160 (Rep. Shellabarger); *id.*, at 1117 (Rep. Wilson). And it appears in only one speech from the Citizenship Clause debates—as part of an explanation of why State citizenship is distinct from national citizenship under the Constitution. See *id.*, at 3031–3032 (Sen. Henderson).

Perhaps recognizing the absence of ratification-era support for a domicile-based rule of national citizenship, the Government and principal dissent both emphasize sources from after the ratification of the Fourteenth Amendment. They turn to the same international law treatises that underpinned the Government's attempts to limit birthright citizenship in the 1880s.[4] This fundamentally revisionist scholarship—and the post-1884 Executive Branch actions that relied upon it—do not put in doubt the understanding of the Citizenship Clause at the time of (and after) its ratification. As Senator Trumbull explained in 1871, the

_____

[4] The principal dissent suggests that any scholar who wanted "to prevent the children of Chinese immigrants from being citizens . . . would not have proposed a domicile requirement," because "many Chinese immigrants were already domiciled here." *Post*, at 72. But several of the scholars upon which the dissent relies (most prominently Francis Wharton) did not agree. In their view, Chinese children born in America were "not citizens" because the Chinese—"as a population"—could not be "domiciled in the United States." Wharton §12, at 41–42. Indeed, the Government made the same argument in *United States* v. *Wong Kim Ark*, 169 U. S. 649 (1898). See Brief for United States in *United States* v. *Wong Kim Ark*, O. T. 1896, No. 132, p. 26 (asserting that "*all* Chinese persons, as a rule, are but temporary residents of this country").

Opinion of the Court

Citizenship Clause recognized that "[e]very person born within the jurisdiction" of the Nation was "a citizen of the United States," as had been true under "the common law of this country as well as of England." Cong. Globe, 1st Sess., 42d Cong., at 575; see also, *e.g.*, Memorandum of Secretary of State H. Fish (1871), in 2 Digest 394; *In re Look Tin Sing*, 21 F., at 906, 909–910.

In any case, postenactment history cannot override the text. If Congress intended to limit American citizenship to the children of those domiciled in the United States, nothing in the succinct language of the Citizenship Clause conveyed that design. Words appearing frequently in the Executive Order—"mother," "father," "lawful," "temporary"—are absent from the Clause. For a simple reason: they did not matter. And while the Clause does ensure *state* citizenship attaches for U. S. citizens in "the State wherein they reside," Amdt. 14, §1, the explicit invocation of residence for *state* citizenship only highlights its absence from the criteria for *U. S.* citizenship. See *Slaughter-House Cases*, 16 Wall. 36, 74 (1873) (a person can "be a citizen of the United States without being a citizen of a State").

When the principal dissent does grapple with the operative legal text—"subject to the jurisdiction" of the United States—it has little to say. It argues only that a person is "subject to the jurisdiction of the government of his domicile." *Post*, at 3. But that is not the question. The question is whether a person is "subject to the jurisdiction" of the government of the country in which he is physically present, even if he is only there temporarily. He is (unless he falls under one of the familiar exceptions, such as for ambassadors). For the reasons given by Chief Justice Marshall in *Schooner Exchange*, the United States exercises

Opinion of the Court

"full and complete power"—its "absolute and complete jurisdiction"—over temporary visitors. 7 Cranch 116, at 136.[5]

To avoid these problems, the principal dissent spends much of its time on the text of the Civil Rights Act. See *post*, at 2–4, 23–31, 35–36, 48–49, 59, 67–68, 87, 88–89. (JUSTICE ALITO does the same—albeit in service of a different result. See *post*, at 13–18, 20–21, 24–25, 36 (dissenting opinion).) The Civil Rights Act made citizens of "all persons born in the United States and not subject to any foreign power." 14 Stat. 27. The principal dissent contends that a person is "not subject to any foreign power" if (and only if) he is "domiciled in" the United States, for it is then (and only then) that "his home nation" is forbidden from regulating his conduct. *Post*, at 3, 13–14. JUSTICE ALITO contends that a person is "not subject to any foreign power" if (and only if) no other country would "automatically" make him a "national[]," whether he is domiciled here or not. *Post*, at 37.

Neither theory works. As to the principal dissent, it is simply not true that domicile in a new nation severs one's ties to the old one. See Story §540, at 451 ("Nations

––––––––––

[5] The Government briefly contends that *Elk* v. *Wilkins*, 112 U. S. 94 (1884) adopted its unconventional understanding of jurisdiction. That is mistaken. *Elk* addressed the citizenship of a child "born a member of one of the Indian tribes." *Id*., at 99. And *Elk* hewed to the very same common law rule announced by Chancellor Kent in 1823—indeed, it even cited him. See *id*., at 100. The Court reasoned that tribal members were "no more 'born in the United States and subject to the jurisdiction thereof'" than "children born within the United States, of ambassadors or other public ministers of foreign nations." *Id*., at 102. In both contexts, after all, the United States had voluntarily "cede[d] . . . a part of its territorial jurisdiction" to another sovereign (or quasi-sovereign). *Wong Kim Ark*, 169 U. S., at 686. As the Court later confirmed, *Elk* "concerned only members of Indian tribes within the United States." *Wong Kim Ark*, 169 U. S., at 682. Beyond that unique intersovereign relationship, the Court's decision "had no tendency to deny citizenship to children born in the United States of foreign parents . . . not in the diplomatic service of a foreign country." *Ibid.*

generally assert a claim to regulate the rights, duties, obligations, and acts of their own citizens, wherever they may be domiciled."). If the test truly is whether a person is "amenable to the laws" of two governments at once, *post*, at 14 (THOMAS, J., dissenting), then it is a test that every child born to a foreign parent fails—a result that even the principal dissent cannot stomach. JUSTICE ALITO seems to recognize this bind, so he would create an ad hoc exception for those whose parents have "done everything within their power . . . to become Americans." *Post*, at 27. He does not explain how that exception can be squared with his view of the text, which (to repeat) is that anyone "automatically" made a "national[]" of his "parents' native country" was not entitled to citizenship under the Civil Rights Act.[6] *Post*, at 37. In our estimation, the Act raises more questions than answers—and was replaced by the Fourteenth Amendment, which "better" expresses the views of the Reconstruction Congress anyway. Cong. Globe, 39th Cong., 1st Sess., at 2894 (Sen. Trumbull). This Court said as much in *Wong Kim Ark*. See 169 U. S., at 675, 688 ("any possible doubt" about the meaning of the Civil Rights Act "was removed" by the change to "the affirmative words" of the Citizenship Clause).

For the dissents and the Government, *Wong Kim Ark* is essentially irrelevant. They attempt to narrow that precedent by noting that the Court's opinion repeatedly referred to the domicile of Wong's parents. That is true. But "the reasoning underlying" the holding of *Wong Kim Ark* cannot

---

[6] JUSTICE KAVANAUGH proposes a similar ad hoc exception to his own interpretation of the Citizenship Clause. Under his rule, the Clause generally does not promise citizenship to children whose parents are "not U. S. citizens." See *post*, at 9 (opinion concurring in judgment and dissenting in part). Yet it *must* grant citizenship under the "facts and circumstances" presented in *Wong Kim Ark*—even though Wong's parents were not U. S. citizens. *Post*, at 5, n. 3. Like the exception proposed by JUSTICE ALITO, JUSTICE KAVANAUGH's exception is at war with his supposedly "unifying" principle of the Clause. *Post*, at 9.

Case: 25-1898   Document: 00118475793   Page: 33   Date Filed: 07/14/2026   Entry ID: 6825720

Cite as: 609 U. S. ____ (2026)          25

Opinion of the Court

be squared with a domicile requirement of the sort the Government envisions. *Bucklew* v. *Precythe*, 587 U. S. 119, 136 (2019). As we have already explained, the Court exhaustively canvassed the text and history of the Citizenship Clause. It traced an unbroken line from the English common law, into the founding and antebellum eras, and through the debates, to the Clause's ratification. Yet at no point did the Court identify any evidence in the historical record that the ratifiers of the Fourteenth Amendment thought themselves to be imposing a domicile limitation.

In the end, it is the *dissent* in *Wong Kim Ark* that makes the strongest case for a domicile-based theory of American citizenship. There, Chief Justice Fuller resisted the application of the English common law rule because it "recognized no exception in the instance of birth during the mere temporary or accidental sojourn of the parents." 169 U. S., at 718. He admitted that, in England, "the question of domicil[e] is entirely distinct from that of allegiance" because "[t]he one relates to the civil, and the other to the political, status." *Ibid.* But he believed that "a different view as to the effect of permanent abode on nationality ha[d] been expressed in this country." *Ibid.* Under this different view, the Fourteenth Amendment "prevent[ed] the acquisition of citizenship by" "the children of aliens, whose parents owed local and temporary allegiance merely, remaining subject to a foreign power." *Id.*, at 721. The Government and today's dissenters agree. But this view commanded only a dissent in 1898, and neither time nor circumstance has changed the fact that it is not the law.

\* \* \*

Again and again, the dissents cast the common law as "feudal," "medieval"—a remnant of "the darkness of the middle ages." *Post*, at 4–5, 45, 54, 64, 75–78 (opinion of THOMAS, J.); see *post*, at 1 (opinion of GORSUCH, J.); *post*, at 2, 4, 27 (opinion of ALITO, J.).

Opinion of the Court

That was not the view of the Reconstruction Congress. Where the dissents see feudalism, the Framers of the Fourteenth Amendment saw emancipation. By the time of the Glorious Revolution in 1688, in fact, the tie created by birth was less a "duty" than a "right"—the foundation of the "ancient liberties" of "free-born subjects." H. Muller, Subjects and Sovereign 16–18, 57–58 (2017). That is why Blackstone described the "privileges" owed to the "natural-born." 1 Blackstone 361–362. That is why the colonists demanded the "rights of Englishmen" more than 250 years ago. B. Bailyn, The Ideological Origins of the American Revolution 192 (1967). And that is why abolitionists lauded the "ancient and universal" rule of citizenship by birth alone as "an ordinance of Heaven." Yates 36–37; see also M. Jones, Birthright Citizens 89–107 (2018).

Citizenship, then and now, was the right to have rights— to freely participate in our political community. The Framers of the Fourteenth Amendment extended that promise to "every free-born person in this land." Cong. Globe, 39th Cong., 1st Sess., at 600 (Sen. Trumbull). We keep that promise today.

The judgment of the District Court for the District of New Hampshire is affirmed.

*It is so ordered.*

Cite as: 609 U. S. \_\_\_\_ (2026)     1

JACKSON, J., concurring

# SUPREME COURT OF THE UNITED STATES

———————

No. 25–365

———————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* BARBARA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 30, 2026]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins as to the introduction and Part I, concurring.

I join the Court's opinion in full. I write separately to respond to some of the themes in the principal dissent. Despite his longstanding endorsement of a "colorblind" Constitution, JUSTICE THOMAS now surprisingly suggests that the Citizenship Clause was a race-conscious remedial measure, relating only to "freed slaves such as Dred Scott," *post*, at 56, and those who shared with them certain characteristics, *post*, at 1 ("no other homeland"); *post*, at 21 ("called America home"). It is for this reason, he says, that "children who were born in the United States but [to parents] not domiciled here" are not entitled to claim birthright citizenship. *Post*, at 3–4. But that narrow vision of the Fourteenth Amendment bears little relationship to the history of its ratification. Even worse, JUSTICE THOMAS's telling elides the entire point of the Second Founding: The Reconstruction Amendments were an anticaste, antisubordination reset for the Nation, not a mere spot treatment for the dark stain of slavery.

## I

It is common ground that the Fourteenth Amendment was "enacted . . . with the one pervading purpose of securing equal citizenship for the freed slaves." *Post*, at 90

2                    TRUMP *v.* BARBARA

JACKSON, J., concurring

(internal quotation marks omitted).  Also true is the fact that this Court "has time and again denied Americans that promise."  *Post*, at 90.[1]  But consensus about the Fourteenth Amendment's central motivation does not justify JUSTICE THOMAS's myopic treatment of it.  The Amendment caused a paradigm shift in the trajectory of our Nation; the teacher who scolds a student for bullying a classmate hopes the student learns the broader lesson of treating *everyone* with kindness, not just that one kid.

In the aftermath of the Civil War, those who championed the Fourteenth Amendment—both within and beyond Congress—understood the assignment.  Their work product used "language that transcended race and region," and thereby "changed and broadened the meaning of freedom for *all* Americans."[2]  Instead of the limited salve the principal dissent makes it out to be, the Citizenship Clause reflects this universalist approach.

A

Consider, first, the voices of those outside the chambers of the Senate and the House of Representatives, whose advocacy and organizing culminated in the Fourteenth

––––––––––

[1] I suspect, though, that JUSTICE THOMAS and I disagree about when and how that promise has been denied by this Court.  My list is long (and sadly only getting longer).  For a sampling, consider: *Civil Rights Cases*, 109 U. S. 3 (1883); *Plessy* v. *Ferguson*, 163 U. S. 537 (1896); *De Lima* v. *Bidwell*, 182 U. S. 1 (1901) (otherwise known as the Insular Cases); *Downes* v. *Bidwell*, 182 U. S. 244 (1901) (same); *Korematsu* v. *United States*, 323 U. S. 214 (1944); *Milliken* v. *Bradley*, 418 U. S. 717 (1974); *McCleskey* v. *Kemp*, 481 U. S. 279 (1987); *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701 (2007); *Shelby County* v. *Holder*, 570 U. S. 529 (2013); *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181 (2023) (SFFA); *Louisiana* v. *Callais*, 608 U. S. ___ (2026).

[2] E. Foner, Reconstruction: America's Unfinished Revolution 1863–1877, pp. 257–258 (1988) (emphasis added).

JACKSON, J., concurring

Amendment.[3]  First in the North (as States abolished slavery), and then in the South (after Emancipation and the Union's victory in the Civil War), Black people who were generally not permitted at the polls or in the halls of power mobilized nevertheless to advance the universalist vision of belonging and citizenship that eventually won the day.

The odds were long and the stakes were high.  Indeed, around the time they gained their freedom, former slaves faced a crisis similar in relevant respects to the American immigrant experience.  With little in terms of possessions and even less in terms of opportunities to make a living for themselves and their families, freed Blacks were not ushered warmly into the broader community (with apologies or compensation), set up for success, or even given the rights and privileges others enjoyed.  Though they'd tilled the soil for centuries and had labored to build every building, once freed, they were basically treated as "strangers" in a not-so-strange land.[4]

This was not for lack of trying to survive and belong on the freedmen's part.  They constructed churches, schools, and mutual-aid societies—safe zones amidst America's racialized social and economic order.[5]  Outside those enclaves, however, freed Blacks were characterized as unassimilable and incapable of full civic participation.[6]

_____

[3] Cf. *Wolford* v. *Lopez*, 609 U. S. \_\_\_, \_\_\_, n. 15 (2026) (JACKSON, J., dissenting) (slip op., at 28, n. 15) (explaining the importance of ensuring that Black experiences and perspectives "are not (here again) excluded from" our analysis of the relevant history).

[4] *African Methodist Episcopal Church* v. *City of New Orleans*, 15 La. Ann. 441, 443 (1860); see also *ante,* at 6–7 (majority opinion) (citing I. Berlin, Slaves Without Masters 136–137 (1974)).  Regarding freedmen in the North prior to the Civil War, see also J. Horton & L. Horton, In Hope of Liberty 125–176 (1997).

[5] *Ibid.*

[6] See D. Nieman, To Set the Law in Motion: The Freedmen's Bureau and the Legal Rights of Blacks, 1865–1868, p. 72 (1979) (Nieman); see also K. Stampp, The Era of Reconstruction 1865-1877, p. 12 (1965)

4                              TRUMP *v.* BARBARA

JACKSON, J., concurring

Their humanity was disregarded.[7]   Serious doubts about
their claims to citizenship were also being sown.[8]   The
reason was clear: "[A]n integrated, race-blind society under
the rubric of 'all men are created equal'—required a societal
commitment to" antisubordination principles and practices,
*i.e.*, "a well-resourced effort to undo the damage done to
black people by slavery."[9]   But "even the most ardent
opponents of slavery recoiled" from that prospect.[10]

   One solution that gained traction in the early 1800s was
to physically separate the freedmen and other Black people
from the general polity.   Antislavery Northerners and pro-
slavery Southerners found common cause in the idea that
freed Blacks would surely "be happiest in a black-led repub-
lic, beyond the contempt of and competition with white

--------

(Stampp) ("In the nineteenth century most white Americans, North and
South, had reservations about the Negro's potentialities—doubted that
he had the innate intellectual capacity and moral fiber of the white man
and assumed that after emancipation he would be relegated to an infe-
rior caste").

   [7] See I. Wilkerson, Caste: The Origins of Our Discontents 153 (2020)
(Wilkerson) ("The crimes of homicide, of rape, and of assault and battery
were felonies in the slavery era as they are today . . . [b]ut the country
allowed most any atrocity to be inflicted on the black body"); see also,
*e.g.*, *id.*, at 147–148 (describing Alabama surgeon James Marion Sims,
widely known as "the founding father of gynecology," who pioneered pro-
cedures by operating on Black female slaves without anesthesia; Sims
said the surgery was "'not painful enough to justify the trouble'"); see
generally D. Smith, Less Than Human: Why We Demean, Enslave, and
Exterminate Others 119 (2012) ("The dehumanization of African Ameri-
cans did not end with the creation of the new nation in 1776, or with the
abolition of slavery in 1865.   Books and pamphlets published during the
latter part of the nineteenth and early twentieth centuries continued to
assert that they were beasts").

   [8] See O. Power-Greene, Against Wind and Tide: The African-American
Struggle Against the Colonization Movement 15–16 (2014).

   [9] See N. Guyatt, Bind Us Apart: How Enlightened Americans Invented
Racial Segregation 247 (2016) (Guyatt).

   [10] *Ibid.*

JACKSON, J., concurring

Americans."[11]  This vision of "paternal caste" prompted the creation of the American Colonization Society, which established the colony of Liberia and pushed for freed Blacks to relocate there voluntarily.[12]  Once freed Blacks were out of sight, they would (thankfully) be out of mind, eliminating any need for a racial reckoning in America.

Meanwhile, many States pushed the envelope, passing "Black Laws" (in the pre-War North) and "Black Codes" (in the post-War South), intending to make it difficult for freed Blacks to live and work there.[13]  Violence, too, played a significant role in the isolation effort.  Those who opposed abolition banded together with those who resented the extra competition in the job market to form marauding mobs,

———————

[11] M. Jones, Birthright Citizens: A History of Race and Rights in Antebellum America 37–38 (2018) (Jones); see also Guyatt 268–269.

By the middle of the century, colonization was so popular that it found favor with leading abolitionists, including President Abraham Lincoln. During an August 1862 meeting at the White House between Lincoln and a "committee of free Negroes," Lincoln described a fund Congress had created "for the purpose of 'colonizing people of African descent,' a cause he had long favored."  C. Sandburg, Abraham Lincoln: The Prairie Years and the War Years 316 (1954).  The problem, as Lincoln described it to his visitors, was that "'[y]our race suffers very greatly, many of them, by living among us, while ours suffers from your presence.'"  *Ibid.* He continued: "'Your race are suffering, in my judgment, the greatest wrong inflicted on any people.  But even when you cease to be slaves, you are yet far removed from being placed on an equality with the white race.'"  *Ibid.*  Colonization would allow free Blacks to thrive, without forcing Whites to accommodate their demands for equal treatment and legal protection.  Interestingly, Lincoln held a universalist view of citizenship despite his support for the colonization movement. See *infra*, at 10–11.

[12] Jones 37; see also E. Foner, The Second Founding: How the Civil War and Reconstruction Remade the Constitution 12 (2019) (Foner, The Second Founding); Guyatt 267, 271–272.

[13] For Black Laws, see, *e.g.*, K. Masur, Until Justice Be Done 16–18, 230–231 (2021) (Masur); Foner, The Second Founding 13.  For Black Codes, see, *e.g.*, *id.*, 47–49; Nieman 72–76; Masur 309–310; *Wolford*, 609 U. S., at \_\_\_–\_\_\_ (slip op., at 26–32) (JACKSON, J., dissenting) (discussing Black Codes).

6                          TRUMP *v.* BARBARA

ransacking Black neighborhoods, homes, and stores.[14]  And local law enforcement?  They did little to help.  Before Emancipation, per the federal Fugitive Slave Act, state officers pursued and arrested Blacks suspected of having escaped slavery.  Afterwards, the cavalry looked the other way when Black neighborhoods were terrorized by vigilante violence.[15]  The Ku Klux Klan would form, and then flourish, starting in 1866.[16]

--------

[14] See D. Blight, Frederick Douglass: Prophet of Freedom 473 (2018) (Blight); Jones 95, 105; K. Lewis, A Curse Upon the Nation: Race, Freedom, and Extermination in America and the Atlantic World 176, 182–183 (2017).  Frederick Douglass's first-hand account from the Baltimore of 1834 provides insight into White resentment over freed Blacks' entry into the labor market:

"The circumstance which led to [my being fired] was the committing of an outrage upon me, by the white apprentices of the ship-yard.  The fight was a desperate one, and I came out of it shockingly mangled.  I was cut and bruised in sundry places, and my left eye was nearly knocked out of its socket.  The facts which led to this brutal outrage upon me illustrate a phase of slavery which was destined to become an important element in the overthrow of the slave system, and I may therefore state them with some minuteness.  That phase was this—the conflict of slavery with the interests of white mechanics and laborers.  In the country this conflict was not so apparent; but in cities, such as Baltimore, Richmond, New Orleans, Mobile, etc., it was seen pretty clearly.  The slaveholders, with a craftiness peculiar to themselves, by encouraging the enmity of the poor laboring white man against the blacks, succeeded in making the said white man almost as much a slave as the black slave himself."  F. Douglass, Life and Times of Frederick Douglass 223–224 (1892).

[15] See Masur 234–235.  The violence, of course, continued after the War and during Reconstruction.  The Colfax, Louisiana, massacre of 1873, for example, was "[t]he bloodiest single instance of racial carnage in the Reconstruction era."  Foner, Reconstruction, at 437.  Two hundred and eighty Black people were ruthlessly slaughtered on Easter Sunday.  "[T]he Colfax massacre taught many lessons, including the lengths to which some opponents of Reconstruction would go to regain their accustomed authority."  *Ibid.*

[16] Foner, Reconstruction, at 342, 428–429; see also *id.*, at 430 ("[T]he Klan aimed to regulate blacks' 'station in society'").

JACKSON, J., concurring

Still, most freed Blacks resisted the pressure to self-deport.[17]  Instead, many started organizing toward the creation of the kind of Nation the colonizationists opposed—one that guaranteed liberty and justice for all.  In the decades leading up to the ratification of the Fourteenth Amendment, Black Americans organized and gathered at more than 600 local and national conventions across the country.[18]  There, delegates erected the political and intellectual scaffolding for the Fourteenth Amendment and, later, for the Black Civil Rights Movement more generally.[19]

Critically for present purposes, these visionaries already understood themselves to be American citizens.  "The refrains 'we are Americans' and 'we are citizens' echoed in conferences throughout the North."[20]  Moreover, "[b]irthright figured importantly" as "delegates frequently characterized their status as that of native-born citizens."[21]  The

_____

[17] See generally Brief for Historians Martha S. Jones et al. as *Amici Curiae* 11–16.

[18] See Colored Conventions Project, Conventions Records (Feb. 12, 2025), https://www.coloredconventions.org/about-records/ (archived at https://perma.cc/3ZD2-3WHS) (collecting "minutes, proceedings, newspaper articles, speeches, letters, transcripts, and images"); see also M. Sinha, The Rise and Fall of the Second American Republic: Reconstruction, 1860–1920, p. 158 (2024); J. Fox, The Constitution of Black Abolitionism: Reframing the Second Founding, 23 U. Pa. J. Const. L. 267, 272–334 (2021).

[19] See E. Ball, Performing Politics, Creating Community: Antebellum Black Conventions as Political Rituals in The Colored Conventions Movement: Black Organizing in the Nineteenth Century (P. Foreman, J. Casey & S. Patterson eds., 2021), pp. 155–157.

[20] Jones 63; see also Address of the Colored National Convention to the People of the United States, in Proceedings of the Colored National Convention, Held in Rochester, July 6th, 7th, and 8th, 1853, p. 8 ("We address you not as aliens nor as exiles, humbly asking to be permitted to dwell among you in peace; but we address you as American citizens asserting their rights on their own native soil").

[21] Jones 63; see also Proceedings of the National Convention of Colored Men, Held in the City of Syracuse, N. Y., Oct. 4, 5, 6, and 7, 1864, p. 42

delegates argued that, as such, they had the requisite allegiance, so, at a minimum, the Federal Government owed them the duty of protection.[22]

The famed orator Frederick Douglass was one of these delegates. Capturing the spirit of the moment, Douglass proclaimed that Chief Justice Taney—the author of the majority opinion in *Dred Scott* v. *Sandford*, 19 How. 393 (1857)—"[could] do many things, but he [could not] . . . change the essential nature of things."[23] In the absence of the artificial evils of slavery and racial subordination, Douglass explained, "the glorious birthright of our common humanity, will become the inheritance of all the inhabitants of this highly favored country."[24]

Do note this: The citizenship thesis of the Colored Conventions was thus not that some *new* status should be created and conferred on freed Blacks. It was instead that

––––––––––

(Syracuse Convention) ("[H]ere were we born, for this country our fathers and brothers have fought, and here we hope to remain in full enjoyment of enfranchised manhood, and its dignities").

[22] This was, of course, an invocation of the principle of "*jus soli*," see *ante,* at 4, which was well-known and widely accepted during this historical period. Delegates at the Colored Conventions drew upon its twin duties—allegiance owed and protection given—to demand not only that their rights as humans be honored, but also that "due attention should be given to our needs." Syracuse Convention 42. The delegates pointedly observed that "[t]he laws which have made white men great, have degraded us, because we were colored, and because we were reduced to chattel slavery." Proceedings of the Colored People's Convention of the State of South Carolina, Held in Zion Church, Charleston, Nov. 1865, p. 23 (S. C. Convention). So, they argued, in slavery's wake, the law needed to make things right: It had to provide "[e]quality—expressed in such language as equal liberty, equal justice, equal rights, and equal citizenship." Foner, The Second Founding, at 13; see also *id*., at 94 ("We claim exactly the same rights, privileges, and immunities as are enjoyed by white men—we ask nothing more, and will be content with nothing less" (quoting The Colored Mass Convention held in Mobile (1867)).

[23] Speech on the Dred Scott Decision (May 1857), in Two Speeches by Frederick Douglass (1857) pp. 27–30, 31, 32–46.

[24] *Id*., at 46.

JACKSON, J., concurring

freed Blacks already had a rightful claim to citizenship *because they had been born on American soil.*  After all, the Nation, from its founding, had "boldly proclaim[ed] that all men are born free and equal, and that consequently life, liberty, and the pursuit of happiness, are inherent in every individual, vested inalienably by natural birthright."[25]  No ideal was more inherently American.  Now, "rest[ing their] cause on the republican standard of the revolutionary Fathers," freed Blacks were "knock[ing] at the doors of the constitution and demand[ing] an entrance."[26]  And "[i]f . . . asked what evidence [they] bring to sustain [their] qualifications for citizenship, [they would] offer them certificates of . . . BIRTH and NATIVITY."[27]  Would the Nation live up to its promise?

Such universalist appeals were a conscious choice.  Yes, Black Americans had suffered a singular wrong.  And yes, they had "'fought and bled'" for the Union, paying a steep price for their freedom.[28]  But the delegates did not rest on these laurels.  Rather, they drew upon the moral and political force of the universal principles that were already core to the Nation's identity.

That bears repeating: Freed Blacks did not advocate for a unique set of rules that catered only to their situation.  Nor did they seek to advance their own position relative to, or at the expense and exclusion of, other marginalized groups.  Instead, those whose gatherings helped galvanize

––––––––––––

[25] Minutes of the State Convention of the Colored Citizens of the State of Michigan, Held in Detroit (Oct. 26–27, 1843), in 1 The Proceedings of the Black State Conventions, 1840–1865 (P. Foner & G. Walker eds., 1979), p. 192; see also Foner, The Second Founding, at 94 ("The former slaves . . . self-consciously viewed themselves as individuals 'newly invested with all the rights of an American citizen.'").

[26] Minutes of the State Convention of the Coloured Citizens of Pennsylvania, Convened at Harrisburg (Dec. 13–14, 1848), p. 20.

[27] *Ibid*.

[28] *Post*, at 1 (THOMAS, J., dissenting) (quoting 2 Life and Writings of Frederick Douglass 256 (P. Foner ed. 1950)).

10                          TRUMP *v.* BARBARA

the push for full equality understood that "[a] diverse origin does not disprove a common nature, nor does it disprove a united destiny."[29]  The firmest foundation for freedom would require an anticaste reset—"both for his sake and for ours"[30]—and would benefit all.

During his U. S. Senate candidacy, Abraham Lincoln developed a similar vision.  In the lead-up to the now-famous Lincoln-Douglas debates, Lincoln explained that the promise of liberty and equality in the Declaration of Independence "was held sacred by all, and thought to include all."[31] Lincoln expressly and intentionally linked the fate of Black Americans and immigrant groups ("among us perhaps half our people who are not descendants at all" of the Founders), and noted that the Nation's future hinged on a universal definition of citizenship that excluded neither.[32]  He explained that the Declaration's promise that "all men are created equal" was the "electric cord . . . that links the hearts of patriotic and liberty-loving men together," regardless of race or descent.[33]

The case was made.  First, there was war.  And then, the delegates' (and Lincoln's) universalist view of citizenship made its mark on the Constitution.

––––––––––

[29] F. Douglass, The Claims of the Negro Ethnologically Considered: An Address, Before the Literary Societies of Western Reserve College, July 12, 1854, p. 34.

[30] F. Douglass, Composite Nation, Delivered in the Parker Fraternity Course, Boston, 1867, p. 21 (1867); see also *ibid.* ("I want a home here not only for the negro, the mulatto and the Latin races, but I want the Asiatic to find a home here in the United States, and feel at home here. . . . Right wrongs no man").

[31] Abraham Lincoln, Speech at Springfield, Illinois (June 26, 1857), in 2 Collected Works of Abraham Lincoln, p. 404 (1953).

[32] Abraham Lincoln, Speech at Chicago, Illinois (July 10, 1858), in 2 *id.*, at 499 (1953).

[33] *Id.*, at 500.

B

The Civil Rights Act of 1866—the predecessor to the Citizenship Clause, see *ante,* at 8–9—was initially drafted as a spot treatment. Senator Lyman Trumbull's first proposal homed in on the freedmen and provided merely that "all persons of African descent born in the United States are hereby declared to be citizens of the United States."[34]  If *that* language had prevailed, the view JUSTICE THOMAS asserts today might be well founded. See *post*, at 4–5 (finding birthright citizenship's "feudal" origins inconsistent with Congress's focus on "secur[ing] equal rights for the freed blacks").

But Senator Trumbull changed his mind. The day after he submitted that first proposal, he requested to "withdraw [the original] and . . . offer another in lieu of it to the same purport, changing the phraseology."[35]

Consistent with the views espoused by activists, Trumbull's new proposal adopted a distinctly universalist register: "All persons born in the United States, and not subject to any foreign power, are hereby declared to be citizens of the United States, without any distinction of color."[36]  This is the language Congress would eventually enact as part of the Civil Rights Act of 1866. And the Civil Rights Act of 1866 would go on to become the basis for the Fourteenth Amendment's Citizenship Clause.

Senator Trumbull's progression from specific to universal was more than mere word choice. In the face of the virulent anti-immigrant—and, in particular, the anti-Chinese and the anti-Romani—sentiment of that era, language targeting just freed former slaves would have been the path of least (or less) resistance. But Senator Trumbull, along with those colleagues who took up the same mantle during the

---

[34] Cong. Globe, 39th Cong., 1st Sess. 474 (1866).

[35] *Id*., at 498.

[36] *Ibid*.

JACKSON, J., concurring

ratification debates, expressly rejected that narrow framing.

Do not miss this context. Throughout the mid-19th century, Chinese immigrants to America were often portrayed as "'coolies,'" a racist slur implying indentured servitude and allegiance to a Chinese master.[37] Some Members of Congress brought that sentiment to the Civil Rights Act's citizenship-related debates. Notably focusing his attention beyond freed former slaves, Senator Edgar Cowan, for example, argued that German immigrants' children born in Pennsylvania should be citizens, but Chinese immigrants' children should not—because Germans and Chinese were different.[38] In response, Senator Trumbull emphasized that the law he had drafted drew no such distinctions.[39]

Undeterred, Senator Cowan would warn again—this time during debates on the Fourteenth Amendment—that the Citizenship Clause would let Chinese immigrants "overrun" California and "double or treble the population" of that State.[40] Senator John Conness of California, where anti-Chinese sentiment was arguably most pronounced, responded that "the children begotten of Chinese parents in

---

[37] J. Shugerman, An Originalist Case for Birthright Citizenship 77 U. C. L. J. (forthcoming 2026) (draft, at 3). When anti-Chinese sentiment reached a fever pitch decades later, Congress enacted the Chinese Exclusion Act and prohibited all Chinese immigration. See *id.*, at 26. Justice Harlan's dissent in *Plessy* v. *Ferguson*—the "most celebrated Fourteenth Amendment opinion" according the principal dissent, see *post,* at 37—did not rise above such prejudice. Justice Harlan described Chinese immigrants as a "race so different from our own that we do not permit those belonging to it to become citizens of the United States" and instead deem them "absolutely excluded from our country." 163 U. S., at 561 (dissenting opinion). Justice Harlan thus drove a wedge between Black Americans and other non-Black minorities.

[38] Cong. Globe, 39th Cong., 1st Sess., at 498 ("The children of German parents are citizens; but Germans are not Chinese").

[39] *Ibid.*; see also *ante,* at 9.

[40] Cong. Globe, 39th Cong., 1st Sess., at 2891.

JACKSON, J., concurring

California . . . shall be citizens."[41]  In fact, he said, the Civil Rights Act had already declared "that the children of all parentage whatever . . . should be regarded and treated as citizens of the United States."[42]  No Senator rose to agree with Senator Cowan or dispute what Senator Conness had said.[43]  And no Senator said what the principal dissent says today: that the text at issue conferred citizenship only on freed Blacks and those in analogous situations.[44]

The debates went similarly with respect to the Roma people, who were referred to at the time as "gypsies."[45]  When asked whether native-born Romani children would be birthright citizens of the United States under the proposed Civil Rights Act, Senator Trumbull replied: "Undoubtedly."[46]  President Andrew Johnson apparently agreed.  In his message vetoing the Act, Johnson noted with disapproval that, under the law, "the Chinese of the Pacific States, Indians subject to taxation, the people called gypsies, as well as the

———————

[41] *Ibid.*

[42] *Ibid.*

[43] See *id.*, at 2891–2897.

[44] See Shugerman, 77 U. C. L. J. (draft, at 26).  In response to this history, the principal dissent notes that Francis Wharton, a late-1800s legal scholar and State Department official, posited that because foreigners " 'born in the United States' of 'parents not being here domiciled' " are not subject to the jurisdiction of the United States, Chinese children born in this country " 'are not citizens.' "  *Post*, at 39 (quoting Conflict of Laws 41 (2d ed. 1881)).  But JUSTICE THOMAS leaves out the motivation behind Wharton's contention: not the Constitution, but that the Chinese were insufficiently "civiliz[ed]" and that "[t]o admit such rights to an emigrating nation, would be not merely to establish a foreign sovereign, but a foreign barbarism, within our national domain."  Conflict of Laws 26 (1872).

[45] William Blackstone called the Roma people "Egyptians" and branded them "outlandish."  See 4 Commentaries on the Laws of England 165 (1770).  (He did not exclude them from the common-law rule of birthright citizenship, however.  See *id.*, at 166.)  The proper term for this group today is "Romani" or the "Roma people."  See Brief for Gerard N. Magliocca as *Amicus Curiae* 1, n. 2.

[46] Cong. Globe, 39th Cong., 1st Sess., at 498.

14                           TRUMP *v.* BARBARA

entire race designated as blacks," would be birthright citizens.[47]  Without making any changes to the bill or responding that Johnson was mistaken in his understanding of it (or otherwise capitulating to Johnson's views in any respect), Congress overrode that presidential veto.[48]

During the ratification debates, Senator Cowan took aim at the Roma people too, characterizing them as undeserving of birthright citizenship because they "wander[ed] in gangs," "infest[ed] society," and "impos[ed] upon the simple and weak everywhere."[49]  And again, Senator Conness dismissed Senator Cowan's prejudices: "The only invasion of Pennsylvania within my recollection was an invasion very much worse and more disastrous to the State, and more to be feared and more feared, than that of Gypsies.  It was an invasion of rebels [at Gettysburg]."[50]

When ratified, the Citizenship Clause thus vindicated the universalist vision of the delegates at the Colored Conventions and their allies in Congress.  Far from the principal dissent's representations, freed Blacks did not receive citizenship as a reward for their military service or for having, through no choice of their own, "no other homeland [and] no allegiance to any foreign power."  *Post,* at 1.  Instead, the Amendment recognized their rightful claim to birthright citizenship simply and solely by virtue of their having been born on American soil.  John Bingham—one of the Amendment's principal architects—said this clearly:  The "rights

———————

[47] A. Johnson, Veto Message (Mar. 27, 1866), in 6 Compilation of the Messages and Papers of the Presidents 405 (J. Richardson, ed. 1897); see Foner, Reconstruction, at 247–248.

[48] E. Maltz, Civil Rights, the Constitution, and Congress, 1863–1869, p. 70 (1990).

[49] Cong. Globe., 39th Cong., 1st Sess., at 2891.

[50] *Id*., at 2892.

JACKSON, J., concurring

of citizenship" are universal because they are the "sacred rights of person[hood]."[51]

With this recognition, the U. S. Constitution finally got an anticaste engine. And with it, the Nation gained a new font of legitimacy and vitality.

## II

Fast forward 150 years, to 2026. Section One of the Fourteenth Amendment still contains that same universalist language, consistent with its origins and the ratifiers' intent. So, respondents say, our Constitution confers citizenship upon almost anyone and everyone who is born on American soil—to include the children of immigrants and temporary sojourners not domiciled in the United States— just as it did at the time of the Fourteenth Amendment's ratification.[52]

But the Government's view (which the principal dissent adopts) rejects this. Its argument focuses on the fact that the Citizenship Clause had a particular purpose: to reverse *Dred Scott*'s holding that Black Americans were not entitled to citizenship. See Brief for Petitioners 13–14; *post,* at 1–2. The reasoning is, in essence, that the Fourteenth Amendment recognized freed Blacks as citizens because they had "'fought and bled'" in the Civil War, "had no other homeland, owed no allegiance to any foreign power, and were subject to no other authority." *Post*, at 1; see also Brief for Petitioners 16–18. Thus, the argument goes, the

─────────

[51] *Id.*, at 1090. Bingham "believed the liberation of the slaves had forced the United States to federalize the Bill of Rights and apply it to all Americans." Blight 479.

[52] Brief for Respondents 7–23. At this point, the "almost" caveat pertains mainly to "the 'children of ambassadors' and other representatives of foreign sovereigns." *Ante*, at 15 (quoting *United States* v. *Wong Kim Ark*, 169 U. S. 649, 675 (1898)). Congress addressed the founding-era exclusion of "those born in the 'alien nations' of Indian tribes," *ante*, at 15 (quoting *Wong Kim Ark*, 169 U. S., at 681), in 1924, with its enactment of the Indian Citizenship Act, ch. 233, 43 Stat. 253.

16 TRUMP *v.* BARBARA

JACKSON, J., concurring

Amendment's guarantees are for only Black Americans and those who fit their fought-and-bled-for-country, no-other-homeland, domiciled mold. *Post*, at 1–3, 90.

That contention is ahistorical for the reasons laid out in Part I, *supra*, and those explained in the Court's opinion. In my view, it is also difficult to square with the notion of a "color-blind" Constitution, which has loomed large in the Court's Fourteenth Amendment jurisprudence.[53] The Court's conception of a color-blind Constitution and the Government's (and principal dissent's) cramped, group-specific reading of the Citizenship Clause are two sides of the same coin, stemming from a basic misunderstanding of the

———————

[53] See *Allen* v. *Milligan*, 608 U. S. ___, ___, ___ (2026) (*per curiam*) (slip op., at 1, 3) (concluding, in light of "our colorblind Constitution," that it is likely unconstitutional for States to be ordered to draw maps that provide fair electoral opportunities for Black Americans, no matter the race-conscious, remedial origin of the Fourteenth Amendment that made the Voting Rights Act possible); *SFFA*, 600 U. S., at 213 (declaring that race-conscious university admissions programs that promote diversity violate the Fourteenth Amendment); see also *Parents Involved*, 551 U. S., at 747–748 (plurality opinion) (rejecting efforts to defend race-conscious public-school placements against claims of unconstitutional discrimination brought by White students).

There are myriad ways in which the Court's adherence to color-blindness is mistaken, some of which I have addressed in other opinions. See *SFFA*, 600 U. S., at 385 (JACKSON, J., dissenting); see also, *e.g.*, *id.*, at 206, 208 (majority opinion) (conflating "[e]liminating racial discrimination" with eliminating all "[d]istinctions between citizens solely because of their ancestry" (internal quotation marks omitted)); *Callais*, 608 U. S., at ___ (slip op., at 17–18) (similar); *Parents Involved*, 551 U. S., at 747–748 (declaring that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race," including by ceasing any race-conscious action designed to remediate the consequences of deeply entrenched housing segregation). My concern now is that a fleeting nature is among its many flaws. One wonders how the outcomes in the above cases might have differed had the Court, like the Government and the principal dissent today, relied upon the fact that the Fourteenth Amendment was enacted to ensure that Black Americans are not treated as second-class citizens, or had it at least acknowledged the connection between the Amendment's historical context and its remedial purpose.

relevant history. As I have shown in this opinion, the Fourteenth Amendment is *not* color-blind; rather, its core principle is that our Nation does not tolerate racial caste—*i.e.*, the systemic subordination that many (even some who opposed slavery) had wished to perpetuate after the Civil War.[54] So, the architects of the Second Founding did not think or pretend that race didn't matter. Quite to the contrary, they understood that race made an enormous difference to the lived experiences of all concerned—and to the fate of our union. Indeed, it is for that very reason that a radical restructuring was required.[55] The Citizenship Clause applies universally precisely because such universal application was necessary to achieve the Amendment's own race-conscious remedial purposes.

Putting a finer point on this: When colonizationists objected to changing their norms to accommodate the equal citizenship and rights of freedmen, freed Blacks and their allies organized to push for a Constitution that would bring their own antisubordination vision to fruition. See *supra*, 7–10. That kind of ambitious transformation—nothing less than the remaking of the soul of a Nation beset by rank, entrenched race-based prejudice and inequity—did not come for free, or purely by the say-so of those who claimed to be "color-blind." It required heavy lifting, a fundamental shift—the very thing for which the Fourteenth Amendment

---

[54] "A caste system is an artificial construction, a fixed and embedded ranking of human value that sets the presumed supremacy of one group against the presumed inferiority of other groups on the basis of ancestry and often immutable traits, traits that would be neutral in the abstract but are ascribed life-and-death meaning in a hierarchy favoring the dominant caste whose forebears designed it. . . . [T]hroughout human history, across time and space, [at least] three caste systems have stood out to this day. The tragically accelerated, chilling, and officially vanquished caste system of Nazi Germany. The lingering, millennia-long caste system of India. And the shape-shifting, unspoken, race-based caste pyramid in the United States." Wilkerson 17.

[55] Stampp 12.

18                            TRUMP *v.* BARBARA

stands: a repudiation of the notion that there is a "superior, dominant, ruling class of citizens," *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting), and a willingness to see, and strive to eliminate, all remaining vestiges of historical subjugation.

So the principal dissent is wrong to complain that the Court "has repurposed the Fourteenth Amendment to protect . . . rights that the Reconstruction Congress never contemplated." See *post*, at 91. Delegates to the Colored Conventions drew upon their own experiences to successfully argue for a new Constitution—one that protected fundamental human rights, including an individual's "'right to own his body and mind'" and "the right of personal security and protection against injuries to our bodies or good name."[56] Thus, even in cases where the protagonist was not a Black American, this Court's Fourteenth Amendment cases have focused, at bottom, on the same universal liberty and equality interests that motivated the Fourteenth Amendment itself. The question is (and always has been): Does the affected individual or group enjoy equal dignity? And the correct answer is (and has always been) to heed the Fourteenth Amendment's universalist, antisubordination command. Our Nation did not undergo something as profound and world-shifting as "Reconstruction" for naught.

*        *        *

After the Civil War, Fredrick Douglass frequently reflected on the events of the time through the lens of biblical stories. In one speech, Douglass described how God leveled Sodom and Gomorrah on account of sin, and how, in the aftermath, Abraham stood atop a nearby mountain to survey what remained. "[T]he orator used the image of Abraham

---

[56] S. C. Convention 27; see also *ibid.* (asserting that "our bodies have been outraged with impunity"); Syracuse Convention 41 ("As a people, we have been denied ownership of our bodies, our wives, homes, children, and the products of our own labor").

JACKSON, J., concurring

looking down upon the destroyed landscape to demand that Americans look down upon their own recent self-destruction, and all but unjustified survival, and *remember*."[57] Douglass declared that his own aim was to "'show that nations should have memories.'"[58]

In the time since Douglass's prescient observation, Americans have come to learn that fading memories are not the only danger. The distortion of historical facts—retellings that reimagine and repurpose past events to lend credence to misbegotten aims—may be an even greater threat.

Yet here we are. The Government, the principal dissent, and a handful of revisionist commentators now vigorously promote an interpretation of the Citizenship Clause that diverges sharply not only from what the text says, but also from the historical record as interpreted by the keepers of "the call of remembrance" (trained historians).[59] What is more, this alternative account pitches Black Americans against immigrants when the advocates who promoted the Fourteenth Amendment did no such thing. Freed Blacks fought for the shared humanity of *all* people. And the Great Emancipator eventually foresaw that the only path forward that could prevent a return—in any form—to slavery and race-based subordination was to link the fates of all.

———————

[57] Blight 482.

[58] *Ibid.*

[59] *Ibid.*; see Brief for Historians Martha S. Jones et al. as *Amici Curiae*; Brief for Race Law Scholars as *Amici Curiae* 4–12; Brief for Originalist Scholars Evan D. Bernick et al. as *Amici Curiae*; Brief for Gerard N. Magliocca as *Amicus Curiae* 4–7. A substantial amount of scholarly work has been done to unearth historical truths about the facts and circumstances that gave rise to the Reconstruction Amendments. In addition to the sources I have cited throughout this opinion, see, for example, D. Faust, This Republic of Suffering: Death and the American Civil War (2008); E. Mathisen, The Loyal Republic: Traitors, Slaves, and the Remaking of Citizenship in Civil War America (2018); K. Stampp, America in 1857: A Nation on the Brink (1990).

20                    TRUMP *v.* BARBARA

JACKSON, J., concurring

Ultimately, then, it is the Government and JUSTICE THOMAS who have "repurposed the Fourteenth Amendment." *Post,* at 91. By ignoring that our Constitution stands firmly against caste and subjugation—on all axes and in all manners—they deny the clear, universalist vision shared and proclaimed by the Fourteenth Amendment's Framers: to "rebuild a shattered empire . . . to plant deep and solid the corner-stone of eternal justice, and to erect thereon a superstructure of perfect equality of every human being before the law."[60]

Of course, the ultimate irony is that for all the talk about the detestable *Dred Scott* decision, the Government and the principal dissent propose a return to its core tenet. Their bottom line is that, for certain people, being born on American soil will not suffice to confer citizenship. It is that odious conclusion that the Citizenship Clause plainly rejects, as the Court explains. *Ante,* at 26. I add only that the Fourteenth Amendment's universalist aims should forever be the death knell for this kind of claim—one that seeks to make bloodline the marker of birthright. The America that was reborn from the rubble of the Civil War simply does not countenance that inequitable result. Thankfully, a majority of the Court *remembered* this today, and has dutifully preserved the most basic animating principle of our Nation's founding—that all human beings are created equal—once more.

---

[60] Address by Congressman Thaddeus Stevens, Bedford, Pa., Sept. 4, 1866, in Cincinnati Commercial, Sept. 11, 1866, p. 2, col. 1.

Opinion of KAVANAUGH, J.

# SUPREME COURT OF THE UNITED STATES

No. 25–365

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* BARBARA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 30, 2026]

JUSTICE KAVANAUGH, concurring in the judgment and dissenting in part.

Executive Order No. 14160 establishes new exceptions to birthright citizenship for children born to foreign citizens unlawfully or temporarily in the country. 90 Fed. Reg. 8449 (2025). The Court today holds that the Order violates the Fourteenth Amendment to the Constitution. I respectfully disagree with the Court's constitutional holding. In my view, the Executive Order does not violate the Fourteenth Amendment. But the Order does contravene a federal statute, 8 U. S. C. §1401(a). Congress could—consistent with the Fourteenth Amendment—amend §1401(a) or otherwise enact new legislation establishing exceptions to birthright citizenship for children born to foreign citizens unlawfully or temporarily in the country. But Congress has not yet done so.

I

I first consider plaintiffs' statutory argument. The statutory analysis is straightforward, and the Court could have (and in my respectful view, should have) decided the case on that narrow ground.

Initially enacted in 1940, §1401(a) of Title 8 provides that persons "born in the United States, and subject to the jurisdiction thereof" "shall be nationals and citizens of the

2                       TRUMP *v.* BARBARA

Opinion of KAVANAUGH, J.

United States at birth."  Nationality Act of 1940, §201(a),
54 Stat. 1138; Immigration and Nationality Act of 1952,
§301(a), 66 Stat. 235.  That statutory language mirrors the
text of §1 of the Fourteenth Amendment, which was ratified
in 1868 and similarly provides:  "All persons born . . . in the
United States, and subject to the jurisdiction thereof, are
citizens of the United States."

   This Court's 1898 *Wong Kim Ark* decision interpreted the
"subject to the jurisdiction" language of the Fourteenth
Amendment.  *United States* v. *Wong Kim Ark*, 169 U. S.
649.  That decision adopted a general rule of birthright
citizenship for those born in the United States—with four
disparate exceptions for "children of foreign sovereigns or
their ministers, or born on foreign public ships, or of
enemies within and during a hostile occupation of part of
our territory" and "children of members of the Indian
tribes."  *Id.*, at 693; see also *Elk* v. *Wilkins*, 112 U. S. 94,
102 (1884).  Importantly, the *Wong Kim Ark* decision
treated those four exceptions as a closed set for
constitutional purposes, meaning that Congress could not
create other exceptions to birthright citizenship, although
Congress could eliminate one or more of those four
exceptions.  See 169 U. S., at 682, 693.

   In 1940 and 1952, Congress employed the exact language
from the Fourteenth Amendment—"subject to the
jurisdiction thereof"—in comprehensive new immigration
and naturalization laws that provided for birthright
citizenship.  54 Stat. 1138; 66 Stat. 235.  The relevant
provisions are now codified at 8 U. S. C. §1401(a).

   Because §1401(a) uses the same language as the
Fourteenth Amendment, the statute has long been
interpreted to adopt *Wong Kim Ark*'s general rule of
birthright citizenship, subject to the exceptions identified
in that case.  If Congress in 1940 or 1952 wanted to create
new exceptions—and thereby test *Wong Kim Ark*'s
statement treating the four exceptions as a closed set—

Opinion of KAVANAUGH, J.

Congress presumably would not have repeated the precise language that this Court had interpreted in *Wong Kim Ark* to contain only those four exceptions. Stated more doctrinally, Congress "must be considered to have adopted also the construction given by this Court to such language, and made it a part of the enactment." *Shapiro* v. *United States*, 335 U. S. 1, 16 (1948) (quotation marks omitted); see *George* v. *McDonough*, 596 U. S. 740, 752 (2022); *Sekhar* v. *United States*, 570 U. S. 729, 733 (2013); *Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries*, 512 U. S. 267, 275 (1994); *United States* v. *Kozminski*, 487 U. S. 931, 945 (1988); *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978).[1]

Importantly, moreover, from the time of those statutory enactments in 1940 and 1952 all the way through 2025, the Executive Branch consistently interpreted §1401(a) to encompass only those *Wong Kim Ark* exceptions to birthright citizenship. (The Government here does not contest that historical point.) That long and consistent Executive Branch interpretation further indicates that §1401(a) incorporates only those exceptions. See *Loper Bright Enterprises* v. *Raimondo,* 603 U. S. 369, 394 (2024) ("interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning").

In 2025, however, Executive Order No. 14160 sought to add two new exceptions to birthright citizenship for children born to foreign citizens who are either illegally or temporarily in the United States. In doing so, the Executive Order goes beyond what §1401(a) authorizes. For the Executive Order to be lawful, therefore, Congress

———————

[1] By the time of the 1940 and 1952 Acts, Congress had granted statutory birthright citizenship for American Indians born in the United States, thereby eliminating the American Indian exception as a matter of statutory law. Ch. 233, 43 Stat. 253.

4                    TRUMP *v.* BARBARA

Opinion of KAVANAUGH, J.

would need to amend §1401(a) or otherwise enact new legislation to encompass those two new exceptions. As of now, Congress has not done so. Over the last 30 years, Congress has considered numerous proposed bills to alter birthright citizenship, but Congress has never actually passed such legislation. See, *e.g.*, Birthright Citizenship Act of 2021, H. R. 140, 117th Cong., 1st Sess.; Citizenship Reform Act of 1997, H. R. 7, 105th Cong., 1st Sess.

Unless and until Congress enacts such legislation, the Executive Order contravenes the federal statute, §1401(a).

II

I next address the Fourteenth Amendment issue. As revealed by the Court's opinion with its detailed account of history and precedent, and by the weighty and thoughtful dissents, the constitutional issue is far more complicated than the statutory issue. After reading those scholarly opinions, one thing seems evident: The constitutional issue is not straightforward, much as we might want it to be.

That is another reason why, in my respectful view, the Court should have decided the case on the narrow and straightforward statutory ground. In any event, because the Court addresses the Constitution, and because I respectfully disagree with its analysis of that highly consequential issue, I too will briefly address it.

Ratified in 1868, the Citizenship Clause of §1 of the Fourteenth Amendment provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

In 1898, as noted above, *Wong Kim Ark* interpreted the Fourteenth Amendment's "subject to the jurisdiction" language to provide a general right of birthright citizenship with four disparate exceptions—for "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation

Opinion of KAVANAUGH, J.

of part of our territory" and "children of members of the Indian tribes." 169 U. S. 649, 693. Importantly, *Wong Kim Ark* indicated that the four exceptions were a closed set, *id*., at 682, 693—meaning that there can be no additional exceptions recognized based on subsequent circumstances or developments. And the decision has consistently been read that way, including by plaintiffs and the Court today.[2]

But *Wong Kim Ark*'s treatment of the exceptions as a "closed set" is incorrect, in my view. Considering the four exceptions as a permanently frozen or closed set as of the Fourteenth Amendment's ratification in 1868—such that there can be no subsequent exceptions recognized based on new developments after 1868—is inconsistent with the Court's longstanding approach to constitutional interpretation in a variety of areas.[3]

To spell that out: The Constitution is an enduring document, and its principles were designed to, and do, apply to modern conditions and developments. The original constitutional principles do not change absent a constitutional amendment, but the relevant principles— both the rules and exceptions alike—must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown or unanticipated by the Constitution's Framers. Stated otherwise, the "meaning of rules is constant. Only their application to new situations presents a novelty." A. Scalia & B. Garner, Reading Law 86 (2012); see also *Heller* v. *District of Columbia*, 670 F. 3d 1244, 1275 (CADC 2011) (Kavanaugh, J., dissenting); A. Scalia, A

—————

[2] At oral argument, plaintiffs repeatedly argued that the exceptions recognized in *Wong Kim Ark* are a "closed set." Tr. of Oral Arg. 81, 85, 112, 114, 116, 122, 124, 128, 129, 134; see also *ante,* at 9, 14–16, 20, 22 (majority opinion).

[3] In my view, to be clear, the result in *Wong Kim Ark* was correct given the facts and circumstances in that case. See *post*, at 27–28 (ALITO, J., dissenting).

6                                    TRUMP *v.* BARBARA

Opinion of KAVANAUGH, J.

Matter of Interpretation 45 (1997) (courts apply "original meaning" to "new and unforeseen phenomena"); Tr. of Oral Arg. 14–16, 115, 121–124, 127–131 (discussing those interpretive principles).

In Fourth Amendment cases, for example, courts apply the reasonableness requirement to searches of cars even though cars did not exist in 1791 or 1868. See, *e.g.*, *Carroll* v. *United States*, 267 U. S. 132 (1925). In First Amendment cases, courts apply free speech protections to the Internet notwithstanding that the Internet did not exist in 1791 or 1868. See, *e.g.*, *Moody* v. *NetChoice LLC*, 603 U. S. 707, 733–734 (2024). In Second Amendment cases, this Court applies the Amendment to semi-automatic handguns even though those did not exist in 1791 or 1868. Cf. *District of Columbia* v. *Heller*, 554 U. S. 570, 628–629 (2008). From the other direction, moreover, this Court recognizes constitutional *exceptions* based on new circumstances when the new exception is relevantly similar to those exceptions that existed in 1791 or 1868. This Court's constitutional precedents do not treat the 1791 or 1868 exceptions as a closed set "trapped in amber." *United States* v. *Rahimi*, 602 U. S. 680, 691 (2024).

So ordinarily, both the relevant constitutional rule *and* the constitutional exceptions (as of 1787, 1791, or 1868, as the case may be) apply to new circumstances. As the Court has said before, "[d]iscerning and developing the law in this way is a commonplace task for any lawyer or judge." *Id.*, at 692 (quotation marks omitted). Indeed, at oral argument in this case, many Members of the Court explored that

Opinion of KAVANAUGH, J.

critical interpretive point at some length with counsel. See Tr. of Oral Arg. 14–16, 115, 121–124, 127–131.[4]

The Citizenship Clause of §1 of the Fourteenth Amendment should be no different. The Court's 1898 decision in *Wong Kim Ark* recognized four exceptions that existed as of the Fourteenth Amendment's ratification in 1868. Therefore, under basic tenets of constitutional interpretation, other exceptions can be recognized when the new exceptions (i) are based on subsequent developments or circumstances that are new, *i.e.*, largely unknown or unanticipated by the Framers of the Fourteenth Amendment, and (ii) are relevantly similar to the four previously recognized *Wong Kim Ark* exceptions. See generally, *e.g.*, *United States* v. *Hemani*, 608 U. S. ___, ___ (2026) (slip op., at 7); *Rahimi*, 602 U. S., at 692; *Moody*, 603

———————

[4] Amid their famous First Amendment debate in *Ollman* v. *Evans*, 750 F. 2d 970 (CADC 1984) (en banc), both Judge Bork and Judge Scalia agreed on that bedrock interpretive point.

Judge Bork: "In a case like this, it is the task of the judge in this generation to discern how the framers' values, defined in the context of the world they knew, apply to the world we know. The world changes in which unchanging values find their application. The fourth amendment was framed by men who did not foresee electronic surveillance. But that does not make it wrong for judges to apply the central value of that amendment to electronic invasions of personal privacy. The commerce power was established by men who did not foresee the scope and intricate interdependence of today's economic activities. But that does not make it wrong for judges to forbid states the power to impose burdensome regulations on the interstate movement of trailer trucks. . . . We must never hesitate to apply old values to new circumstances." *Id.*, at 995–996 (concurring opinion).

Judge Scalia: "I am not in need of [a] reminder that the fourth amendment must be applied to modern electronic surveillance, the commerce clause to trucks and the first amendment to broadcasting. The application of existing principles to new phenomena—either new because they have not existed before or new because they have never been presented to a court before—is what I would call not 'evolution' but merely routine elaboration of the law." *Id.*, at 1038, n. 2 (opinion dissenting in part) (citations omitted).

8                    TRUMP *v.* BARBARA

Opinion of KAVANAUGH, J.

U. S., at 733–734; *Bucklew* v. *Precythe*, 587 U. S. 119, 130–134 (2019); *United States* v. *Jones*, 565 U. S. 400, 404–405 (2012); *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. 786, 790 (2011); *Kyllo* v. *United States*, 533 U. S. 27, 33–34 (2001).

Here, that interpretive principle would support additional exceptions for children born to foreign citizens unlawfully or temporarily in the country.[5]

First, significant illegal immigration into the United States is a new circumstance that was largely unknown as of 1868 and that the Framers of the Fourteenth Amendment could not have fully anticipated. And the Framers likely would not have anticipated (and presumably would not have intended) the odd result of granting a substantial birthright citizenship benefit to (i) those foreign citizens who violate U. S. immigration law and illegally enter or overstay and then have children in the United States over (ii) those foreign citizens who follow U. S. immigration law and have children in their home countries while seeking to lawfully immigrate to the United States. Nor presumably would they have wanted to grant constitutional birthright citizenship to children of foreign citizens unlawfully in the country while simultaneously denying constitutional birthright citizenship to children of tribal American Indians. So too, the issue of temporary visitors who give birth in the United States presents a new and different circumstance than in 1868 given the significant changes in immigration laws and travel.

And second, those two categories of foreign citizens—namely, those unlawfully or temporarily in the country—are relevantly similar to the four categories of persons

---

[5] When I refer to foreign citizens in this opinion, I am not referring to those who are dual citizens of the United States and a foreign nation. Persons born in the United States to parents who are dual citizens of the United States and another nation are constitutionally entitled to birthright citizenship.

recognized as exceptions in *Wong Kim Ark*. The only apparent principle unifying the four disparate exceptions listed by the Court in *Wong Kim Ark*—especially in light of the exception for tribal American Indians—is that the parents in all of those varied circumstances were not U. S. citizens and were citizens of other nations, whether tribal or foreign. Cf. *post*, at 3–22 (ALITO, J., dissenting). An exception for those born in the United States to foreign parents unlawfully or temporarily in the country is consistent with that principle and therefore with the Fourteenth Amendment.[6]

All of that said, as noted above, Congress in 1940 and 1952 enacted a statute, §1401(a), that at the time and since has always been understood to authorize only the four *Wong Kim Ark* exceptions. If Congress amends §1401(a) or otherwise enacts a statute creating new exceptions along the lines of the Executive Order for children born to foreign citizens unlawfully or temporarily in the country, such a statute, as I see it, would pass constitutional muster.[7]

_____

[6] Plaintiffs' only proposed unifying principle for the four exceptions is what they call the "fiction of extraterritoriality." Tr. of Oral Arg. 81. The Court today seemingly embraces that same principle. *Ante,* at 3, 10 (majority opinion). It is not clear what the "fiction of extraterritoriality" means here. And it certainly does not support treating the four exceptions as a permanently closed set. If plaintiffs' point is to indulge the "fiction," to use their word, that certain foreign citizens such as diplomats should be considered as being back in their home countries for purposes of birthright citizenship, why does that not also apply to those in the United States unlawfully or temporarily? And most starkly, plaintiffs cannot convincingly explain their view that the children of tribal American Indians are *not* constitutionally entitled to birthright citizenship, while the children of foreign citizens unlawfully or temporarily in the country are constitutionally entitled to birthright citizenship. See Tr. of Oral Arg. 131–132.

[7] Nothing in this opinion is intended to suggest how birthright citizenship should be addressed as a policy matter.

10                     TRUMP *v.* BARBARA

Opinion of KAVANAUGH, J.

\*     \*     \*

For those reasons, to reiterate, the Executive Order does not violate the Fourteenth Amendment.  But the Order does contravene  8  U. S. C.  §1401(a).    Consistent  with  the Fourteenth Amendment, Congress could amend §1401(a) or otherwise enact new legislation establishing exceptions to birthright citizenship for children born to foreign citizens unlawfully or temporarily in the country.  But Congress has not yet done so.

# SUPREME COURT OF THE UNITED STATES

No. 25–365

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* BARBARA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 30, 2026]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, dissenting.

This Court's decision in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), would have permanently denied citizenship to blacks as "a subordinate and inferior class." *Id.*, at 404–405. After the Civil War, the Reconstruction Congress overruled *Dred Scott*, first with the Civil Rights Act of 1866, then with the Citizenship Clause of the Fourteenth Amendment. Both the Civil Rights Act and the Citizenship Clause guaranteed citizenship to persons born and domiciled in the United States regardless of their race. Neither guaranteed citizenship to persons who were not domiciled in the United States.

Blacks were entitled to citizenship because they were Americans. They had no other homeland, owed no allegiance to any foreign power, and were subject to no other authority. They "fought and bled in the same battles," "gained and gloried in the same victories," and were "liable to be called upon to defend [America] in time of war" alongside every other citizen. 2 Life and Writings of Frederick Douglass 256, 266 (P. Foner ed. 1950) (Douglass). The Citizenship Clause thus guaranteed them the "dignity and glory of American citizenship," so as to ensure that they would never be treated as second class under the law.

*Plessy* v. *Ferguson*, 163 U. S. 537, 555 (1896) (Harlan, J., dissenting).

The same could not be said for the children of foreign temporary visitors. Foreign temporary visitors were attached to their home country, lacked similar bonds to this country, and would not be called upon in time of war. Americans, consistent with their settler ethos, believed that citizens were the people who called a place home. Accordingly, domicile—a person's legal home—played a key role in both state and national citizenship in America. A person was a "citizen" of the state where he had his "domicil." *Barber* v. *Barber*, 21 How. 582, 599 (1859). When foreigners temporarily visited, their "national character" was unchanged. *The Venus*, 8 Cranch 253, 278–279 (1814). Such visitors were "strangers," not "subjects." *Id.*, at 278. A person born here but domiciled in a foreign land was therefore considered "as much a stranger to the country as his father." 1 H. St. George Tucker, Commentaries on the Laws of Virginia 57 (1836) (Tucker).

That is why, when Dred Scott went to court, he argued that to be a "citizen," "it is only necessary that he should have acquired a domicil." Brief for Plaintiff in *Dred Scott* v. *Sandford*, D. T. 1855, No. 7, p. 6. (Brief for *Dred Scott*). After this Court held that Scott was not a citizen because he was black, Republicans in Congress, such as Representative John Bingham, stated that a person was a citizen if he was "born and domiciled" in the United States. Cong. Globe, 35th Cong., 2d Sess., 983 (1859). Scott was a citizen, in their view, because he was born to Americans, not to "temporary sojourners." Cong. Globe, 35th Cong., 1st Sess., 210 (1858) (statement of Rep. Bliss). As Frederick Douglass had put it, the freedmen sought citizenship "*not* as aliens nor as exiles," but as "Americans." 2 Douglass 255 (emphasis added).

Congress implemented the principle that citizenship follows birth and domicile in the Civil Rights Act of 1866 and

then in the Citizenship Clause of the Fourteenth Amendment. The Civil Rights Act guaranteed citizenship to persons who were both "born in the United States" and, as relevant here, "not subject to any foreign power." Act of Apr. 9, 1866, 14 Stat. 27. The phrase "not subject to any foreign power" excluded from citizenship children of foreign temporary visitors, who were subject to the power of their home nation. See, *e.g.*, *The Pizarro*, 2 Wheat. 227, 246 (1817); *The Venus*, 8 Cranch, at 278–279. The Citizenship Clause, which the same Congress passed shortly after the Civil Rights Act, was understood to have the same meaning. It guaranteed citizenship to persons who were both "born . . . in the United States" and "subject to the jurisdiction thereof." Amdt. 14, §1.

A person was subject to the jurisdiction of the government of his domicile. "Domicil" was "the foundation of jurisdiction over persons." 1 T. Twiss, The Law of Nations 239 (1861) (Twiss). The government of a person's domicile had broad power over that person, including with respect to his personal affairs, his conduct abroad, his personal taxes, and the mutual duties of protection and allegiance. So, as the Senator who introduced the Citizenship Clause explained, "the word 'jurisdiction,' as here employed, ought to be construed so as to imply a full and complete jurisdiction . . . the same jurisdiction in extent and quality as applies to every citizen of the United States now." Cong. Globe, 39th Cong., 1st Sess., 2895 (1866) (statement of Sen. Howard). After all, Congress "would have no right to make citizens" of "persons temporarily resident." *Id.*, at 572 (statement of Sen. Trumbull).

The Citizenship Clause was consistently interpreted not to apply to the children of foreign temporary visitors, who were by definition not domiciled in the United States. Regardless of administration or party, the Federal Government for decades after ratification regularly denied claims to citizenship by children who were born in the United

THOMAS, J., dissenting

States but not domiciled here. When a child was "born" in the United States to parents "domiciled" abroad, he was "not, therefore, under the statute and the Constitution a citizen of the United States by birth." Letter from Sec. of State T. Bayard to B. Winchester (Nov. 28, 1885), in 2 F. Wharton, Digest of International Law 399–400 (2d ed. 1887) (Wharton Digest). Scholars agreed: A child "born within the territory of the United States, of alien parents" was not a citizen unless his parents were "permanently domiciled within the United States." W. Robinson, Notes on Elementary Law 70 (1875). This Court agreed: The Citizenship Clause "exclude[d] from its operation children of . . . citizens or subjects of foreign States born within the United States." *Slaughter-House Cases*, 16 Wall. 36, 73 (1873). And, Congress agreed: The Citizenship Clause did not extend to a child born here but "subject to any foreign power." See Enforcement Act of 1870, §18, 16 Stat. 144 (reenacting Act of Apr. 9, 1866, 14 Stat. 27). As Justice Harlan would write in his dissent in *Plessy* v. *Ferguson*, 163 U. S. 537, the Citizenship Clause "gave citizenship to all born or naturalized in the United States *and residing here*." *Id.*, at 563 (emphasis added).

The Court offers a different account. American citizenship, the Court says, was based on a medieval English "feudal" principle, according to which each person "owed personal service to the lord of the soil" as his "master"—a perpetual servitude that was "born with the child and only ended in the grave." 2 Cong. Rec. 3282 (1874) (statement of Rep. Cox). Americans, the Court says, adopted this feudal principle as a rule of American citizenship "with little fanfare." *Ante,* at 4. Then, according to the Court, the Reconstruction Congress codified that feudal principle with the words "not subject to any foreign power" in the Civil Rights Act and "subject to the jurisdiction thereof" in the Citizenship Clause. Then, the Court says, the Clause's meaning

was definitively settled by dicta in *United States* v. *Wong Kim Ark*, 169 U. S. 649 (1898).

With due respect, the Court's account is not historically accurate. The Court says that the Citizenship Clause incorporated the English feudal principle that subjects owed lifetime servitude to the King who owned the soil on which they were born, but Americans—unsurprisingly—rejected this feudal principle. The Court's theory of American citizenship is based on the opinion of a New York assistant vice chancellor in an inheritance dispute called *Lynch* v. *Clarke*, 1 Sand. Ch. 583, 584–585 (N. Y. Ch. 1844). *Ante,* at 6–10. But, the assistant vice chancellor's reasoning, whatever it was worth, was not even followed in New York by the time of the Citizenship Clause. Finally, the Court reasons that dicta in *Wong Kim Ark* settled the meaning of the Clause. But, *Wong Kim Ark* itself emphasized that its holding was limited to persons domiciled in the United States. And, scholars and government officials continued to agree after *Wong Kim Ark* that the Citizenship Clause did not extend to the children of foreign temporary visitors. The rule remained what it always was: A child born on American soil of "a stranger or traveler passing through the country, or temporarily residing here," was "not a citizen." H. Black, Handbook of American Constitutional Law 634 (3d ed. 1910).

The Court today takes the extraordinary step of holding facially unconstitutional the President's Order excluding from citizenship the children of foreign temporary visitors and illegal aliens. In doing so, the Court adds to the sad history of the Fourteenth Amendment, which was designed and understood to secure equal rights for the freed blacks but has instead been repurposed for political projects that the Reconstruction Congress did not support. Because many potential applications of the President's Order are consistent with the original public meaning of the Citizenship Clause, I respectfully dissent.

6                    TRUMP *v.* BARBARA

Thomas, J., dissenting

I

A

I begin with early American practices related to citizenship and nationality, which inform what the Citizenship Clause means.

In America, you were generally a citizen if you were born here and this was your home. The legal word for home was domicile. The concepts were so linked as to be taken as effectively synonymous at times, such that Justice Bushrod Washington could say: "[C]itizenship means domicil—home—permanent residence." *Gardner* v. *Sharp*, 9 F. Cas. 1196, 1199 (No. 5,236) (CC NJ 1826). The same correspondence has persisted throughout American history. See, *e.g.*, *Harding* v. *Standard Oil Co.*, 182 F. 421, 423 (CC ND Ill. 1910) ("'Domicile' and 'citizenship' are substantially synonymous terms, in most cases"). Citizens were not the people who were temporarily passing through a territory or who happened to be born within it. Citizens were the permanent members of the body politic—the people whose roots were in a place, who called that place home, and who would, if necessary, go to war for that place. The law of both state and national citizenship reflected this principle.

Domicile was critical for state citizenship. As Chief Justice Marshall explained, a person was "a citizen of that State" in which "he has a fixed and permanent domicil." *Brown* v. *Keene*, 8 Pet. 112, 115 (1834); accord, *e.g.*, *Eberly* v. *Moore*, 24 How. 147, 157 (1861) ("citizens" if "domicil[ed]"); *Barber*, 21 How., at 599 ("citizenship" by "domicil"); 3 J. Story, Commentaries on the Constitution of the United States 565 (1833) (Story on Constitution) ("change of citizenship" by "change of domicil"). Temporary visitors, it followed, were not citizens. When a person went to a new State on "a mere temporary visit, for a transient purpose," Justice Story explained, he could not thereby "claim to be a citizen of such state." *Case* v. *Clarke*, 5 F. Cas. 254, 255 (No. 2,490) (R. I. 1828). Instead, to become a "citizen of the

state to which he removes," someone had to show "that he ha[d] his domicil there." *Catlett* v. *Pacific Ins. Co.*, 5 F. Cas. 291, 296 (No. 2,517) (CC NY 1826). The same rule remains in place today: as a general matter, "an individual is deemed a citizen of the State of h[is] domicil." *Wachovia Bank, N. A.* v. *Schmidt*, 546 U. S. 303, 318 (2006).

Domicile was also critical for national citizenship. As this Court stated the rule, when a person acquires a "domicil" in a nation, he "becomes a member of the new society, at least as a permanent inhabitant." *The Venus*, 8 Cranch, at 278. Domicile played a role in determining someone's "national character," which would change whenever he "removes to a foreign country [and] settles himself there" with an "intention permanently to reside there." *Id.*, at 279. He was a "subject" of the nation where he was "domiciled." *The Pizarro*, 2 Wheat., at 246. He "follow[ed] the character of that country, in war as well as in peace." *Ibid.*; accord, *e.g.*, H. Halleck, Elements of International Law and Laws of War 144 (1866) (explaining that, in war, national character turns on domicile); *Hanger* v. *Abbott*, 6 Wall. 532, 535 (1868) (same).

Thus, the view of the Executive Branch was that when a person acquires an American "domicil," the law "enjoins upon other nations to respect him, in regard to protection, as an American citizen." Letter from Sec. of State W. Marcy to B. Hülsemann (Sept. 26, 1853), in Correspondence Between the Secretary of State and the Charge D'Affaires of Austria Relative to the Case of Martin Koszta 18 (1853) (Koszta); see also Report of the Committee on Foreign Affairs Concerning the Rights of American Citizens in Foreign States, in Cong. Globe, 40th Cong., 2d Sess., App. 100 (1868) (Report of 1868). "Domicil confers a national character; it does not allow any one who has a domicil to decline the national character thus conferred." Koszta 18. His status "remains as long as the domicil is retained, and is

THOMAS, J., dissenting

changed with it." *Id.*, at 20; see also Cong. Globe, 37th
Cong., 3d Sess., 992 (1863) (statement of Sen. McDougall).

This approach was consistent with this country's settler
ethos. Daniel Webster wrote that "no government has car-
ried th[e] general presumption f[u]rther" than the United
States that a person attains a new "national character"
when he "settles" and "inten[ds] permanently to reside" in
a nation. Report of Secretary of State D. Webster (Dec. 23,
1851), H. R. Exec. Doc. No. 10, 32d Cong., 1st Sess., 2 (1860)
(Webster Report) (internal quotation marks omitted). Alt-
hough some nations would lay claim to anyone born in their
land or any descendant of their citizens, America viewed its
people as the people who built their lives here. A person
domiciled here "pays the same price for his protection as
native-born or naturalized citizens pay for theirs": "In war
he shares equally with them in the calamities which may
befall the country," "his services may be required for its de-
fence," and "his life may be perilled and sacrificed in main-
taining its rights and vindicating its honor." Koszta 20. See
also, *e.g.*, *The Dos Hermanos*, 2 Wheat. 76, 98 (1817) (rea-
soning that "if upon his return to New-Orleans . . . he ac-
quired a domicil there . . . he became a re[-]integrated
American citizen"); *The Mary and Susan*, 1 Wheat. 46, 55,
n. *f* (1816) (discussing "the effect of domicil . . . upon na-
tional character").

The United States thus did not claim as a citizen every
child born on its soil. Instead, pursuant to the principle
that children followed their parents' domicile, a child was a
citizen of the place where his parents were domiciled. "[A]
child born of foreign parents is not, on principles of natural
reason, necessarily to be considered as a citizen of the coun-
try where he is born." 1 Tucker 57 (emphasis deleted). If
he was "born in the country," but "both his parents were
strangers not designing a permanent change of country,"
then he was "as much a stranger to the country as his fa-
ther." *Ibid.* The rule was that "when a subject is traveling

THOMAS, J., dissenting

or sojourning abroad," he "continues under the protection of" his home nation, so "his children" are "an exception to the rule which makes the place of birth the test of citizenship." *Ludlam* v. *Ludlam*, 31 Barb. 486, 503 (N. Y. Gen. Term 1860); see also 37 Annals of Cong. 599 (1820) (statement of Rep. Hemphill) (for "citizenship" to be "acquired by birth," a child must be born to "parents belonging to no other nation or tribe"); *Hardy* v. *De Leon*, 5 Tex. 211, 236–237 (1849) (a child born on American soil to parents domiciled in the then-Republic of Texas was a citizen of Texas); Political Code of New York §5 (1860) (citizenship requires "domicil[e]" and excludes "children of transient aliens").

The relationship between citizenship and domicile was a matter of general law from which the political branches could depart by statute, but those statutes also typically tracked the domicile rule. So, Congress retained the prerogative to set the terms for becoming a naturalized citizen and could impose requirements beyond domicile. See Art. I, §8, cl. 4. But, when Congress enacted naturalization statutes, they too generally tracked the domicile requirement. See, *e.g.*, Act of Mar. 26, 1790, §1, 1 Stat. 103–104 (requiring two years of residence for naturalization); Act of Jan. 29, 1795, 1 Stat. 414 (requiring five years of residence for naturalization). And, even when a person was domiciled here and not formally naturalized, he was already considered a citizen for some purposes. Before being naturalized, domiciliaries were "*de facto* though not *de jure* citizens of the country of their domicil," 1 R. Phillimore, International Law 262 (1854), or "domiciled citizen[s]," Koszta 20. Likewise, for other purposes, national citizenship was not an independent concept but simply derivative of state citizenship. "Every citizen of a state," it was often said, was "*ipso facto* a citizen of the United States." 3 J. Story, Commentaries on the Constitution of the United States 565 (1833). In these contexts, too, national citizenship required domicile

10          TRUMP *v.* BARBARA

THOMAS, J., dissenting

because state citizenship required domicile.  See Part I–A,
*supra.*

Of course, birthplace closely correlated with domicile.
Most children were born where their parents were domi-
ciled and where, as a result, they were domiciled.  The cor-
relation was especially strong in the early 19th century,
when crossing an ocean for a temporary visit was an unap-
pealing prospect for pregnant women.  Because birthplace
was often a heuristic for domicile, it could be generally
stated that children were citizens of their place of birth.  See
*ante,* at 3–6 (majority opinion).  But, when the specific ques-
tion arose, a "reasonable qualification" to that general
statement excepted "children of parents, who were *in
itinere* in the country, or abiding there for temporary pur-
poses."  J. Story, Commentaries on the Conflict of Laws 48
(1834) (Story on Conflict of Laws).

B

The law of domicile is essential to understanding the cit-
izenship provisions of the Civil Rights Act and the Four-
teenth Amendment, so I briefly explain the relevant parts
of the law of domicile here.

1

Domicile meant legal home.  The most common definition
of domicile was residence with the intent to permanently
remain.  *The Venus*, 8 Cranch, at 278; accord, Story on Con-
flict of Laws §44, at 42 ("residence" and the "intention of
making it the home of the party").  A person's residence was
the place where he lived.  R. Phillimore, The Law of Domicil
16–18 (1847) (Law of Domicil).  He had the intent to perma-
nently remain in that place if he planned to stay there in-
definitely.  *Ibid.*

A person was not domiciled in a place simply because he
was temporarily present or born there.  A person's presence
in a place was merely "primâ facie" evidence that he was

domiciled there. *Bruce* v. *Bruce*, 2 B. & P. 229, 231, 126 Eng. Rep. 1251, 1252 (C. P. 1790); accord, *e.g.*, Story on Conflict of Laws 45. Because a person's temporary visit to a place did not change his domicile, persons who were temporarily present in a place were regarded by the law not as "subjects," but as "strangers." *The Venus*, 8 Cranch, at 278. Accordingly, a person's "place of birth" was only "*primâ facie* evidence of domicil." *President and Fellows of Harvard College* v. *Gore*, 22 Mass. 370, 375 (1827); accord, *e.g.*, *Overseers of Readington* v. *Overseers of Tewksbury*, 2 N. J. L. 289 (1807) ("The place of the birth of a legitimate child is *prima facie* the place of his settlement").

A child took on the domicile of his parents. Because any person incapable of establishing his own domicile had the domicile "of that person, on whom he depends for support," it followed that generally "minor children ha[d] the settlement of their fathers." *Inhabitants of Dedham* v. *Inhabitants of Natick*, 16 Mass. 135, 139 (1819); accord, 1 Twiss 238–239. So, if a child was born to foreigners who did not permanently reside here, the child was not domiciled here. See Law of Domicil 69; A. Dicey & J. Moore, Digest of the Law of England 103 (1896) (Dicey & Moore).

Finally, each person had one and only one domicile. "[E]very person must have a domicil somewhere," and every person "can have only one domicil." *Inhabitants of Abington* v. *Inhabitants of N. Bridgewater*, 40 Mass. 170, 177 (1839); accord, D. Field, Outlines of an International Code 147 (2d ed. 1876) (Field). "The supposition, that a man can have two domicils, would lead to the absurdest consequences." *Inhabitants of Abington*, 40 Mass., at 177. A person can reside and intend to permanently remain in only one place at a time. And, "[n]o person according to the Law of Nations is without a Domicil." 1 Twiss 239; accord, Field 147. So, if someone did not intend to remain where he was at the moment, the law ascribed that person his last such place as his domicile.

12               TRUMP *v.* BARBARA

THOMAS, J., dissenting

2

a

Because a person could have only one domicile, domicile was a natural criterion for citizenship. In the 19th century, dual citizenship was considered highly undesirable, if not a contradiction in terms. "[T]he general view was that 'no one can have two countries.'" R. Mensel, Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment, 32 St. Louis U. Pub. L. Rev. 329, 334 (2013) (alterations omitted). Dual citizenship led to a number of foreign-policy concerns, such as conflicting claims on the dual citizen during a war. Report of 1868, at 100; *Inhabitants of Abington*, 40 Mass., at 177–178. Therefore, the United States did not "recogniz[e] a 'double allegiance.'" H. R. Rep. No. 784, 43d Cong., 1st Sess., 23 (1874). Instead, under "our law" a citizen was "bound to be 'true and faithful' alone to our Government." *Ibid.*; accord, *Savorgnan* v. *United States*, 338 U. S. 491, 500 (1950) ("The United States has long recognized the general undesirability of dual allegiances"). Because each person had one and only one domicile, domicile-based citizenship avoided the problems attendant to dual citizenship.

The principle that citizenship followed domicile also made it more likely that citizens would be attached to their country. As Alexander Hamilton envisioned it, the citizenry were the people who would join together against any threat—"a large body of citizens . . . who stand ready to defend their own rights and those of their fellow-citizens." The Federalist No. 29, p. 185 (C. Rossiter ed. 1961); see also Report of 1868, at 95. As Frederick Douglass saw it, citizenship belonged to those who "fought and bled in the same battles," and "gained and gloried in the same victories." 2 Douglass 266. And, as this Court put it, it is to "the citizen" that "the country must look for its safety." *United States* v. *Gettysburg Electric R. Co.*, 160 U. S. 668, 682 (1896). The "dignity and glory of American citizenship," *Plessy*, 163

THOMAS, J., dissenting

U. S., at 555 (Harlan, J., dissenting), belongs to people who have a meaningful "tie [to] this country," *Tuan Anh Nguyen* v. *INS*, 533 U. S. 53, 68 (2001). A domiciliary had, by definition, the sort of permanent attachment to a place that befitted him to citizenship. See, *e.g.*, Law of Domicil 17; Koszta 20. A temporary visitor whose homeland was somewhere else, although he had legal rights and was entitled to dignified treatment, lacked the ties to this country that would make him fit for citizenship. He therefore was generally not eligible for naturalization, and his children were likewise not naturally citizens of their birthplace.[1]

b

Once a person became domiciled in a place, he was considered no longer subject to any foreign power. A person was "subject" to the government of where he was "domiciled." *The Pizarro*, 2 Wheat., at 246; see also *Gilman* v. *Gilman*, 52 Me. 165, 174 (1863); *Inhabitants of Abington*, 40 Mass., at 177–178. When a person traveled abroad, he remained subject to the power of his home nation—much like an American who travels abroad today remains subject to the power of this Government. As this Court explained,

---

[1] Perhaps for this reason, although the United States welcomed settlers with its domicile-based approach, the baseline in most of the western world was often that only the children of citizens could be citizens. See, *e.g.*, Aristotle's Politics 102 (B. Jowett transl. 1920) ("[A] citizen is defined to be one of whom both the parents are citizens"); 2 T. Aquinas, Summa Theologica, Part I, 2d Part, Question 105, Art. 3, pp. 316–317 (Fathers of Eng. Dominican Province transl. 1952) (foreigners "were not at once admitted to citizenship" because "if foreigners were allowed to meddle with the affairs of a nation as soon as they settled down in its midst, many dangers might occur, since the foreigners not yet having the common good firmly at heart might attempt something hurtful to the people"); E. de Vattel, Law of Nations 101–102 (1797) ("[I]n order to be of the country, it is necessary that a person be born of a father who is a citizen; for if he is born there of a foreigner, it will be only the place of his birth, not his country"); P. Webster, Law of Citizenship 103–108 (1891) (collecting examples).

14                           TRUMP *v.* BARBARA

THOMAS, J., dissenting

if a person "goes into a foreign country" on a "temporary" visit, he remains subject to the power of his home country. *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 120 (1804); accord, *The Venus*, 8 Cranch, at 278. When a person moved to a country permanently, by contrast, he was no longer subject to the power of the country from which he originated: "[T]hose who reside[d]" in a new nation "from a permanent cause" became "subject to" the new nation. *Ibid.*; see also *Schooner Charming Betsy*, 2 Cranch, at 120; Cong. Globe, 37th Cong., 3d Sess., at 992 (statement of Sen. McDougall).

c

American legal authorities described a person as "subject to the jurisdiction" of the government of his domicile. *Hood* v. *Hood*, 93 Mass. 196, 199–200 (1865). Then, as now, governments exercised different types of authority over temporary visitors and permanent residents. A government "do[es] not apply the same Laws in all matters to persons who are only temporarily resident, as it applies to persons who are permanently resident within its territory." 1 Twiss 217. So, while a government applied, among other things, its ordinary criminal laws to temporary visitors, it had a wide range of further powers only with respect to persons domiciled within it. For that reason, when someone was present in a territory but had a domicile elsewhere, although he was still amenable to the laws of the host government, that government would describe him as not "subject to our jurisdiction." *Dorsey* v. *Dorsey*, 7 Watts 349, 351–352 (Pa. 1838). In contrast, when a party made "his habitual and usual domicil" in a place, he became (in 1860 parlance) "subject to the jurisdiction" thereof. *Mandeville* v. *Huston*, 15 La. Ann. 281, 282 (1860).[2]

───────────

[2] This characterization of jurisdiction as a function of domicile was common. See, *e.g.*, *Harteau* v. *Harteau*, 31 Mass. 181, 182–183 (1833) (when parties "changed their domicile," they were "not then subject to

THOMAS, J., dissenting

A person was "subject to the jurisdiction" of the government of his domicile because of the legal relationships that followed from domicile. "The fact of domicil" was "one of the highest importance to a person." *Inhabitants of Abington*, 40 Mass., at 176. It was said that domicile "determines [a person's] civil and political rights and privileges, duties and obligations; it fixes his allegiance; it determines his belligerent and neutral character in time of war; it regulates his personal and social relations, whilst he lives, and [it] furnishes the rule for the disposal of his property when he dies." *Ibid.*

The legal relationships that followed from domicile—which collectively made a person subject to the jurisdiction of the government of his domicile—could be grouped into four categories.

First, domicile determined which government had the power to declare the law as to an individual's most important personal affairs. Story on Conflict of Laws 51–52. The law governing personal affairs included the laws of marriage and divorce, which followed a couple's domicile. *E.g.*, *Hood*, 93 Mass., at 199–200; *Ditson* v. *Ditson*, 4 R. I. 87, 93–94 (1856). It included laws governing the succession of a person's estate, which was distributed "according to the law of distribution of the place of his domicil." 2 J. Kent, Commentaries on American Law 67 (1848); accord, Wharton Treatise 1872, §20, at 34–35. And, it included laws governing a person's age of majority, his capacity to contract, his right to sue, and his rights with respect to moveable property. See, *e.g.*, 1 W. Burge, Commentaries on Colonial and Foreign Laws 32 (1832); 1 Twiss 217–237; *Inhabitants of Abington*, 40 Mass., at 176; *Ditson*, 4 R. I., at 93–94. Jurisdiction over these personal affairs had "exclusive

the jurisdiction" of their original State); 1 Twiss 239 ("Domicil" was "the foundation of jurisdiction over persons"); F. Wharton, Conflict of Laws §35, p. 44 (1872) (Wharton Treatise 1872) ("domicil . . . fixes . . . the jurisdiction that attaches to the child").

THOMAS, J., dissenting

operation given to it only with respect to persons domiciled." 1 Twiss 237. Mere territorial presence was not enough. See, *e.g.*, Wharton Treatise 1872, §32, at 42–43; H. Wheaton, Elements of International Law 140–142 (8th ed. 1836).

Second, domicile determined which government had plenary jurisdiction over a person to regulate his actions anywhere. The law governing domiciliaries (unlike the law governing temporary visitors) had "effect given to it beyond the limits of [the] territory." 1 Twiss 223; see also, *e.g.*, *Inhabitants of Hanover* v. *Turner*, 14 Mass. 227, 231 (1817); Wharton Treatise 1872, at 34–44, 519–521. And, as now, a government could exercise personal jurisdiction over domiciliaries while the domiciliaries were abroad and for their conduct abroad. See *id.*, at 519–521 (*in personam* judgment has "extra-territorial force" when rendered by government where "domiciled"); accord, *e.g.*, *id.*, at 481–482; *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. 915, 924 (2011).

Third, domicile determined which government had the power to impose personal taxes on a person. The power to impose "personal and income taxes" depended on "the party's domicil." Wharton Treatise 1872, at 68; see also *id.*, at 34. A sovereign could tax the property in its territory belonging to anyone, but it could impose personal taxes—such as a capitation tax—only on persons domiciled within it. A person "not domiciled, is not within the jurisdiction of the assessors." *Preston* v. *Boston*, 29 Mass. 7, 12 (1831). He "was not liable to taxation in the city for his poll, income and personal property" because "his residence and domicile was not in the city." *Id.*, at 10; accord, *In re Hood's Estate*, 21 Pa. 106, 115 (1853) (describing the "rule" of "great antiquity and of high obligation" that "taxation follows the domicil"). So, while "transient travellers" were "not liable for ordinary governmental or municipal taxes," such taxes could "be collected from domiciled aliens." Wharton

THOMAS, J., dissenting

Treatise 1872, at 48, 78. A nondomiciliary could recover taxes as improperly collected because he was—regardless of his territorial presence—"not subject to the jurisdiction" of the taxing authority. *Christ Church Hospital* v. *Philadelphia County*, 24 Pa. 229, 231 (1855).

Fourth, domicile determined which government owed a person protection when he went abroad. As this Court explained, "[t]he American citizen who goes into a foreign country, although he owes a local and temporary allegiance to that country, is yet, if he performs no other act changing his condition, entitled to the protection of our government." *Schooner Charming Betsy*, 2 Cranch, at 120 (emphasis deleted); accord, Webster Report 2–3. So, before the Civil War, the Federal Government intervened to protect Americans abroad based on their domicile. See, *e.g.*, Koszta 8–27. A nonnaturalized domiciliary abroad was entitled to "protection as an American citizen." *Id.*, at 18. The Department of State throughout the 19th century repeatedly confirmed "the right of persons domiciled in the United States, but not naturalized therein, to maintain internationally their status of domicil, and to claim protection from this Government in the maintenance of such status." 2 Wharton Digest 487 (quoting 1885 Department of State instructions).

This protection abroad corresponded to the primary allegiance that the domiciliary owed his home government. When a person went "abroad for a time," "his own state still possesse[d] a right to his allegiance." W. Hall, The Foreign Powers and Jurisdiction of the British Crown 1–2 (1894). He "continue[d] under the obligations of [his home] allegiance, and his children, though born in a foreign country, [we]re not born under foreign allegiance." *Ludlam*, 31 Barb., at 503. Although he owed a partial and temporary allegiance to his host nation, he was excused from military service and other obligations "distinctively associated with natural allegiance" because he owed "a prior and more binding allegiance to his own sovereign." P. Hamburger,

18                    TRUMP *v.* BARBARA

THOMAS, J., dissenting

Beyond Protection, 109 Colum. L. Rev. 1823, 1847 (2009). Domicile was for that reason typically a prerequisite to, among other things, compulsory service in the militia. See H. Halleck, International Law 385 (1861); Cong. Globe, 37th Cong., 3d Sess., at 991 (statement of Sen. Doolittle); A. Swearer, Interpreting the Citizenship Clause Within the Context of Contemporaneous Political Debates on Alien Conscription and Expatriation, 2 Tex. A & M J. L. & Civ. Gov. 73, 86, 95–96 (2025). And, although America more than other nations supported the right to change that allegiance, it held that doing so required a change of domicile. See Webster Report 2–3.[3]

C

When Dred Scott sued for his freedom, he claimed to be a citizen of Missouri, the State of his domicile. Scott, a black man held in slavery, sued in a federal court, which could hear the case only if it was between "Citizens of different States." U. S. Const., Art. III, §2. Scott argued that he was a citizen of Missouri and that the defendant, Sandford, was a citizen of New York. Scott, though, was not born in Missouri; he was born in Virginia but domiciled in Missouri.

_____

[3] The Court claims that "the Government and the dissent identify no source that defined allegiance at birth as being based on domicile in the period from 1776 to 1868." *Ante,* at 18. It is the Court that focuses on "allegiance," but, in any event, many sources disprove the Court's claim. See, *e.g.*, *Ludlam* v. *Ludlam*, 31 Barb. 486, 503 (N. Y. Gen. Term 1860) (He "continues under the obligations of [his home] allegiance, and his children, though born in a foreign country, are not born under foreign allegiance"); *Inhabitants of Abington* v. *Inhabitants of N. Bridgewater*, 40 Mass. 170, 176 (1839) ("domicil . . . fixes his allegiance"); *The Santissima Trinidad*, 7 Wheat. 283, 347 (1822) (Story, J., for the Court) (a person cannot "throw off his own allegiance" without a "change of domicile"); *Hodgson* v. *DeBeauchesne*, 14 Eng. Rep. 920, 932 (Privy Council 1858) ("a settled domicile in a country, imports an allegiance to the country, very different, from a mere obedience to its laws during a temporary residence"); *Inhabitants of Calais* v. *Inhabitants of Marshfield*, 30 Me. 511, 520 (1849) ("consent or change of domicile" required for "allegiance").

See D. Fehrenbacher, The Dred Scott Case: Its Significance in American Law and Politics 240 (1978); Tr. of Record in *Dred Scott* v. *Sandford*, D. T. 1854, No. 137, p. 10. He alleged that he was a Missouri citizen because he and his family were brought there in 1838, "where they have ever since resided." *Ibid.* He argued that the term "citizen" described "persons identified with the communities where they reside." Brief for *Dred Scott* 5–6. In response to the argument that blacks could not vote and therefore were not citizens, Scott explained that "a person need not have acquired all these rights, it is only necessary that he should have acquired a domicil to enable him to sue as a 'citizen.'" *Id.*, at 6. "[C]itizenship," Scott argued—in terms that would have been familiar at the time—"means nothing but residence." *Ibid.* (internal quotation marks omitted).

Nobody disagreed with the premise that Scott was domiciled in Missouri. Black slaves and freedmen alike were unambiguously Americans. They were "not foreigners." Cong. Globe, 39th Cong., 1st Sess., at 1160 (statement of Rep. Shellabarger). They were not "aliens." *Id.*, at 1117 (statement of Rep. Wilson). They "owed no foreign allegiance." *Id.*, at 530 (statement of Sen. Johnson); accord, *Dred Scott*, 19 How., at 420. It was the dissimilarity of American blacks to foreigners that Frederick Douglass emphasized in his call for recognizing the citizenship of blacks: "We address you *not* as aliens nor as exiles, humbly asking to be permitted to dwell among you in peace." 2 Douglass 255 (emphasis added). Instead, "We are Americans." *Ibid.* So, "speaking the same language and being of the same religion, worshipping the same God, owing our redemption to the same Savior, and learning our duties from the same Bible," Douglass reasoned, "we shall not be treated as barbarians." *Id.*, at 256. American blacks were "liable to perform all the duties and support all the obligations of citizens." Cong. Globe, 39th Cong., 1st Sess., at 1117 (statement of Rep. Wilson). They were domiciled in the United States,

whether in slavery or freedom. See, *e.g.*, 4 R. Phillimore, Commentaries Upon International Law 96–97 (1861); accord, Law of Domicil 45; Brief for *Dred Scott* 6; Cong. Globe, 39th Cong., 1st Sess., at 1160 (statement of Rep. Shellabarger). Dred Scott was therefore a citizen of Missouri.

This Court disagreed. It held that Scott was not a citizen of Missouri—and therefore could not sue as a citizen—because of his race. According to the Court, blacks could not be citizens because they were "considered as a subordinate and inferior class of beings, who had been subjugated by the dominant race, and, whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held the power and the Government might choose to grant them." 19 How., at 404–405. As a result, the Court said, blacks were denied the basic privileges of citizenship—including the right to "keep and carry arms wherever they went" and to exercise the "full liberty of speech in public and in private." *Id.*, at 417. They could not sue in federal court as state "citizens." *Ibid.*

Justices McLean and Curtis dissented. Justice McLean would have ruled that Scott was "a citizen of Missouri" because he had a "permanent domicil in the State." *Id.*, at 531. As he stated the law of citizenship, "[b]eing a freeman, and having his domicil in a State different from that of the defendant, he is a citizen." *Ibid.* Likewise, Justice Curtis took the position, common at the time, see Part I–A, *supra*, that national citizenship was simply based on state citizenship. 19 How., at 581–582. He said that birthplace alone is not sufficient to be a national citizen, but that a person must be both born here and a citizen of a State. "[T]hose persons born within the several States, who . . . are citizens of the State, are thereby citizens of the United States." *Id.*, at 582. State citizenship, of course, was based on domicile. See Part I–A, *supra*. Justice Curtis thus agreed that Scott was a citizen of Missouri. 19 How., at 588.

Critics of the *Dred Scott* decision consistently took the position that citizenship should be based on birth and domicile regardless of race. Domicile, after all, was colorblind. In the words of Representative John Bingham of Ohio, soon to become a central figure in the crafting of the Fourteenth Amendment: "[A]ll free persons born and domiciled within the jurisdiction of the United States, are citizens of the United States from birth." Cong. Globe, 35th Cong., 2d Sess., at 983. Blacks such as Dred Scott called America home, so they were citizens despite having been subordinated based on their race. As Representative Shellabarger would explain, "persons of African descent whose ancestors were slaves" were entitled to "citizenship" because they were "domiciled in our own country and continu[ed] here to reside." Cong. Globe, 39th Cong., 1st Sess., at 1160. Likewise, Representative Philemon Bliss condemned *Dred Scott* and explained that all persons born here were citizens regardless of their race—"excep[t]" for children born to "temporary sojourners." Cong. Globe, 35th Cong., 1st Sess., at 210.

Chief among the critics of *Dred Scott* was Abraham Lincoln. Soon after the Court released the decision, Lincoln declared that "[t]he Dred Scott decision is erroneous" and did "obvious violence to the plain unmistakable language of the Declaration [of Independence]." His Speeches and Writings 355, 360 (R. Basler ed. 1946). The case exacerbated national division over the issue of slavery and contributed to Lincoln's election as President. See, *e.g.*, 2 C. Warren, The Supreme Court in United States History 279–357 (1928). Lincoln vowed not to "acquiesce in it as a precedent," but instead to "do what we can" to have it "overruled." Lincoln, His Speeches and Writings, at 355.

During the Civil War, Union officials continued to define citizenship based on birth and domicile. Lincoln's Attorney General Edward Bates wrote that the place of birth was "*prima facie*" evidence of citizenship, Citizenship, 10 Op.

THOMAS, J., dissenting

Atty. Gen. 382, 396 (1862), a rule that corresponded with the familiar rule that "place of birth" was "*prima facie*" evidence of domicile, *President and Fellows of Harvard College*, 22 Mass., at 375; see also 10 Op. Atty. Gen., at 388 ("[E]very citizen of the United States is a citizen of the particular State in which he is domiciled"). The Lincoln Administration deemed persons citizens if they were born and domiciled in the United States. See 10 Op. Atty. Gen. 321, 322 (1862) ("Mrs. Preto . . . was born in New Jersey, and, no doubt, at her father's domicil," so she was "therefore, born a citizen of the United States"). Congress's discussion of who could be subject to a wartime conscription law focused on the distinction between temporary "sojourners" and those who settled here "with the intention of making their home" here—only the latter were "fully and completely subject to the law." Cong. Globe, 37th Cong., 3d Sess., at 992 (statement of Sen. McDougall). For the purposes of conscription, children of foreigners born here were "American Citizens" if "permanently domiciled in the U. S.," and could avoid conscription if their parents had not established a long-term residence in the United States.[4] Even at a memorial service for Lincoln, prominent statesman George Bancroft confirmed that "every one born on [American] soil, with the few exceptions of the children of travellers and transient residents, owes [it] a primary allegiance." Hon.

---

[4] Note of Major Gen. Hurlbut (Feb. 5, 1865), microformed on Microcopy No. 53, Roll 16, Vol. 27–29, Mar. 19, 1865–Feb. 4, 1867, NAID: 188124588, p. 70 National Publications, https://catalog.archives. gov/id/188124588?objectPage=70 (archived at https://perma.cc/N47D-V2NP); see Letter from A. Atocha, Judge of the Provost Court, to Brig. Gen. Bowen (Nov. 12, 1863), microformed on NARA Record Group 94: Records of the Adj. Gen.'s Office, Series: Letters Received, 1863–Atocha, A A–File No. G480, NAID: 85651033, pp. 3–5 (National Archives & Records Admin), https://catalog.archives.gov/id/85651033?objectPage=3 (archived at https://perma.cc/6VN3-9L4W); see I. Wurman, Jurisdiction and Citizenship, 49 Harv. J. L. Pub. Pol'y 315, 370–372 (2026).

THOMAS, J., dissenting

G. Bancroft's Oration at the Obsequies of Abraham Lincoln (Apr. 25, 1865) The Pulpit and Rostrum, Nos. 34 & 35, p. 5.

#### D

After the Civil War, Congress vindicated Lincoln's vow to overrule *Dred Scott*—first with the Civil Rights Act, then with the Citizenship Clause of the Fourteenth Amendment.

#### 1

"Congress enacted the Civil Rights Act of 1866" to "repudiate *Dred Scott*." *United States* v. *Vaello Madero*, 596 U. S. 159, 174 (2022) (THOMAS, J., concurring); see also E. Foner, The Second Founding 63 (2020). The Civil Rights Act of 1866 confirmed that former slaves were citizens, but it did not extend citizenship to foreign temporary visitors or Indians who were still within their tribes.

#### a

The Civil Rights Act guaranteed citizenship only to persons born here and "not subject to any foreign power." In full, the citizenship provision of the Civil Rights Act, which formed the basis for the Citizenship Clause at issue in this case, stated:

> "That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." 14 Stat. 27.

Temporary visitors domiciled in a foreign country remained subject to a foreign power. See Part I–B–2, *supra*. The Civil Rights Act therefore "intentionally excluded" children of foreign temporary visitors. Brief for Former United States Attorney General Edwin Meese III as *Amicus Curiae* 4.

The congressional debates were clarifying on this score. When Senator Trumbull introduced the Civil Rights Act's citizenship provision, he stated that the language excluded "persons temporarily resident" in the United States, whom

THOMAS, J., dissenting

"we would have no right to make citizens."  Cong. Globe, 39th Cong., 1st Sess., at 572.  He had considered limiting the Civil Rights Act's citizenship provision to persons "ow-ing allegiance" to the United States, but he abandoned that terminology because temporary visitors owed a *partial* alle-giance to the United States—and he wanted to make clear that the Act excluded them.  *Ibid.*  Likewise, when Repre-sentative James Wilson spoke in support of the Act in the House, he explained "that every person born in the United States is a natural-born citizen," except, "it may be," "chil-dren born on our soil to temporary sojourners."  *Id.*, at 1117.

Others confirmed that the Civil Rights Act excluded the children of temporary visitors.  Representative Bingham described the Civil Rights Act as "simply declaratory" of pre-existing law, *id.*, at 1291, which, he had already ex-plained, required that a citizen be both "born and domi-ciled" in the United States, Cong. Globe, 35th Cong., 2d Sess., at 983.  Bingham understood the Act to grant citizen-ship only to children "of parents not owing allegiance to any foreign sovereignty."  Cong. Globe, 39th Cong., 1st Sess., at 1291.  Representative Martin Thayer agreed that the Act required that a person "not ow[e] allegiance to a foreign Power."  *Id.*, at 1152.  Of course, temporary visitors and their children owed allegiance to their home country.  See Part I–B–2–c, *supra*.  Unsurprisingly, then, the public in-terpreted the Act to guarantee citizenship to "all persons born in the United States," except "those subject to foreign governments," a class which included those born to "foreign parents temporarily sojourning in this country."  The Chi-cago Republican, Mar. 30, 1866, p. 4; see also K. Lash, Prima Facie Citizenship, 101 Notre Dame L. Rev. 101, 147 (2026).

b

The Civil Rights Act also excluded from citizenship "Indi-ans not taxed."  This provision was intended to exclude

THOMAS, J., dissenting

Indians in tribes, but to recognize the citizenship of Indians who had left those tribes and joined the body politic. In Senator Trumbull's words, it excluded Indians who "belong to the Indian tribes." See Cong. Globe, 39th Cong., 1st Sess., at 572 (statement of Sen. Trumbull). But, it included Indians who were "no longer connected with their tribes" and instead lived and "earn[ed] a livelihood in the white settlements." *Ibid.* (statement of Sen. Ramsey). Tribal Indians were "[c]onsidered virtually as foreigners," but "[w]henever they [we]re separated from those tribes, and c[a]me within the jurisdiction of the United States so as to be counted, they [we]re citizens of the United States." *Ibid.*

Like temporary visitors, tribal Indians were not completely subject to the jurisdiction of the United States. The United States did not have the right to impose personal taxes on them—hence, "Indians not taxed." See, *e.g.*, *Elk* v. *Wilkins*, 112 U. S. 94, 99 (1884); *Goodell* v. *Jackson*, 20 Johns. 693, 710 (N. Y. 1823). Their personal affairs remained subject to the jurisdiction of their tribal nation. "The right of self-government" was "secured to each tribe, with jurisdiction over all persons and property within its limits, subject to certain exceptions, founded on principles somewhat analogous to the international laws among civilized nations." H. R. Rep. No. 474, 23d Cong., 1st Sess., p. 18 (1834); accord, 7 Op. Atty. Gen. 174–175 (1855). The United States did not interfere "with the disposition, or descent, or tenure of their property, as between themselves," or "prove their wills," or subject them to the "laws of marriage and divorce," or subject them to the "laws of the *United States*, against high treason." *Goodell*, 20 Johns., at 710. Tribal Indians did not owe the United States primary allegiance and did not receive from it complete protection. See *ibid.*; T. Cooley, General Principles of Constitutional Law 243 (1880); *Elk*, 112 U. S., at 99; *id.*, at 119 (Harlan, J. dissenting); H. R. Rep. No. 474, at 18–20; see also B. Tennant, "Excluding Indians Not Taxed": *Dred Scott, Standing*

*Bear*, *Elk* and the Legal Status of Native Americans in the Latter Half of the Nineteenth Century, 86 Int'l Soc. Sci. Rev. 24, 29 (2011) ("Native Americans were comparable to foreigners because they did not fall completely under U. S. jurisdiction").

Indians in tribes were not covered by the Civil Rights Act's exclusion of persons "subject to any foreign power" because Indian tribes were not "foreign." They were "domestic dependent nations." *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831). Thus, to preserve the status quo that tribal Indians were not citizens, Congress used the clause "not subject to any foreign power, excluding Indians not taxed." 14 Stat. 27.

2

Although the Civil Rights Act by its terms overruled *Dred Scott*, the Reconstruction Congress could not be sure that it would endure. Some questioned whether Congress had the constitutional power to enact the Civil Rights Act and thus feared that a hostile court might neuter it. See *Vaello Madero*, 596 U. S., at 175 (THOMAS, J., concurring). Others worried that "as soon as the Democrats came into power," they would repeal the Act. H. Flack, The Adoption of the Fourteenth Amendment 95 (1908); accord, Foner, The Second Founding, at 68–71. Thus, when it passed the Civil Rights Act, the Reconstruction Congress was already drafting the Fourteenth Amendment. See *id.*, at 55–92; K. Lash, The Origins of the Privileges or Immunities Clause, Part II, 99 Geo. L. J. 329, 349 (2011). Two months later, Congress would formally propose the Citizenship Clause of the Fourteenth Amendment to the States. See *Hurd* v. *Hodge*, 334 U. S. 24, 32, n. 11 (1948). The States ratified the Amendment in 1868.

The Citizenship Clause of the Fourteenth Amendment constitutionalized the Civil Rights Act's citizenship provision. The "main object" of the Clause was to settle "the

THOMAS, J., dissenting

citizenship of freed [slaves]." *Elk*, 112 U. S., at 101. In full, the Citizenship Clause provided:

> "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Amdt. 14, §1.

This language, all agreed, "unambiguously overruled this Court's contrary holding in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), that the Constitution did not recognize black Americans as citizens of the United States or their own State." *McDonald* v. *Chicago*, 561 U. S. 742, 807–808 (2010) (THOMAS, J., concurring in part and concurring in judgment); see also *Slaughter-House Cases*, 16 Wall., at 73. The "Citizenship Clause 'forever closed the door on *Dred Scott*' and 'constitutionalized the Civil Rights Act of 1866'" by foreclosing a racial criterion for citizenship. *Vaello Madero*, 596 U. S., at 175 (THOMAS, J., concurring) (quoting K. Lash, The Fourteenth Amendment and the Privileges and Immunities of American Citizenship 171 (2014)); see also *Slaughter-House Cases*, 16 Wall., at 73; *id*., at 94–95 (Field, J., dissenting).

The Citizenship Clause did not change the Civil Rights Act's rule. The Clause and the Act were passed by the same Congress during the same session. See *Hurd*, 334 U. S., at 32. Senator Howard, who proposed the Citizenship Clause, believed that it hardly warranted discussion because Congress had just enacted the same rule in the Civil Rights Act. The Senate had "so fully discussed" "the question of citizenship" as "not to need any further elucidation." Cong. Globe, 39th Cong., 1st Sess., at 2890. He also stated that the Citizenship Clause "is simply declaratory of what I regard as the law of the land already." *Ibid*. Senator Trumbull, who had introduced the Civil Rights Act's citizenship provision, confirmed that "[t]he object to be arrived at is the same." *Id*., at 2893–2894. Senator Johnson had "no doubt" that "all

THOMAS, J., dissenting

that this amendment provides is, that all persons born in the United States and not subject to some foreign Power" are "citizens of the United States." *Id.*, at 2893. To be a "citizen," Senator Howard said, meant to be "not a subject of a foreign Power." *Id.*, at 2895.

The phrase "subject to the jurisdiction" was a familiar way to describe the relation of a domiciliary to his home nation. See Part I–B–2–c, *supra*. Lawyers in America would have known that a person was "subject to the jurisdiction" of the place of his domicile. *Hood*, 93 Mass., at 199–200. Congressmen confirmed that the Clause should not be construed to refer to the bare territorial power that a sovereign exercises over all persons in its territory. "I understand the words here, 'subject to the jurisdiction of the United States,'" Senator George Williams said, "to mean fully and completely subject to the jurisdiction of the United States." Cong. Globe, 39th Cong., 1st Sess., at 2897. "[T]he word 'jurisdiction,' as here employed," Senator Howard explained, "ought to be construed so as to imply a full and complete jurisdiction"—"the same jurisdiction in extent and quality as applies to every citizen of the United States now." *Id.*, at 2895. The Citizenship Clause, Senator Trumbull agreed, "means 'subject to the *complete* jurisdiction thereof.'" *Id.*, at 2893 (emphasis added). So, although, "in one sense, all persons born within the geographical limits of the United States are subject to the jurisdiction of the United States," Senator Williams explained, some were not covered by the Citizenship Clause because they "are not subject to the jurisdiction of the United States in every sense." *Id.*, at 2897. Each of these descriptions precluded applying the Citizenship Clause to the children of temporary visitors, who—unlike children domiciled here—were not subject to the jurisdiction of the United States in every sense.

It was on this basis that Congressmen believed that the Clause fixed in place the rule of the Civil Rights Act.

THOMAS, J., dissenting

Senator Trumbull stated that the Citizenship Clause, like the Civil Rights Act, would still exclude all persons subject to a foreign power: "What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. That is what it means." *Id.*, at 2893. Senator Howard agreed that the Citizenship Clause "w[ould] not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of embassadors or foreign ministers accredited to the Government of the United States." *Id.*, at 2890. And, shortly before the Citizenship Clause was introduced, Senator William Fessenden, a supporter of the Amendment, explained that "persons may be born in the United States and not be citizens of the United States," then gave the example of "a person [who] is born here of parents from abroad temporarily in this country." *Id.*, at 2769; see Lash, 101 Notre Dame L. Rev., at 151–152.

The Citizenship Clause, just like the Civil Rights Act, also excluded from citizenship the children of tribal Indians—meaning Indians whose tribes retained sovereign authority over them. "Certainly," Senator Howard said, "gentlemen cannot contend that an Indian belonging to a tribe, although born within the limits of a State, is subject to this full and complete jurisdiction." Cong. Globe, 39th Cong., 1st Sess., at 2895. As Senator Trumbull saw it, tribal Indians were excluded because they, like temporary visitors, retained a primary allegiance to, and therefore were subject to, their tribal nation: "It cannot be said of any Indian who owes allegiance, partial allegiance if you please, to some other Government that he is 'subject to the jurisdiction of the United States.'" *Id.*, at 2893. He concluded: "It is only those persons who come completely within our jurisdiction, who are subject to our laws, that we think of making citizens." *Ibid.* Congress was satisfied that its language accomplished that result with the phrase "subject to the jurisdiction thereof." As Senator Williams explained, "I would

THOMAS, J., dissenting

not agree to this proposed constitutional amendment if I supposed it made Indians not taxed citizens of the United States. But I am satisfied that, giving to the amendment a fair and reasonable construction, it does not." *Id*., at 2897.

The Citizenship Clause used different wording from the Civil Rights Act only to resolve an uncertainty that had arisen out of the Act's "Indians not taxed" language. Senator Trumbull explained that the category of "Indians not taxed" was an attempted proxy for the Indians over whom the United States lacked complete jurisdiction: The Civil Rights Act was supposed to "designate a class of persons who were not a part of our population," so it was supposed to exclude tribal Indians while including Indians who "come within the jurisdiction of the United States." *Id*., at 572. The former could not be "taxed," in the sense of personal taxes. See Parts I–B–2–c, I–D–1–b, *supra*. But, the phrase "excluding Indians not taxed," Trumbull realized, could be misunderstood to encompass Indians who had left their tribal community and permanently settled outside of it, but were not taxed for other reasons—such as because they were "not possessed of wealth." Cong. Globe, 39th Cong., 1st Sess., at 2894. Similarly, making citizenship depend on taxation could allow States to manipulate citizenship eligibility by changing their tax practices. *Id*., at 2895 (statement of Sen. Howard).

The phrase "subject to the jurisdiction" solved the problem because it avoided excluding from citizenship the children of nontribal Indians who for whatever reason were not taxed. Tribal Indians were not in "any sense" "subject to the complete jurisdiction of the United States." Cong. Globe, 39th Cong., 1st Sess., at 2893 (statement of Sen. Trumbull). Like temporary visitors, tribal Indians were "not subject to our jurisdiction in the sense of owing allegiance solely to the United States." *Id*., at 2894. Their internal affairs—including marriages, family matters, intestacy, and payment of personal taxes—were regulated by

their tribes. See Part I–D–1–b, *supra*. Thus, "members of Congress understood [the Fourteenth Amendment's] language to be more precisely describing, not substantively altering, the set of individuals excluded from birthright citizenship by the Civil Rights Act." M. Shawhan, Comment, The Significance of Domicile in Lyman Trumbull's Conception of Citizenship, 119 Yale L. J. 1351, 1353 (2010); accord, Lash, 101 Notre Dame L. Rev., at 159.

With respect to temporary visitors from foreign nations, the phrase was believed to accomplish the same object as the Civil Rights Act's exclusion of those "subject to" a foreign power. Children born to temporary visitors owed allegiance to another government—the country of their domicile—so they were not subject to the jurisdiction of the United States. "[T]he Citizenship Clause simply states in positive terms ('subject to the jurisdiction thereof') what the Act stated in negative terms ('not subject to any foreign power')." Brief for Sen. Eric Schmitt et al. as *Amici Curiae* 18.

### E

#### 1

The evidence from the decades following ratification confirms that the Citizenship Clause was understood to exclude the children of temporary visitors. There was frequently expressed, enduring, and widespread agreement, from the Reconstruction Congress through the end of the 19th century (and even into the 20th), that the Citizenship Clause did not guarantee citizenship to persons not domiciled here. The Executive Branch, Congress, courts, States, lawyers, scholars, and commentators generally shared this understanding.

#### a

The Executive Branch understood the Citizenship Clause to exclude the children of temporary visitors. In 1873,

THOMAS, J., dissenting

President Grant's Attorney General George Williams interpreted it to apply only to persons over whom the United States had complete jurisdiction: "[T]he word 'jurisdiction' must be understood to mean absolute or complete jurisdiction, such as the United States had over its citizens before the adoption of this amendment." 14 Op. Atty. Gen. 295, 300. It therefore excluded "[a]liens" over whom the United States had "only" a "limited" jurisdiction, even if they were "born here." *Ibid.*[5]

Across administrations, the Executive Branch took the same position. A child born on American soil was not an American citizen when he was "domiciled in" a foreign country. Letter from Sec. of State T. Bayard to B. Winchester (Nov. 28, 1885), in 2 Wharton Digest 399–400. By virtue of his foreign domicile, he was "on his birth 'subject to a foreign power' and 'not subject to the jurisdiction of the United States.'" *Ibid.* "A child born in this country to a foreign father, when taken by his father abroad, acquires the father's domicil and nationality." Letter from Sec. of State F. Frelinghuysen to M. Cramer (June 4, 1883), in *id.*, at 397. These statements were not mere abstract positions, but the Executive Branch's operating rule of decision for decades.

When the children of temporary visitors born on American soil claimed to be citizens based on the Citizenship Clause, the Executive Branch repeatedly denied their claims to citizenship:

- Joseph Speck was denied citizenship after being born in the United States to parents domiciled in Switzerland. In 1878, Speck claimed to be a citizen after his

---

[5] This interpretation was shared by Ebenezer Hoar, a prior Attorney General for President Grant. Hoar too believed that, under the Citizenship Clause, "a child born within the United States of parents who are not citizens" is not himself a citizen unless "domiciled" in the United States. 2 Cong. Rec. 3279 (1874); see also J. Lollman, Note, The Significance of Parental Domicile Under the Citizenship Clause, 101 Va. L. Rev. 455, 474–475 (2015).

father returned with him to Switzerland. President
Hayes's Acting Secretary of State Frederick Seward re-
jected his claim. Although Speck may have been able
to claim citizenship had he been domiciled in the
United States, Seward denied his claim because "his
status, as well as his domicil, according to the well-un-
derstood principles of international and municipal law,
follows that of the father until the boy attains his ma-
jority." Letter from Acting Sec. of State F. Seward to
H. Fish (Aug. 20, 1878), in *id.*, at 396.

- Ludwig Hausding was denied citizenship after being
born in the United States to parents domiciled in Sax-
ony. Hausding's parents were "Saxon subjects, tempo-
rarily in the United States." Letter from Sec. of State
F. Frelinghuysen to J. Kasson (Jan. 15, 1885), in Pa-
pers Relating to the Foreign Relations of the United
States 395 (1886). President Cleveland's Secretary of
State Frederick Frelinghuysen explained in 1885 that
Hausding was not constitutionally entitled to citizen-
ship. Because Hausding's parents were not domiciled
here, he remained "subject to any foreign power." *Ibid.*
Therefore, his attempt to "assert citizenship on the
ground of birth in the United States" was "untenable."
*Ibid.*; see also 2 Wharton Digest 397–399.

- Richard Greisser was denied citizenship after being
born in the United States to parents domiciled in Ger-
many. He was "born in 1867 in the State of Ohio." Let-
ter from Sec. of State T. Bayard to B. Winchester (Nov.
28, 1885), in *id.*, at 399. His father was "domiciled in
Germany." *Ibid.* According to President Cleveland's
Secretary of State Thomas Bayard in 1885, Greisser
therefore "was on his birth 'subject to a foreign power'
and 'not subject to the jurisdiction of the United
States.'" *Id.*, at 400. He was "not, therefore, under the
statute and the Constitution a citizen of the United

THOMAS, J., dissenting

States by birth." *Ibid.* The State Department thus denied Greisser's claim to citizenship. *Ibid.*

- Freiderich de Bourry was denied citizenship after being born in the United States to parents domiciled in Austria. When de Bourry sought protection as an American citizen in 1886 after returning to Europe, Secretary Bayard denied his claim to citizenship. Although de Bourry was "born in the city of New York," Secretary Bayard explained, his parents were "temporarily resident" and returned to Europe a few years later. Letter from Sec. of State T. Bayard to J. Lee (July 24, 1886), in *id.*, at 401. He then remained in Europe, showing that "an Austrian domicile was chosen." *Id.*, at 402. Secretary Bayard concluded that De Bourry's "'passport must therefore be refused.'" *Ibid.*

- The child of a woman named Mary Deveraux was denied citizenship after being born in the United States in 1889. Deveraux was an Irish woman who arrived in New York and promptly went to the hospital to give birth the next day. She was not yet, however, lawfully admitted to the country. Although the baby was undoubtedly "born on American soil," it was not an American citizen because Deveraux had not yet been lawfully admitted. See Letter from F. Reeve, Acting Solicitor of the Treasury, to W. Windom, Secretary of the Treasury (Mar. 4, 1890), in 11 Documents of the Assembly of the State of New York, pp. 47–48 (1890). President Harrison's Administration denied the baby citizenship: "I am, therefore, of the opinion that the child in controversy born during the temporary removal of the mother from the importing vessel to a lying-in hospital for her own comfort, pending further examination as to whether she belongs to the prohibited class of immigrants, did not become, by reason of its birth, under such circumstances, an American citizen."

THOMAS, J., dissenting

> *Id.*, at 48; see A. Swearer, Subject to the [Complete] Jurisdiction Thereof, 24 Tex. Rev. L. & Pol. 135, 171 (2020).

These children were not born to diplomats. They were not part of invading armies or Indian tribes. They were simply foreigners, born on American soil but not domiciled here. And, they were all denied citizenship under the Citizenship Clause—by those in a better position to know its original meaning than we are today. See also 2 Wharton Digest 393–402; P. Webster, Law of Citizenship in the United States: Treated Historically 109–129 (1891).[6]

Even the most expansive executive interpretation of the Citizenship Clause ultimately denied citizenship to a child born here but domiciled abroad. When Francois Heinrich, born of parents who ultimately returned to their native Austria, claimed to be an American citizen, President Grant's Executive Branch did say that he was "'originally clothed with American nationality.'" *Ante,* at 13 (majority opinion). But, it then promptly denied Heinrich's claim to American citizenship. Heinrich was instead—despite being born in the United States—a citizen of Austria, where he was domiciled: "Francois A. Heinrich should be held by the United States to be an Austrian subject, and treated as such; . . . he is not an American citizen." Letter from Sec. of State H. Fish to Baron Lederer (Dec. 24, 1872), in 2 Wharton Digest 395–396.

### b

Congress understood the Citizenship Clause to exclude the children of temporary visitors. Just two years after the

---

[6] Sometimes, children born to lawful foreigners could "elect one allegiance and repudiate the other" upon "reaching full age" by becoming domiciled in the United States. F. Wharton, Conflict of Laws 35 (2d ed. 1880) (Wharton Treatise 1880). But, they were not guaranteed citizenship by birth alone, and they were not guaranteed citizenship without domicile.

THOMAS, J., dissenting

Fourteenth Amendment was ratified, Congress passed the Enforcement Act of 1870.  The Act implemented the Citizenship Clause with the same language that the Civil Rights Act had used, limiting the right to citizenship to persons born here and "not subject to any foreign power."  Enforcement Act of 1870, §18, 16 Stat. 144 (reenacting Act of Apr. 9, 1866, 14 Stat. 27).  The 1870 Act thus incorporated language that expressly excluded the children of temporary foreign visitors, who were subject to the power of the foreign countries in which they were domiciled.  See Part I–B–2, *supra*.  If the Citizenship Clause included the children of temporary visitors—who clearly fall outside the reach of the Enforcement Act—then the Reconstruction Congress would have violated its own Citizenship Clause in an Act designed to enforce it.  See Brief for Professor Richard Epstein as *Amicus Curiae* 8.  The parties point to no one who suggested that the 1870 Act was unconstitutional.

c

This Court long agreed that the Citizenship Clause did not apply to persons born here to children of temporary visitors.  Just five years after the Citizenship Clause was ratified, this Court explained that the phrase "subject to the jurisdiction" excluded persons not domiciled here: "The phrase 'subject to its jurisdiction,'" the Court explained, "was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states born within the United States." *Slaughter-House Cases*, 16 Wall., at 73.

Then, in *Elk*, the Court again interpreted the Clause to require complete jurisdiction, not just bare territorial authority.  The Court held that to satisfy the Citizenship Clause, a person must not only be "born within the territorial limits of the United States," but must be "completely subject" to the United States' "political jurisdiction" at birth.  112 U. S., at 102.  The Citizenship Clause's "evident

THOMAS, J., dissenting

meaning," this Court said, "is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to [its] political jurisdiction, and owing [it] direct and immediate allegiance." *Ibid.* The Citizenship Clause thus granted citizenship at birth only to persons who "ow[ed] no allegiance to any alien power." *Id.*, at 101. Of course, the children of temporary visitors were not completely subject to the United States' political jurisdiction, did not owe the United States direct and immediate allegiance, and did owe allegiance to an alien power. See Part I–B–2, *supra.*

Justice Harlan dissented in *Elk*, but he agreed that the Citizenship Clause referred to the same "complete jurisdiction." *Id.*, at 117. He dissented only because he thought that someone born in the territorial United States could become a citizen even if he became subject to its complete jurisdiction later in life. On Justice Harlan's view, which was not uncommon at the time, the Citizenship Clause did not require that the person be born *while* subject to the complete jurisdiction of the United States. *Id.*, at 116–121. Instead, a person could be born in the United States while not subject to its jurisdiction—as John Elk was because he was a member of an Indian tribe at birth—but become subject to its jurisdiction later—as Elk did by "abandoning his tribe." *Id.*, at 122. On Justice Harlan's view, following the law of domicile, persons became subject to the jurisdiction of the United States "by becoming bona fide residents of States" and "subject to taxation" there. *Id.*, at 120–122; see also *id.*, at 122 (explaining that one becomes "subject to the complete jurisdiction of the United States" "by residence in one of the States"). Every Justice in *Elk* thus agreed that the Citizenship Clause did not refer to bare territorial authority.

The most celebrated Fourteenth Amendment opinion is Justice Harlan's dissent in *Plessy* v. *Ferguson.* In that dissent, Justice Harlan disagreed with the *Plessy* Court's

conclusion that the Constitution tolerated state-imposed segregation. Justice Harlan took the position, to be vindicated decades later, that "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens." 163 U. S., at 559. He also took a view on whom the Citizenship Clause applied and did not apply to. According to Justice Harlan, the Citizenship Clause did not apply to persons born here who resided abroad. Instead, it "gave citizenship to all born or naturalized in the United States *and residing here*." *Id.*, at 563 (emphasis added).

d

State officials likewise agreed that the Citizenship Clause excluded persons not domiciled here. Although the Citizenship Clause guaranteed both national and state citizenship, States excluded from citizenship "children of transient aliens." Political Code of California §51(1) (1872); accord, *e.g.*, Rev. Codes of N. D. §11(1), p. 64 (1895) ("The citizens of the state are: All persons born in this state and residing within it, except the children of transient aliens"); The Complete Codes and Statutes of the State of Montana §71(1), p. 5 (W. Sanders ed. 1895) ("The citizens of the State are: All persons born in this State and residing within it, except the children of transient aliens"). Nobody seemed to suggest that these state laws violated the Fourteenth Amendment.

Likewise, state judicial precedent held that the Citizenship Clause included children born of foreign parents only "when the parents are domiciled here." *Benny* v. *O'Brien*, 58 N. J. L. 36, 40 (1895). To qualify for citizenship, "[t]wo facts must concur[:] the person must be born here, and he must be subject to the jurisdiction of the United States according to the fourteenth amendment, which means, according to the Civil Rights act, that the person born here is not subject to any foreign power." *Id.*, at 39. The

THOMAS, J., dissenting

Citizenship Clause thus "excepted" those "born in this country of foreign parents who are temporarily traveling here." *Ibid.*

2

Scholars agreed, as well, that the Citizenship Clause required domicile. As early as 1875, Yale Law School Professor William Robinson wrote that a "native-born citizen" was "one who was born within the jurisdiction and allegiance of the United States." Notes on Elementary Law, at 70. And, to be born within the jurisdiction and allegiance of the United States, a person "born within the territory of the United States, of alien parents," had to show that those parents were "permanently domiciled within the United States." *Ibid.*

A long list of eminent 19th-century legal scholars—including Thomas Cooley, Francis Wharton, Henry Campbell Black, and Justice Samuel Miller—agreed. Cooley wrote that "a citizen by birth must not only be born within the United States, but he must also be subject to the jurisdiction thereof; and by this is meant that full and complete jurisdiction to which citizens generally are subject, and not any qualified and partial jurisdiction, such as may consist with allegiance to some other government." General Principles of Constitutional Law 243. Francis Wharton explained that children "born in the United States" of "parents not being here domiciled, are not citizens." Wharton Treatise 1880, at 41; see also 2 Wharton Digest 393–394 (Citizenship Clause "exclude[d] children born in the United States to foreigners here on transient residence, such children not being by the law of nations 'subject to the jurisdiction of the United States'"). Henry Campbell Black—of Black's Law Dictionary—wrote: "[I]f a stranger or traveler passing through the country, or temporarily residing here, . . . has a child born here, who goes out of the country with his father, such child is not a citizen of the United States,

THOMAS, J., dissenting

because he was not subject to its jurisdiction." Handbook of American Constitutional Law 458 (1895). By contrast, "the children, born within the United States, of permanently resident aliens, . . . are citizens." *Id.*, at 458–459. And, Justice Samuel Miller confirmed in his lectures on constitutional law that if a "traveller . . . temporarily residing in this country . . . has a child born here which goes out of the country with its father, such child is not a citizen of the United States, because it was not subject to its jurisdiction." Lectures on the Constitution of the United States 279 (1891).

Scholar after scholar confirmed that domicile was required for citizenship. "The words 'subject to the jurisdiction thereof,' exclude[d] the children of foreigners transiently within the United States." A. Morse, Treatise on Citizenship 248 (1881). The Citizenship Clause excluded the "children of foreign subjects, born while the latter transiently sojourn here." M. Lesser, Citizenship and Franchise, 4 Colum. L. Times 113, 146 (1891). "[T]he children of foreigners, in transient residence, are not citizens, their fathers being subject to the jurisdiction less completely than Indians." Hall, The Foreign Powers and Jurisdiction of the British Crown, at 63; see also W. Hall, International Law 236–237 (4th ed. 1895) ("In the United States it would seem that the children of foreigners in transient residence are not citizens"). "[T]he requirement of personal subjection to the 'jurisdiction thereof'" excludes "children of persons passing through or temporarily residing in this country." B. Winchester, Citizenship in Its International Relation, 31 Am. L. Rev. 504 (1897).

As immigration laws became more restrictive, some adopted the view that children must be born to citizens to obtain citizenship by birth. In contesting that view, its detractors spoke in terms of domicile. Prominent jurist Henry C. Ide, for example, published an article arguing that whether "the very fact of birth in our country render[s] one

'subject to the jurisdiction thereof'" depends on "the question of domicile." Citizenship By Birth—Another View, 30 Am. L. Rev. 241, 248 (1896). The "'jurisdiction' referred to in the amendment means political national jurisdiction and not merely the jurisdiction of our laws." *Id.*, at 247. "One born of parents temporarily in our country" is not constitutionally guaranteed citizenship because he "is not born with the stamp of domicile," so the "elements of national jurisdiction are wanting." *Id.*, at 248. By contrast, Ide contended, persons "domiciled but not naturalized" are "*de facto* though not *de jure* citizens of the country of their domicile," so "[t]heir children should be deemed *de jure* as well as *de facto* citizens." *Id.*, at 249 (internal quotation marks omitted).[7]

### 3

In *United States* v. *Wong Kim Ark*, 169 U. S. 649, this Court interpreted the Citizenship Clause to apply to a person born and domiciled here.

The case, and the arguments made in it, arose out of the unique circumstances of Chinese immigration in the late-19th century. Hundreds of thousands of Chinese immigrated to the United States during this time. They were met with considerable hostility. By statute, Chinese settlers could not be naturalized. See *In re Ah Yup*, 1 F. Cas.

---

[7] Throughout this time, Indians in tribes born on American soil continued to be viewed as noncitizens. Their citizenship evolved not through any changes to the interpretation of the Citizenship Clause, but through changes in statutory law. Congress in 1887, effectively adopting Justice Harlan's dissent in *Elk* v. *Wilkins,* 112 U. S. 94 (1884), as a matter of policy, granted citizenship to "every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life." Act of Feb. 8, 1887, §6, 24 Stat. 390. And, Congress declared Indians in tribes citizens in the 1924 Indian Citizenship Act. See Act of June 2, 1924, ch. 233, 43 Stat. 253.

THOMAS, J., dissenting

223, 223–225 (CC Cal. 1878); *Fong Yue Ting* v. *United States*, 149 U. S. 698, 724 (1893). Congress then banned Chinese immigration in the Chinese Exclusion Act of 1882. See Act of May 6, 1882, ch. 126, 22 Stat. 58–61. Meanwhile, if a Chinese person renounced his allegiance to China, the Chinese Government could behead him upon his return, sell his family as slaves, and banish his relatives. See *Wong Kim Ark*, 169 U. S., at 725, n. 1; Justice John Marshall Harlan: Lectures on Constitutional Law, 1897–98, Lecture No. 27 (May 7, 1898), in 81 Geo. Wash. L. Rev. Arguendo 12, 345 (B. Frye, J. Blackman, & M. McCloskey eds. 2013). Given the era's concern with dual citizenship, see Part I–B–2–a, *supra*, this policy made it even more difficult for Chinese immigrants to fully settle in the United States. See *Wong Kim Ark*, 169 U. S., at 725–726 (Fuller, C. J., dissenting).

Unlike other settlers, then, the Chinese—even those who lived here and wished to remain—had no path to citizenship and no means of freeing themselves from the grasp of China. The Executive Branch took the view that because domicile no longer ensured full integration into the American body politic, the Citizenship Clause's phrase "subject to the jurisdiction" must require more than domicile. That view would entail that a child born to Chinese parents domiciled in this country was not a citizen. Instead, the Executive Branch sought to replace the requirement of domicile, which would make any child of domiciled Chinese immigrants a citizen, with the requirement that a person's parents already be citizens. See Brief for United States in *United States* v. *Wong Kim Ark*, O. T. 1895, No. 904, pp. 23–34; see also, *e.g.*, *In re Look Tin Sing*, 21 F. 905, 906 (Cal. 1884). Acting on this view, the Government in 1895 denied citizenship to a man domiciled in the United States from birth.

The stipulated facts were these. See *Wong Kim Ark*, 169 U. S., at 652–653. Wong Kim Ark was born in San

THOMAS, J., dissenting

Francisco in 1873, and his legal home was California. His parents were not temporary visitors. They were not illegal aliens. See Tr. of Record in *United States* v. *Wong Kim Ark*, O. T. 1897, No. 132, p. 6. Instead, Wong's parents "had done everything within their power to express their desire and intent to become Americans." *Post*, at 27 (ALITO, J., dissenting). They came to settle in America. After Wong traveled to China in 1890, he returned and was admitted to the United States as a citizen. But, after his second trip to China in 1894, the American customs collector denied him permission to re-enter. The Government claimed, for the first time, that Wong was not a citizen.

This Court's decision in *Wong Kim Ark* concerned only persons already domiciled in the United States. As stated in the Government's brief, the "question presented by this appeal" was: "Is a person born within the United States of alien parents domiciled therein a citizen thereof by the fact of his birth?" Brief for Appellant in *Wong Kim Ark*, O. T. 1895, No. 904, p. 2 (emphasis deleted). The Government agreed that Wong was born and domiciled in the United States. *Id.*, at 23; see also Brief for United States in *Wong Kim Ark*, O. T. 1896, No. 449, pp. 2–3. In fact, the thrust of the Government's opening brief was that birth and domicile were insufficient. The Government lamented "the mistakes made and the misunderstanding arising from failing to distinguish between nationality and domicile." Brief for Appellant in *Wong Kim Ark*, O. T. 1895, No. 904, at 13; see also Reply Brief in *Wong Kim Ark*, O. T. 1896, No. 449, at 9–10. It disapproved of the decisions of "some of our Attorneys-General and Secretaries of State" for their "error of failing to distinguish between nationality and domicile." *Id.*, at 10. It acknowledged that state citizenship was based on domicile, but argued that a different rule should govern national citizenship to "preserve the distinction between State and national sovereignty." *Id.*, at 17. "The Constitution does not countenance," the Government argued,

THOMAS, J., dissenting

making "*domicile* an element of nationality." *Id.*, at 29. The Court was not persuaded and ruled that Wong, born in the United States to parents domiciled here, was a citizen.

The Court found it so important that Wong and his parents were domiciled in the United States at the time of his birth that it gratuitously insisted upon that fact throughout its opinion. The Court's introductory paragraph stated seven different ways that Wong was domiciled in the United States: He was born to parents who were "at the time of his birth *domiciled residents* of the United States." 169 U. S., at 652 (emphasis added). His parents were "enjoying a *permanent domicile* and *residence* therein at San Francisco." *Ibid.* (emphasis added). His parents "continued to *reside and remain* in the United States." *Ibid.* (emphasis added). He "ever since his birth, has had but *one residence*, to wit, in California, within the United States." *Ibid.* (emphasis added). He "ha[d] there *resided.*" *Ibid.* (emphasis added). He "never lost or changed that *residence.*" *Ibid.* (emphasis added). And, he never "gained or acquired another *residence.*" *Ibid.* (emphasis added).

Two paragraphs later, the Court confirmed that its decision was limited to persons born and domiciled in the United States. "The question presented by the record is whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicil and residence in the United States*, . . . becomes at the time of his birth a citizen of the United States." *Id.*, at 653 (emphasis added). Then, if that were not enough, the Court reiterated the same limits to its opinion in its final paragraph: This case "present[ed] for determination *the single question*, stated at the beginning of this opinion, namely, whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but have a *permanent domicil and residence*

THOMAS, J., dissenting

*in the United States* . . . becomes at the time of his birth a citizen of the United States." *Id.*, at 705 (emphasis added).

The opinion itself was filled with meandering dicta. The Court's interpretation of the Citizenship Clause evolved over the course of the opinion, before landing on an interpretation that limited citizenship at birth to persons domiciled here. At first, the opinion stated that the rule of American citizenship was the feudal principle of birth on the soil with only two exceptions: (1) "the child of an ambassador or other diplomatic agent of a foreign State" and (2) the child of "an alien enemy in hostile occupation." *Id.*, at 658. Then, after considering more evidence and arguments, the opinion reformulated the rule to include a third exception: (1) "children of members of the Indian tribes," (2) "children born of alien enemies in hostile occupation," and (3) "children of diplomatic representatives of a foreign State." *Id.*, at 682. Then, after discussing more "considerations and authorities," the opinion reformulated the rule with at least five exceptions and a residence requirement: "[A]ll children here born of *resident* aliens," with "the exceptions or qualifications" of (1) "children of foreign sovereigns," (2) children of foreign "ministers," (3) children "born on foreign public ships," (4) children "of enemies within and during a hostile occupation of part of our territory," and (5) "children of members of the Indian tribes owing direct allegiance to their several tribes." *Id.*, at 693 (emphasis added). Then, the Court concluded by reiterating an explicit domicile requirement: Outside of these five categories, the Citizenship Clause covers "all other persons, of whatever race or color, *domiciled within the United States." Ibid.* (emphasis added). So, although these various statements are both dicta and irreconcilable—as is much of the opinion's reasoning—the Court's most complete rule statement was limited to persons, like Wong, born and domiciled in the United States.

THOMAS, J., dissenting

Chief Justice Fuller's dissent, joined by Justice Harlan, did not accept the Government's primary theory that, to qualify for birthright citizenship, a child born in this country must also be born to citizen parents. Such a position, after all, was in tension with Justice Harlan's twice-stated view that the Citizenship Clause turned on "complete jurisdiction," *Elk*, 112 U. S., at 116–117 (dissenting opinion), or "resid[ence]," *Plessy*, 163 U. S., at 563 (dissenting opinion)—two terms that corresponded to domicile. Chief Justice Fuller's dissent instead took the position that the Citizenship Clause "recognize[d] an essential difference between birth during temporary, and birth during permanent, residence." *Wong Kim Ark*, 169 U. S., at 729; accord, Comment, 7 Yale L. J. 365, 367 (1898). On his account, the Citizenship Clause excluded children "born of aliens whose residence was merely temporary." 169 U. S., at 729.

Chief Justice Fuller nonetheless dissented because he rejected the premise that Wong's parents were domiciled here at the time of his birth. He explained that because Chinese law purported to bind Wong's family even after they had settled here, the family "cannot . . . acquire a permanent home here, no matter what the length of their stay may be." *Id.*, at 731; see also *id.*, at 725, and n. 1; see also Justice John Marshall Harlan: Lectures on Constitutional Law, in 81 Geo. Wash. L. Rev. Arguendo, at 345. Thus, Chief Justice Fuller and Justice Harlan dissented because, in their view, Wong and his parents were not actually domiciled in the United States at the time of his birth.

4

*Wong Kim Ark* left in place the same rule that existed before: A child of a domiciliary was a citizen, but a child of a temporary visitor was not.

"The effect of [*Wong Kim Ark*]," a legal scholar explained shortly after it was published, "is to make citizens of the United States by virtue of the Fourteenth Amendment all

THOMAS, J., dissenting

persons born in the United States of alien parents *permanently domiciled and residing here.*" W. Guthrie, Lectures on the Fourteenth Article of Amendment to the Constitution of the United States 57 (1898) (emphasis added). As a Fourteenth Amendment treatise published in 1901 explained, it remained the case that "mere birth within American territory does not always make the child an American citizen." H. Brannon, Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States 25 (Brannon). The Citizenship Clause excluded "children of aliens born here while their parents are traveling or only temporarily resident." *Ibid*. *Wong Kim Ark* was limited to "alien parents, not temporarily resident here, but permanently domiciled." Brannon 29.

On this understanding of *Wong Kim Ark*, temporary visitors' children were still excluded from citizenship. "In the United States," William Edward Hall wrote six years after *Wong Kim Ark*, "it would seem that the children of foreigners in transient residence are not citizens." International Law 227 (5th ed. 1904). A 1901 international-law treatise explained that "children born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction'" of the United States. H. Taylor, International Public Law 220. When a "father has domiciled himself in the Union," John Westlake wrote in 1904, his children "are citizens." International Law 219–220. But, when he is "in the Union for a transient purpose," his children "born within it have his nationality." *Ibid*.

This understanding was widespread after *Wong Kim Ark*: "A person born in this country of alien parents" was a "citizen" only if those parents were "domiciled." 1 Bouvier's Law Dictionary 492 (1914). A child born in the United States is a "citizen" when "domiciled," but not when his parents left after being "temporarily resident." 1 F. Wharton, Conflict of Laws 44–45 (1905). A child born on American

soil to "a stranger or traveler passing through the country" was not a citizen, but a child "born within the United States, of permanently resident aliens" was a citizen. Black, Handbook of American Constitutional Law, at 634 (3d ed. 1910). The rule remained, in other words, that "children . . . of foreigners in transient residence" were "excluded from citizenship, even though born in the United States." 1 H. Bellott, Leading Cases on International Law 183 (4th ed. 1922).

Government officials generally agreed. In 1910, a Department of Justice report explained that "it has never been held, and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship." Spanish Treaty Claims Comm'n, Final Report of William Wallace Brown 124. The Citizenship Clause did "not mean that jurisdiction to which the bodily form of the child is subject from the moment of its birth . . . but that larger jurisdiction, which, though difficult to define, is well known and understood, the difference between the jurisdiction which is exercised over a visitor and that over one domiciled, which difference may be seen at a glance." *Id.*, at 125.

Even this Court described *Wong Kim Ark* in limited terms. It read *Wong Kim Ark* to apply to aliens with a "permanent domicil and residence in the United States." *Chin Bak Kan* v. *United States*, 186 U. S. 193, 200 (1902) (internal quotation marks omitted). *Wong Kim Ark*, in its telling, covered children born to parents "permanently domiciled in the United States." *Kwock Jan Fat* v. *White*, 253 U. S. 454, 457 (1920).

5

Throughout this period, Congress left in place the same statutory language that it originally enacted in 1866 and

then re-enacted in 1870, so American citizenship was limited to persons "not subject to any foreign power." See Enforcement Act of 1870, §18, 16 Stat. 144 (reenacting Act of Apr. 9, 1866, 14 Stat. 27); see also Rev. Stat. §1992 (1875) ("All persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States"); 8 U. S. C. §1 (1934 ed.) ("All persons born in the United States and not subject to any foreign power are declared to be citizens of the United States").

The Nationality Act of 1940 replaced that language with the same language (in relevant part) as the Citizenship Clause itself: a "person born in the United States, and subject to the jurisdiction thereof," is a citizen. 54 Stat. 1138. Congress reenacted that provision verbatim in the 1952 Immigration and Nationality Act (INA). 66 Stat. 235–236. It remains the governing statute today. See 8 U. S. C. §1401.

### F

#### 1

In the 20th century, executive practice repurposed the Citizenship Clause to treat the children of temporary visitors and illegal aliens as citizens.

An assistant solicitor named Richard Flournoy prominently argued that the Citizenship Clause does include the children of temporary visitors. See Dual Nationality and Election, 30 Yale L. J. 545, 546 (1921). He disagreed with "a number of writers" who held that "in order that a person born in the United States of alien parents may have American citizenship, his parents must have been domiciled in this country at the time of his birth." *Id.*, at 552. Although he acknowledged that "*Wong Kim Ark* did not directly decide the precise point," he said that the Citizenship Clause should be read to incorporate a rule that "originated with the feudal system, under which all persons, with certain limited exceptions, born within the fief of an over lord were

THOMAS, J., dissenting

held to owe fealty to him and allegiance to the sovereign."
*Id.*, at 546, 552.  Flournoy acknowledged that some conse-
quences of his theory were "[a]bsurd."  *Id.*, at 553.

President   Franklin   D.   Roosevelt's   administration
adopted the view that the Citizenship Clause applied to the
children of temporary visitors.  See Brief for Citizenship
Law Scholars as *Amici Curiae* 10–18; 1 House Committee
on Immigration and Naturalization, 76th Cong., 1st Sess.,
7 (Comm. Print 1939).  In 1995, some 127 years after the
Citizenship Clause was enacted, President Clinton's Office
of Legal Counsel endorsed the same view.  19 Op. OLC. 340.
It explained that the right to American citizenship for the
children of illegal aliens and temporary visitors "is funda-
mental to our liberty as we understand it."  *Id.*, at 349.

Many in Congress disagreed with the Executive Branch's
view.  As late as the 1990s, Senator Harry Reid sponsored
bipartisan legislation to clarify that the child of an illegal
alien or temporary visitor would "not be a citizen of the
United States or of any State solely by reason of physical
presence within the United States at the moment of birth."
S. 1351, 103d Cong. 1st Sess., §1001 (1993).  "No sane coun-
try," Senator Reid argued, would offer a "reward for being
an illegal immigrant."  R. Igielnik, Most Americans Favor
Birthright Citizenship.  That Wasn't Always True, N. Y.
Times, Mar. 31, 2026.  Others supported similar legislation.
*Ibid.*

The question was not prominent in judicial opinions in
the 20th century.  One of the first substantial discussions
arose 105 years after *Wong Kim Ark*, when Judge Posner
treated the matter as unsettled.  "A constitutional amend-
ment may be required to change the rule whereby birth in
this country automatically confers U. S. citizenship," he
wrote, "but I doubt it."  *Oforji* v. *Ashcroft*, 354 F. 3d 609, 621
(CA7 2003) (concurring opinion).  "The purpose of the rule
was to grant citizenship to the recently freed slaves," and it

THOMAS, J., dissenting

"would not be flouting the Constitution" to "put an end to the nonsense." *Ibid.*

2

Some took advantage of the Executive Branch's recent policy of granting citizenship to anyone born on American soil. The policy encouraged "birth tourism"—the practice of traveling here with temporary authorization solely to give birth and obtain citizenship for one's children, then returning to raise them in another country.

Today, "birth tourism companies" reportedly collect large fees from wealthy foreigners to facilitate their trips to give birth in the United States. Senate Committee on Homeland Security and Governmental Affairs, Report on Birth Tourism in the United States: Minority Staff Report 25–33 (2022). Large numbers of children are born in the United States each year to parents who are temporarily present here in order to obtain citizenship for their children. J. Pak, Why Chinese Parents Come To America to Give Birth, Marketplace (Mar. 7, 2019), https://www.marketplace.org/story/2019/03/06/why-chinese-parents-come-america-give-birth; see also Brief for Tennessee et al. as *Amici Curiae* 28–29.

G

1

Upon taking office, President Trump issued an Executive Order that expressed the Executive Branch's interpretation of the Citizenship Clause. See Exec. Order No. 14160, 90 Fed. Reg. 8449 (2025).

The Citizenship Order adopts the view that the Fourteenth Amendment does not guarantee citizenship at birth to the children of temporary visitors and illegal aliens. Section 1 of the Order interprets the scope of the Citizenship Clause. It states that someone born in the United States is not guaranteed citizenship if that person is born here to

THOMAS, J., dissenting

lawful temporary foreign visitors or to illegal aliens. By contrast, a person is guaranteed citizenship if he is born here to lawful permanent residents or citizens. Section 2 of the Order then directs the Executive Branch to implement this interpretation by not issuing documents recognizing the citizenship of persons in the two excluded categories and by not accepting documents issued by state, local, or other governments purporting to recognize the citizenship of such persons. Those directives are prospective. They "apply only to persons who are born within the United States after 30 days from the date of this order." *Ibid.* Section 3 of the Order directs executive officials to implement the Order with appropriate regulations, policies, and guidance. *Id.*, at 8449–8450.

The President's initiative generated a groundswell of new scholarship into the original meaning of the Citizenship Clause. A wide range of originalist scholars have concluded that the 20th century executive practice was mistaken and that the Order has substantial lawful applications. See generally, *e.g.*, Lash, 101 Notre Dame L. Rev. 101; R. Epstein, The Myth of Birthright Citizenship (2026); I. Wurman, Jurisdiction and Citizenship, 49 Harv. J. L. Pub. Pol'y 315 (2026); Swearer, 2 Tex. A & M J. L. & Civ. Gov. 73; R. Barnett, Trump Is Right on Birthright Citizenship, Wall Street Journal, Mar. 31, 2026; P. Hamburger, Allegiance, Birthright, and Citizenship, Law and Liberty (Apr. 9, 2026), https://lawliberty.org/allegiance-birthright-and-citzenship (archived at perma.cc/S9JB-ZNEP).

2

Before the Order went into effect or executive agencies implemented it, several District Courts universally enjoined its implementation.[8] This Court partially stayed

_____

[8] See *CASA, Inc.* v. *Trump*, 763 F. Supp. 3d 723, 747 (Md. 2025); *Washington* v. *Trump*, 765 F. Supp. 3d 1142, 1154 (WD Wash. 2025); *Doe* v.

THOMAS, J., dissenting

those injunctions in *Trump* v. *CASA, Inc.*, 606 U. S. 831 (2025), because they exceeded the District Courts' remedial authority. *Id.*, at 861. Several plaintiffs immediately filed new actions, and several District Courts again enjoined the Executive Branch from implementing the Order.[9]

This case arises from one of those actions. Three plaintiffs sued on behalf of a putative class. The plaintiffs, who proceed under pseudonyms, are each illegal aliens or lawful temporary visitors. The first plaintiff, a Honduran citizen, was expecting a baby due in October 2025. The other two plaintiffs, one Taiwanese citizen and one Brazilian citizen, did not allege that they were expecting a baby. None alleged that any of their children will be domiciled in the United States. As a right of action, plaintiffs invoked the Citizenship Clause itself, the INA, and the Administrative Procedure Act. They sued on behalf of a putative class of all children who would be ineligible for citizenship under the President's Order, as well as those children's parents. And, they sought to have the Order declared "unconstitutional and unlawful in its entirety." Complaint in No. 25–cv–244 (NH), ECF Doc. 1, p. 16.

The District Court ruled for the plaintiffs. It interpreted the Citizenship Clause to guarantee citizenship to the children of all lawful temporary visitors and illegal aliens. As to relief, the District Court certified a provisional universal class under Federal Rule of Civil Procedure 23(b)(2), which states that class actions may be maintained if the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." The certified class consisted of "[a]ll current and future persons . . . born on or after February 20, 2025" who fall within the two

—————

*Trump*, 766 F. Supp. 3d 266, 290 (Mass. 2025); *New Hampshire Indonesian Community Support* v. *Trump*, 765 F. Supp. 3d 102, 112 (NH 2025).

[9] See, *e.g.*, 790 F. Supp. 3d 80, 101, 105–106 (NH 2025); *CASA, Inc.* v. *Trump*, 793 F. Supp. 3d 703, 710 (Md. 2025).

categories covered by the President's order. 790 F. Supp. 3d 80, 105 (NH 2025). The District Court entered a class-wide preliminary injunction prohibiting enforcement of the Citizenship Order against anyone in the class—meaning anyone at all.

3

The Court today affirms the District Court's universal-class injunction. It holds that the Fourteenth Amendment guarantees citizenship to all children born here to lawful temporary visitors or illegal aliens. On the Court's telling, the law of citizenship in the United States was fixed to an English rule that everyone born on the soil was permanently bound to serve the sovereign. *Ante,* at 2–3. This principle of permanent feudal allegiance, according to the Court, was repurposed into a rule of citizenship and adopted by "all of the states." *Ante,* at 4 (internal quotation marks omitted). The rule's universal acceptance was embodied by an 1844 state equity decision called *Lynch* v. *Clarke*, 1 Sand. Ch. 583. See *ante,* at 6. The rule extended citizenship to all persons born within United States territory, except three categories: children of foreign representatives, children over whom the Government lacked "actual power," and children of Indians in tribes. *Ante,* at 3, 4–6. Those three exceptions were then adopted in the Civil Rights Act and the Enforcement Act by the phrase "not subject to any foreign power," and in the Citizenship Clause by the phrase "subject to the jurisdiction thereof." *Ante,* at 8–10. This Court's *Wong Kim Ark* opinion three decades later, the Court says, confirmed the same rule. *Ante,* at 13–16.

II

Before proceeding to the merits, I briefly note three threshold impediments to the Court's decision today that the Court leaves unaddressed.

First, the Court has an "independent obligation," *Summers* v. *Earth Island Institute*, 555 U. S. 488, 499 (2009), to ensure that every single recipient of "'class action'" relief has standing, *TransUnion LLC* v. *Ramirez*, 594 U. S. 413, 431 (2021). But, today it affirms an injunction on behalf of a class that includes "all current or future persons" subject to the Order indefinitely into the future. 790 F. Supp. 3d, at 105. Contra, *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 564 (1992); see *CASA*, 606 U. S., at 855, n. 1 (explaining that class judgment "binds the whole class").

Second, the Court cannot grant relief to any party without a right of action. See *Whole Woman's Health* v. *Jackson*, 595 U. S. 30, 52 (2021) (THOMAS, J., concurring in part and dissenting in part). But, it grants relief here on the basis of a suit brought under the Citizenship Clause, the INA, and the APA. The Citizenship Clause and the INA's equivalent, by their terms, create no right of action. The APA authorizes suits challenging "final agency action," but the plaintiffs did not allege any final agency action. See 5 U. S. C. §704; *Bennett* v. *Spear*, 520 U. S. 154, 177–178 (1997).

Third, because respondents sought to invalidate the Citizenship Order in its entirety and the District Court granted facial relief, the plaintiffs bear the burden to show that all applications of the Order are unlawful. See *post*, at 2 (GORSUCH, J., dissenting). Under this Court's precedent, facial challenges require plaintiffs to establish "that 'no set of circumstances exists under which the [Order] would be valid.'" *Moody* v. *NetChoice, LLC*, 603 U. S. 707, 765 (2024) (THOMAS, J., concurring in judgment) (quoting *United States* v. *Salerno*, 481 U. S. 739, 745 (1987)). To prevent federal courts from invading the political branches' interest in effectuating policies "enacted by representatives of [the] people," *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers) (internal quotation marks omitted), facial invalidation must remain rare and "hard to win." *Moody*, 603 U. S., at 723.

The Court's decision to hold the Citizenship Order facially unconstitutional, in other words, makes it unlawful for the President to enforce the Order against a single person. He cannot enforce the Order against a child of an alien enemy or a child of a foreign spy. He cannot even enforce the Order against children who are raised in foreign countries, join foreign armies, and fight wars against the United States. The Court, without considering any of these individual circumstances, holds unconstitutional the application of the Citizenship Order in all of them.

### III

In my view, the Citizenship Order is not facially unconstitutional. The Order is consistent with the original meaning of the Citizenship Clause, at least insofar as it applies to children born to parents, here lawfully or unlawfully, who are not domiciled in the United States.

The Citizenship Clause was enacted for people who were born in this country and called it home. It was enacted for freed slaves such as Dred Scott, who had "a domicil" here and therefore were entitled to sue as citizens. Brief for *Dred Scott* 6. It was enacted for men such as Frederick Douglass, who demanded citizenship "not as aliens nor as exiles," but as "Americans." 2 Douglass 255. Its authors and supporters promised, over and over again, that it would exclude the children of "persons temporarily resident" here, whom "we would have no right to make citizens." Cong. Globe, 39th Cong., 1st Sess., at 572 (statement of Sen. Trumbull). In Senator Trumbull's words: "What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. That is what it means." *Id.*, at 2893. And, for decades after ratification, it was interpreted by all three branches of Government and by a wide range of legal authorities to be limited to people who were already Americans.

THOMAS, J., dissenting

The ordinary principles of constitutional interpretation—the ones on which this Court typically relies when presented with a constitutional question such as this one—support the conclusion that the Citizenship Clause requires domicile. That conclusion is supported by the constitutional text, contemporaneous evidence, early executive practice, early legislative practice, judicial precedent, and all of the other indicators of original public meaning. The Court's alternative account does not have a similar degree of support.

The Citizenship Order is therefore, insofar as it applies to persons not domiciled here, consistent with the Citizenship Clause. It is consistent with the Citizenship Clause in its exclusion of the children of lawful temporary visitors, such as birth tourists. The exclusion of the children of lawful temporary visitors—who are, by definition, not domiciled here—was originally a matter of widespread agreement. As to them, the Citizenship Order does exactly what the Executive Branch did for most of the rest of the 19th century, what this Court said that it could do, and what scholars for decades confirmed that it could do. And, the Order is at least facially consistent with the Citizenship Clause in its exclusion of the children of illegal aliens because at least some such persons are not domiciled here, and therefore also are not citizens.[10]

––––––––––

[10] Because this case presents a facial challenge and no one disputes that lawful temporary visitors and some illegal aliens are not domiciled here, I would reserve for another day the question whether the children of illegal aliens *can* be domiciled here.

The Government and several scholars have suggested some reasons why, they believe, illegal aliens can never be domiciled here. An illegal alien's entry and presence violate federal law. See *INS* v. *Lopez-Mendoza*, 468 U. S. 1032, 1038 (1984). He is subject to potential removal at any time. 8 U. S. C. §§1182(a)(2)(6)(A)(i), 1229a(a)(2). And, some authorities have suggested that domicile requires permission to remain. Cf. *Fong Yue Ting* v. *United States*, 149 U. S. 698, 724 (1893); 1 Z. Swift, A System of the Laws of Connecticut 167 (1795). Therefore, when

58     TRUMP *v.* BARBARA

THOMAS, J., dissenting

A

The constitutional text supports the conclusion that the Citizenship Clause requires domicile.

1

The Citizenship Clause guarantees citizenship to persons who were both born in the United States and "subject to the jurisdiction thereof." Amdt. 14, §1. At the time that the Citizenship Clause was adopted, the phrase "subject to the jurisdiction" referred to the legal relationship that a person had to the government of his domicile. See Part I–B–2–c, *supra*. That legal relationship included the government's power over the domiciliary's personal affairs, power to regulate his conduct everywhere, and power to impose personal taxes on him. See Story on Conflict of Laws 51–52; *In re Hood's Estate*, 21 Pa., at 115. It also included the reciprocal relationship of protection abroad and primary allegiance. *Schooner Charming Betsy*, 2 Cranch, at 120. A government lacked the powers associated with this relationship, and thus lacked complete jurisdiction, over temporary visitors. See *The Venus*, 8 Cranch, at 278. Temporary visitors remained subject to the jurisdiction of their

―――――――

presented with variations on this question in other contexts, some courts have concluded that an alien who wishes to remain in the United States in violation of federal law cannot be "domiciled" here because he "lacks the legal capacity to establish domicile." *Carlson* v. *Reed*, 249 F. 3d 876, 881 (CA9 2001) (O'Scannlain, J., for the court); cf. *Kaplan* v. *Tod*, 267 U. S. 228, 230 (1925); Letter from F. Reeve, Acting Solicitor of the Treasury, to W. Windom, Secretary of the Treasury (Mar. 4, 1890), in 11 Documents of the Assembly of the State of New York, pp. 47–48 (1890); Wurman, 49 Harv. J. L. Pub. Pol'y, at 324, 448, and n. 503.

That said, many others understandably have suggested that long-term resident illegal aliens satisfy the elements of domicile because they reside here with the intent to permanently remain. As JUSTICE GORSUCH explains, the children of such aliens may be domiciled here because they are "born here to parents who have long chosen to make this Nation their permanent home." *Post*, at 3 (dissenting opinion). Such questions are best resolved in the context of as-applied challenges. See *ibid.*

THOMAS, J., dissenting

home country. See *The Pizarro*, 2 Wheat., at 246. Hence, a person was "subject to the jurisdiction" of the government where he was domiciled. *Hood*, 93 Mass., at 199–200.

This interpretation accords with the contemporaneous evidence that would have informed the public meaning of the text. It is consistent with the Civil Rights Act's requirement that citizens be "not subject to any foreign power." 14 Stat. 27. A person born in the United States to temporary visitors was subject to a foreign power—namely, the power of his home country in which he retained his domicile. See *The Venus*, 8 Cranch, at 277–279; *The Pizarro*, 2 Wheat., at 246. It is consistent with the early American law of state and national citizenship, which turned on domicile. *Brown*, 8 Pet., at 115; *The Venus*, 8 Cranch, at 277–278; Webster Report 2–3. It overrules *Dred Scott* because it restores the rule of decision under which Scott should have won— namely, that he was entitled to sue as a "citizen" of Missouri because he had a "permanent domicil in the State." *Dred Scott*, 19 How., at 531 (McLean, J., dissenting); accord, Brief for *Dred Scott* 6. It excludes tribal Indians because they remained first and foremost subject to their separate nations, which alone had complete jurisdiction over them. See *Elk*, 112 U. S., at 101–102. And, it ensures that the freedmen, who were clearly American, would not be denied citizenship based on a racial caste system.[11]

---

[11] Some have asked whether freed slaves were domiciled here given that their ancestors were brought here against their wills. It was firmly established that freed slaves were domiciled here. See, *e.g.*, 4 R. Phillimore, Commentaries Upon International Law 96–97 (1861); accord, Law of Domicil 45; Cong. Globe, 39th Cong., 1st Sess. 1160 (1866) (statement of Rep. Shellabarger); *id.*, at 1117 (statement of Rep. Wilson); *id.*, at 530 (statement of Sen. Johnson); 2 Douglass 255. Those who argue that blacks were not domiciled in the United States would have concurred in the judgment in Chief Justice Taney's opinion in *Dred Scott*, the outcome of which turned on whether Dred Scott was domiciled in Missouri. See Brief for *Dred Scott* 6.

THOMAS, J., dissenting

In other words, the phrase "subject to the jurisdiction" meant what the drafters and ratifiers said that it meant: "'complete jurisdiction,'" Cong. Globe, 39th Cong., 1st Sess., at 2893 (statement of Sen. Trumbull); "fully and completely subject to the jurisdiction of the United States," *id.*, at 2897 (statement of Sen. Williams); "the jurisdiction of the United States in every sense," *ibid.*; and a "full and complete jurisdiction," "coextensive in all respects with the constitutional power of the United States, whether exercised by Congress, by the executive, or by the judicial department; that is to say, the same jurisdiction in extent and quality as applies to every citizen of the United States now," *id.*, at 2895 (statement of Sen. Howard).

The phrase thus also had the implication that the drafters and ratifiers said that it had: The children of temporary visitors were not citizens. The Citizenship Clause, they said, "w[ould] not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of embassadors or foreign ministers." *Id.*, at 2890 (statement of Sen. Howard). After all, "we would have no right to make citizens" of "persons temporarily resident" in the United States. *Id.*, at 572 (statement of Sen. Trumbull).

2

The Court's alternative theory is more difficult to square with the text.

a

The Court defines the phrase "subject to the jurisdiction" of the United States to refer to "the power of the United States to govern those within its territory." *Ante,* at 11. It then says that at least three categories of persons born within United States territory are not subject to its jurisdiction.

First, a person is not subject to the jurisdiction of the United States when the Government "impliedly waive[s]"

its regulatory power over him. *Ante,* at 11; see also *ante*, at
15. The Court understands this category to exempt all chil-
dren of "representatives of foreign sovereigns," endeavoring
to capture a longstanding principle that such children were
not entitled to citizenship. *Ante*, at 15. Although the Court
gestures toward diplomatic immunity as a basis for this ex-
ception, diplomatic immunity extends to "only a narrow set"
of "diplomatic official[s]," not to all foreign representatives.
Brief for Sen. Ted Cruz et al. as *Amici Curiae* 28–29. Most
foreign officials receive a partial immunity, such as immun-
ity for their official acts. See Dept. of State, Diplomatic and
Consular Immunity (July 2019), www.state.gov/wp-con-
tent/uploads/2019/07/2018-DipConImm_v5_Web.pdf
(archived at perma.cc/LK63-C3YL). But, partial immunity
cannot render a person not "subject to the jurisdiction" of
the United States for Fourteenth Amendment purposes.
After all, a variety of clearly American government offi-
cials—such as judges, prosecutors, and police officers—
have similar partial official immunity.[12] Furthermore, if
the political branches can deny someone citizenship by
"waiv[ing]" their regulatory power over him, then they can
deny citizenship to any child in America, even if his family
has lived here for generations and has no other home. The
better explanation for excluding the children of foreign rep-
resentatives is that they were not domiciled in the United
States.[13]

------

[12] See *Pierson* v. *Ray*, 386 U. S. 547, 553 (1967); *Van de Kamp* v. *Gold-
stein*, 555 U. S. 335, 340–341 (2009); *Rivas-Villegas* v. *Cortesluna*, 595
U. S. 1, 5 (2021) (*per curiam*); *Tenney* v. *Brandhove*, 341 U. S. 367, 378–
379 (1951); *Trump* v. *United States*, 603 U. S. 593, 642 (2024); Brief for
Sen. Ted Cruz et al. as *Amici Curiae* 29.

[13] Diplomats and other foreign officials were likely mentioned specifi-
cally in accounts of the scope of citizenship for another reason. They
shared much in common with domiciliaries—they were often not transi-
ent visitors, but instead stayed in the country for long indefinite periods
(and were likely to have and raise children here)—but the law treated
them uniquely and presumed that they were not domiciled regardless of

Second, the Court says, a person is not subject to the jurisdiction of the United States when the Government lacks "actual power" over him. *Ante,* at 3. This category, presumably, is an attempt to accommodate the consensus that citizenship would not have been granted to the children of foreign invaders. See Brief for Respondents 1 (recognizing exception for a person in an "occupying arm[y]"); *CASA,* 606 U. S., at 884 (SOTOMAYOR, J., dissenting) (recognizing exception for a person "born of alien enemies in hostile occupation" (internal quotation marks omitted)). But, while the child of a foreign invader is of course not constitutionally entitled to citizenship, it is not because America lacks "actual power" over him. If it were, then citizenship could be denied to any American over whom the Government happened to lack "actual power" at birth. The more likely reason why foreign invaders are not citizens is that they too are foreign and not domiciled here.

Third, the Court says, a person is not subject to the jurisdiction of the United States when he is a "membe[r]" of an "alien and sovereign" nation. *Ante,* at 5 (internal quotation

---

the duration of their residence. See, *e.g.*, 1 Twiss 239 ("[T]he residence of Ambassadors and Political Envoys in a foreign country, even if such residence continue up to the time of their death, being a residence 'sine animo manendi,' should not operate to change their Domicil"); H. Halleck, Elements of International Law 310 (1866) ("The national character of an ambassador, or public minister, is not affected by his residence in a foreign country, no matter what may be its duration, or the circumstances indicative of the intent of the party to render it permanent"); Dicey & Moore 146 ("Official residence in a country is not in itself evidence of an intention to settle there, because all that can (in general) be inferred from such residence is that the official resides during the time and for the purpose of his office. . . . The presumption is strongly (if not conclusively) in favor of [the official] intending to retain his [original] domicil"); Brannon 25 ("Children born here of foreign representatives . . . under international law and common law . . . have transient residence here, not permanent domicile"); Story on Conflict of Laws §48, at 47 (6th ed. 1865) ("Ambassadors and other foreign ministers retain their domicil in the country, which they represent, and to which they belong").

THOMAS, J., dissenting

marks omitted). This category reflects the Court's attempt to accommodate the historical record that the Citizenship Clause excluded the children of Indians in tribes. See Part I–D–1–b, *supra*. But, the Court cannot explain why tribal Indians were not "subject to the jurisdiction" of the United States if they happened to be born outside Indian lands while foreign temporary visitors were. It is true that tribal Indians belonged to "alien and sovereign" nations and that the United States' relations with them implicated "intersovereign concerns." *Ante,* at 12. But, temporarily visiting foreigners also belong to "alien and sovereign" nations, and the United States' relations with them also implicate "intersovereign concerns." It is difficult to understand why China, for example, would be less alien or less sovereign than the Cherokee Nations. It is also difficult to understand why tribal Indians would be less entitled to American citizenship if born on non-Indian land within the United States than children of birth tourists who immediately returned to China.

b

The Court's definition also cannot be reconciled with the contextual evidence that would have informed the meaning of the Citizenship Clause.

The Court does not attempt to explain how its reading of the Citizenship Clause comports with the Civil Rights Act's citizenship provision. The Court does not present evidence that the children of temporary visitors were "not subject to any foreign power," as the Civil Rights Act required. Temporary visitors *were* subject to the foreign power of the government of their domicile. See Part I–B–2, *supra*; see also Brief for Tennessee et al. as *Amici Curiae* 8–9. The Court also does not present any evidence that the Citizenship Clause had a different meaning from the Civil Rights Act. As no party here disputes, the two provisions were agreed to have been synonymous with respect to foreigners. See

THOMAS, J., dissenting

Cong. Globe, 39th Cong., 1st Sess., at 2890. As the plaintiffs' counsel put it, "the Framers were trying to do the same thing with the language in both." Tr. of Oral Arg. 106–107; accord, *id.*, at 120.

The Court likewise cannot explain the evidence that citizenship in this country was instead based on domicile. See Part I–A–1, *supra.* It does not meaningfully engage with the congressional debates, during which this provision was extensively discussed. See Part I–D, *supra.* And, it has no account of why so many legislators made so many statements irreconcilable with its view. See *ibid.*

In fact, the Court does not even identify anyone who expressed the feudal principle in the relevant language—"not subject to any foreign power" or "subject to the jurisdiction" of the United States. The closest that it comes is *Lynch* v. *Clarke*'s use of the phrase "within the jurisdiction," see *ante,* at 6, 10, language that denotes "territorial jurisdiction," *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 137 (1812). But, Congress conspicuously chose not to use that broader territorial phrase in the Citizenship Clause. Notably, the Fourteenth Amendment elsewhere says that no State may "deny to any person *within its jurisdiction* the equal protection of the laws." §1 (emphasis added). The Citizenship Clause does not use that territorial phrase. See Brief for Professor Richard A. Epstein as *Amicus Curiae* 6–7 (explaining that the Equal Protection Clause refers to all persons "*within its jurisdiction*" and that "the phrase 'subject to the jurisdiction thereof' means something other than 'within the jurisdiction'"). Thus, while "jurisdiction" can refer to mere territorial jurisdiction, see *ante,* at 22–23, which a government of course exercises over temporary visitors, *Schooner Exchange*, 7 Cranch, at 137, the Citizenship Clause did not adopt that sense of jurisdiction.

THOMAS, J., dissenting

\*    \*    \*

I would not interpret "subject to the jurisdiction" to refer to the exclusion of three bespoke categories of persons whose relationship to the sovereign was not described in those terms. There is a simpler interpretation of the text that was expressly endorsed by those closer in time to ratification: Children born to diplomats, hostile alien occupiers, and Indians in tribes were not citizens because they were not subject to the complete jurisdiction of the United States. For the same reason, the children of foreign temporary visitors, who were also not subject to the complete jurisdiction of the United States, were also not citizens.

B

Practice and precedent immediately and long following ratification support the same conclusion. In constitutional law, this Court often pays close attention to how government officials interpreted and applied a constitutional provision shortly after its enactment. See *Stuart* v. *Laird*, 1 Cranch 299, 309 (1803); *Trump* v. *Slaughter*, 609 U. S. ___, ___–___ (2026) (slip op., at 9–13). Here, the Executive Branch, Congress, and the Judiciary all largely interpreted the Citizenship Clause to require domicile in the decades following ratification.

1

The Executive Branch regularly denied citizenship to the children of temporary visitors under the Citizenship Clause.

The Executive Branch's position, from the outset, was that the Citizenship Clause excluded the children of aliens who were not subject to the "complete jurisdiction" of the United States. See 14 Op. Atty. Gen., at 300. Therefore, a child born in the United States but "domiciled" abroad was "on his birth 'subject to a foreign power' and 'not subject to the jurisdiction of the United States.'" Letter from Sec. of

THOMAS, J., dissenting

State T. Bayard to B. Winchester (Nov. 28, 1885), in 2 Wharton Digest 399–400. Many executive decisions under the Citizenship Clause denied citizenship to children born but not domiciled here. See Part I–E–1–a, *supra.* In recorded, reasoned decisions, the Hayes, Cleveland, and Harrison administrations—in accordance with the opinion of President Grant's Attorney General—all denied citizenship to children born in the United States but not domiciled here (who also did not satisfy any of the exceptions to the Court's rule). See Part I–E–1–a, *supra*; 2 Wharton Digest 393–402. On the Court's account, each of these administrations—Republican and Democratic, over the course of multiple decades, and close in time to ratification—acted in defiance of the Constitution, seemingly without objection.

Against this settled course of practice, the Court can find only a single executive decision from the entire 19th century that it believes supports its interpretation. *Ante,* at 13. But, in that case, the Executive Branch ultimately ruled that the claimant—Francois Heinrich—was not a citizen. Heinrich was born on American soil and did not fall into any of the Court's three exceptions, but Secretary of State Hamilton Fish still concluded that he was "not an American citizen" because he resided in Austria. Letter to Baron Lederer (Dec. 24, 1872), in 2 Wharton Digest 395–396. The Court understands the Executive Branch to have concluded that Heinrich was "originally clothed with American nationality" but then lost that citizenship upon returning to his domicile abroad. *Ante,* at 13 (internal quotation marks omitted). Even the Court is thus forced to embrace an interpretation of the Citizenship Clause that allows the political branches to deny citizenship to persons born here to temporary visitors. On that interpretation, the political branches can deny citizenship to such persons once they return home.

Beyond that single case, the Court does not dispute that the many other 19th-century executive decisions were

THOMAS, J., dissenting

incompatible with its view. And, it has found no examples of the Executive Branch actually affording the privileges of citizenship under the Citizenship Clause to a person born here while domiciled abroad. The Executive Branch instead repeatedly took the position that the Citizenship Clause required domicile.[14]

2

Congressional practice supports the same conclusion. "[E]arly congressional enactments provide contemporaneous and weighty evidence of the Constitution's meaning." *Utah* v. *Evans*, 536 U. S. 452, 503 (2002) (THOMAS, J., concurring in part and dissenting in part) (internal quotation marks and alterations omitted). Congress could have enacted a statute that referred to the Court's three categories of exceptions. Instead, in 1870, the Reconstruction Congress reenacted the Civil Rights Act, which expressly excluded all persons "subject to any foreign power." 16 Stat. 144 (reenacting Act of Apr. 9, 1866, 14 Stat. 27). Once again, a foreigner who was not domiciled here remained subject to a foreign power—namely, his home country. See

———————
[14] One *amicus* brief tried to identify a decision recognizing the citizenship of a person born but not domiciled here, but it hurt more than it helped. See Brief for Charitable Irish Society of Boston et al. as *Amici Curiae* 5, n. 2. That person was named Joseph Mogridge. Mogridge made a claim against the United States in 1872 that required him to be a British subject. See 22 British and American Mixed Comm'n, Memorials, Demurrers, Briefs, and Decisions, No. 345 (1873) (Mixed Comm'n). The United States prevailed on the argument that Mogridge was an American citizen because he was "born within the United States" and he was "at the time of the alleged injuries, domiciled within the United States." *Ibid.* Before *Elk*, some believed that the domicile required by the Citizenship Clause could be acquired after birth. See 112 U. S., at 121–122 (Harlan, J., dissenting). The Government apparently took that view. What was not an open question was whether the Citizenship Clause required that a person, as the Mogridge case shows, be "domiciled within the United States." Demurrer to Memorial, 22 Mixed Comm'n No. 345. For good reason, the plaintiffs and the Court chose not to invoke Mogridge's case.

THOMAS, J., dissenting

Part I–B–2, *supra.* Nobody in Congress, as far as I am aware, argued that this exclusionary language violated the Citizenship Clause.

Congress left the language excluding persons "subject to any foreign power" in place until 1940. See, *e.g.*, Rev. Statutes §1992 (1875) ("All persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States"); 8 U. S. C. §1 (1934 ed.) ("All persons born in the United States and not subject to any foreign power are declared to be citizens of the United States"). It was the governing rule for the first 72 years after ratification. "[S]uch contemporaneous legislative exposition of the Constitution . . . , acquiesced in for a long term of years, fixes the construction to be given its provisions." *Printz* v. *United States*, 521 U. S. 898, 905 (1997) (internal quotation marks omitted).

The Court has no explanation for the Reconstruction Congress's 1870 decision to exclude from citizenship all persons "subject to any foreign power." It appears to concede that it cannot reconcile its interpretation of the Citizenship Clause with that statute. See *ante,* at 23–25. And, the Court recognizes that "every child born to" temporary visitors was subject to a foreign power. See *ante,* at 24; see also Part I–B–2–b, *supra.* According to the Court, then, Congress defied the Citizenship Clause immediately after enacting it.

3

Early judicial precedent supports the same conclusion. In 1873—five years after ratification—this Court described the Citizenship Clause in a manner that is, on the Court's view, indefensible. It stated that the Clause "exclude[d] from its operation children of . . . citizens or subjects of foreign states born within the United States." *Slaughter-House Cases*, 16 Wall., at 73. The Court rejects that position today, but declines to address its previous interpretation.

THOMAS, J., dissenting

Likewise, in 1884, this Court interpreted the Citizenship Clause to require that a person be "not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to [its] political jurisdiction," "owing [it] direct and immediate allegiance," and "owing no allegiance to any alien power." *Elk*, 112 U. S., at 101–102; accord, *id.*, at 117–122 (Harlan, J., dissenting); *Plessy*, 163 U. S., at 563 (Harlan, J., dissenting). The Court also rejects that position today. See *ante,* at 25.

## C

Decades of postratification scholarship interpreting the Citizenship Clause confirmed this view.

Most interpreters of the Citizenship Clause concluded that it required domicile. The Citizenship Clause, scholars said, required that a child born here of alien parents show that those parents were "permanently domiciled within the United States." Robinson, Notes on Elementary Law, at 70. It excluded those with "allegiance to some other government." Cooley, General Principles of Constitutional Law, at 243. Children born in the United States, their "parents not being here domiciled, are not citizens." Wharton Treatise 1880, at 41. "The words 'subject to the jurisdiction thereof,' . . . exclude[d] the children of foreigners transiently within the United States." Morse, Treatise on Citizenship, at 248. Children "born in the United States to foreigners here on transient residence" were not "subject to the jurisdiction of the United States." 2 Wharton Digest 393–394. A "child born here" to parents "temporarily residing" was "not a citizen of the United States, because it was not subject to its jurisdiction." S. Miller, Lectures on the Constitution of the United States, at 279.

Many more agreed: The Citizenship Clause excluded the "children of foreign subjects, born while the latter transiently sojourn here." Lesser, Citizenship and Franchise, 4 Colum. L. Times, at 146. The "children of foreigners, in

THOMAS, J., dissenting

transient residence, are not citizens." Hall, Foreign Powers and Jurisdiction of the British Crown, at 63. "[I]f a stranger or traveler passing through the country" has "a child born here, who goes out of the country with his father, such child is not a citizen." Black, Handbook of American Constitutional Law 458 (1895). "[C]hildren of foreigners in transient residence are not citizens." Hall, International Law, at 236–237 (1895). "One born of parents temporarily in our country" is not constitutionally guaranteed citizenship because he "is not born with the stamp of domicile," so the "elements of national jurisdiction are wanting." Ide, Citizenship By Birth—Another View, 30 Am. L. Rev., at 248. The Citizenship Clause excludes "children of persons passing through or temporarily residing in this country." Winchester, Citizenship in Its International Relation, 31 Am. L. Rev., at 504.

\*　　\*　　\*

The Court does not attempt to match this postratification evidence. To the contrary, the Court acknowledges that— at least by the 1880s—the Citizenship Clause was understood to require domicile by the "Government," the "Executive Branch," the "State Department," "scholars," and "treatises." *Ante*, at 14, 21. The Court, though, proposes that this widespread understanding was not evidence of the original public meaning of the Citizenship Clause, but a rebellion against it. *Ibid.* The scholars, courts, and government officials who held that domicile was required, the Court says, were engaged in a law-reform effort. Their motive, the Court seems to say, was to deny citizenship to Chinese immigrants, especially around "the election of President Cleveland, the first Democrat to hold the office since the Civil War." *Ibid.* On this basis, the Court suggests ignoring the considerable postratification practice and scholarship that is incompatible with its view. *Ibid.*

THOMAS, J., dissenting

The Court's account does not make sense. To begin, the postratification evidence against the Court's view begins not "nearly two decades after the Fourteenth Amendment's ratification," but immediately. *Ante,* at 13. Well before the Court has any explanation for a departure from its view, all three branches of the Federal Government had already rejected it. In 1870, Congress interpreted the Citizenship Clause to require that a child born here be "not subject to any foreign power." See 16 Stat. 144 (reenacting Act of Apr. 9, 1866, 14 Stat. 27). In 1873, the Supreme Court interpreted the Citizenship Clause to "exclude from its operation children of . . . citizens or subjects of foreign States born within the United States." *Slaughter-House Cases*, 16 Wall., at 72–73. And, the same year, President Grant's Attorney General interpreted the Citizenship Clause to exclude the children of "[a]liens" over whom the United States had "limited" jurisdiction even though they were "born here." 14 Op. Atty. Gen., at 300.

If all three branches of the Federal Government were not enough, many others concurred during these first two decades. The Court cannot explain why, in the 1870s, William Robinson wrote that children "born within the territory of the United States, of alien parents" were not citizens unless "permanently domiciled within the United States," Robinson, Notes on Elementary Law 70; why California excluded from citizenship "children of transient aliens," Political Code of California §51(1); why Representative Ebenezer Hoar—President Grant's first Attorney General and one of the nation's most eminent jurists—interpreted the Citizenship Clause to require domicile, 2 Cong. Rec. 3279; see 3 C. Warren, The Supreme Court in United States History 223–226 (1924); and why the Executive Branch denied citizenship to a child born here but domiciled abroad, see Letter from Acting Sec. of State F. Seward to H. Fish (Aug. 20, 1878), in 2 Wharton Digest 396. The Court likewise cannot explain why, in 1880, Thomas Cooley wrote that the

THOMAS, J., dissenting

Citizenship Clause excluded children who had any "allegiance to some other government." General Principles of Constitutional Law in the United States of America 243.

The Court's theory does not even explain the later evidence that it characterizes as a revisionist project. If, as the Court suggests, various government officials and scholars were trying to prevent the children of Chinese immigrants from being citizens, then they would not have proposed a domicile requirement alone. They would have needed to propose a citizenship requirement. As *Wong Kim Ark* exemplifies, many Chinese immigrants were already domiciled here; they simply were ineligible for formal naturalization. See 169 U. S., at 652; Part I–E–3, *supra*. Accordingly, when the Executive Branch did attempt to exclude the Chinese in the 1890s, it argued against the domicile rule. See Part I–E–3, *supra*. Meanwhile, as far as I can tell, the people excluded by the domicile requirement were not Chinese, contra, *ante* at 21, n. 7, but mostly European. Children such as Joseph Speck of Switzerland, Ludwig Hausding of Saxony, Richard Greisser of Germany, Freiderich de Bourry of Austria, and the child of Mary Deveraux of Ireland are unlikely targets of a campaign of anti-Chinese discrimination. See Part I–E–1–a, *supra*.

The more likely explanation for why so many Americans stated that the Citizenship Clause required domicile is that the Citizenship Clause required domicile.

D

Many other indicators of original public meaning support the domicile requirement. I briefly address three.

First, if the Court were right that the Citizenship Clause did not require domicile, then it would have increased dual nationality, which would have provoked concern among 19th-century Americans. "The United States has long recognized the general undesirability of dual allegiances." *Savorgnan*, 338 U. S., at 500. "[A]t the time of ratification,

THOMAS, J., dissenting

exclusive loyalty to the United States had long been a fundamental element of American citizenship." Brief for Professor Richard Epstein as *Amicus Curiae* 12; see also Part I–B–2–a, *supra.* The view at the time was that a nation should "as soon tolerate a man with two wives as a man with two countries." Letter from G. Bancroft to Lord Palmerston (Jan. 26, 1849), S. Exec. Doc. No. 38, 36th Cong., 1st Sess., at 164 (1860); see also P. Spiro, Dual Nationality and the Meaning of Citizenship, 46 Emory L. Rev. 1411, 1430 (1997).

Opposition to dual nationality was especially strong after the Civil War. "The country had just emerged from a civil war that cost the lives of over 600,000 men due to a treasonous denial of allegiance to the Union—the United States. Going forward, there would be no national citizenship absent a reasonable expectation of national allegiance." Lash, 101 Notre Dame L. Rev., at 141 (emphasis deleted). An 1868 congressional report explained that if a person was a national of both his home country and the country of his birthplace, it could "expos[e]" him to competing claims for "compulsory military service," or could cause him to be "summoned to fight for Governments with which [he] ha[s] no connections, and against those with which [his] fortunes are indissolubly united." Report of 1868, at 100; accord, *Kawakita* v. *United States*, 343 U. S. 717, 733, 736 (1952). "The intimate association of those who are claimed as subjects of foreign Governments is such as to put in peril the rights or peace of all." Report of 1868, at 100. Accordingly, this Court has long resisted reading the Citizenship Clause to inhibit the political branches' ability to address "problems attendant on dual nationality." *Rogers* v. *Bellei*, 401 U. S. 815, 831 (1971).

A rule that recognized the citizenship of children born to temporary visitors would have increased dual nationality. At the adoption of the Citizenship Clause, as today, most nations treated the children of their citizens born while

74                    TRUMP *v.* BARBARA

THOMAS, J., dissenting

temporarily abroad as citizens. See Spiro, 46 Emory L. J., at 1426; 1 W. Blackstone, Commentaries on the Laws of England 373 (1768). As a result, a child born in the United States of a temporary visitor would have immediately been a citizen of his home nation. If the Court's interpretation were correct, the child would immediately also become a dual citizen. It is unlikely that the Reconstruction Congress constitutionalized such a rule. By contrast, the domicile requirement mitigated the problem of dual nationality. Each person had one and only one domicile, so tying citizenship to domicile avoided dual citizenship. See *Inhabitants of Abington*, 40 Mass., at 177; accord, Field 147.

Second, the domicile rule aligns national citizenship with the longstanding rule for state citizenship. Even after the Court's decision today, Americans are citizens of only the State of their domicile, even if it is not the State of their birth. *Wachovia Bank*, 546 U. S., at 318. No one doubts that a child born to New Yorkers on vacation in Florida would be treated as domiciled in, and a citizen of, New York. Brief for Sen. Eric Schmitt et al. as *Amici Curiae* 7, n. 2. For the same reason, one would think that a child born to Canadians on vacation in Florida should not be a citizen of the United States. The Court, in other words, rejects and is bewildered by an approach to citizenship that is in fact the one we still know best.

Third, the domicile rule would make the Citizenship Clause accord with America's treatment of its own domiciliaries abroad. America itself has long taken the position that children of American citizens born on temporary visits abroad are American citizens. See, *e.g.*, 8 U. S. C. §§1401(c), (g); Act of Feb. 10, 1855, 10 Stat. 604; Act of Apr. 14, 1802, 1 Stat. 155; *Ludlam*, 31 Barb., at 503–504; Cooley, Principles of Constitutional Law 243, n. 1. Such children were long considered American citizens because their parents were domiciled in America. See, *e.g.*, *United States* v. *Gordon*, 25 F. Cas. 1364, 1368 (No. 15,231) (SDNY 1861).

THOMAS, J., dissenting

It is unclear why the same reasoning should not apply in the other direction.

## IV

The Court's alternative history is mistaken.

### A

The Court's theory of the Citizenship Clause stands on three main pillars: *Calvin's Case*, *Lynch* v. *Clarke*, and *Wong Kim Ark*. None can justify the Court's decision today.

#### 1

The first pillar of the Court's theory is *Calvin's Case*, a 418-year-old English common-law decision. *Calvin's Case* held that a child born in Scotland could hold land in England. See 7 Co. Rep. 1a, 77 Eng. Rep. 377 (K. B. 1608). According to the Court, Sir Edward Coke's separate opinion in *Calvin*'s *Case* established the "common law" principle called "*jus soli*," pursuant to which people owed perpetual feudal allegiance to the King of England if they were "'born within the dominions'" that he owned. *Ante,* at 3–4. This principle applied to all persons born on the land, not just those domiciled there. As the Court tells it, the 1608 feudal principle as described by Coke was adopted as the law of citizenship in America and then incorporated by reference in the Citizenship Clause. *Ante,* at 2–9.

The English principle was a rule of feudal servitude, not a rule of citizenship. "[I]n England there was no such thing as a citizen." Hamburger, Allegiance, Birthright, and Citizenship. The English principle instead determined a person's permanent feudal bondage to the King, which he could not unilaterally abandon. It was based on the notion that "[a] man owed personal service to the lord of the soil, the same as his master owed it to the king; and it was born with the child and only ended in the grave"—a relation of "master and servant." 2 Cong. Rec 3279 (statement of Rep. Cox). "Under the feudal system, every owner of lands held them

THOMAS, J., dissenting

in subjection to some superior or lord." 1 Blackstone, Commentaries on the Laws of England, at 367–368. The lord would "protect the vassal in the enjoyment of the territory granted him," while the vassal would "be faithful to the lord, and defend him against all his enemies." *Ibid.*; see also P. Schuck & R. Smith, Citizenship Without Consent 12–18 (1985).[15]

The English feudal principle "was not accepted by the American governments." Report of 1868, at 95. As JUSTICE ALITO explains, the principle that birth on the soil made a person perpetually bound to the King was premised on the theory that the King was anointed by God to rule the people like children. *Post*, at 4–5 (dissenting opinion). John Adams famously wrote that the feudal theory meant that "the common people were held together, in herds and clans, in a state of *servile* dependence on their lords" in "a state of total ignorance of every thing divine and human." 1 Papers of John Adams 113 (1977) (Adams). Americans "emphatically rejected" this theory. *Post*, at 5 (ALITO, J., dissenting). "[T]hey began their settlements, and formed their plan both of ecclesiastical and civil government, in *direct opposition* to . . . the *feudal* syste[m]." 1 Adams 114. They then dissolved "all Allegiance to the British Crown." Declaration of Independence ¶32. And, they set up a new system of government in which the people were not regarded as servile dependents. Instead, the people were sovereign, and the government derived its legitimacy from them. Declaration of Independence ¶2. In this new system of government, feudalism had no place. See 1 Adams 111–115; M. Rothbard, Conceived in Liberty 532–573 (2011). The soil did not belong to the government, but to the people. And, those who

---

[15] The English feudal principle was also a product of the "isolated position of th[e] island" nation of England, which meant that temporary visits from childbearing foreigners were rare. A. Cockburn, Nationality: The Law Relating to Subjects and Aliens, Considered With a View to Future Legislation 7 (1869); cf. Law of Domicil 5–6.

THOMAS, J., dissenting

were born on it did not owe the government a lifetime of obeisance or servitude.

The Reconstruction Congress expressly opposed the feudal principle that the Court claims that it adopted.  Contra, *ante,* at 25–26 (majority opinion).  As its Committee on Foreign Affairs saw the matter, "[t]here is nothing American in the oath of the land barons of England."  Report of 1868, at 99.  It described the English rule's "claim of indefeasible allegiance and perpetual service" as "the symbol of feudalism and force."  *Id*., at 96.  Instead of the feudal principle, the congressional Report explained that American law viewed people as taking on a new citizenship, as relevant here, when they changed their "domicile."  *Id*., at 100.  The same year that the Citizenship Clause was ratified, Congress passed a statute rejecting the feudal principle and explaining that it supported the right of all persons to expatriate and change their citizenship.  Act of July 27, 1868, 15 Stat. 223–224; see Spiro, 46 Emory L. J., at 1427–1428.

In fact, by the 1840s, even English law had evolved.  England had moved on from "the darkness of the middle ages" and—as the "subjects of one kingdom began to migrate into and reside in other countries"—had begun to attach a newfound "importance to the Law of Domicil."  Law of Domicil 14.  Well before the Citizenship Clause, this Court explained that "the Courts of England ha[d] decided, that a person who removes to a foreign country, settles himself there, and engages in the trade of the country, furnishes, by these acts, such evidence of an intention permanently to reside there, as to stamp him with the national character of the state where he resides."  *The Venus*, 8 Cranch, at 279.  A year after the Citizenship Clause, a renowned English case declared that a person's civil status, "by virtue of which he has ascribed to him the character of a citizen of some particular country," is "governed universally by one single principle, namely, that of domicil."  *Udny* v. *Udny*, (1869) SC (HL) 441, 457 (Scot).

THOMAS, J., dissenting

2

The second pillar of the Court's theory is *Lynch* v. *Clarke*—a "single state-court case about citizenship," *ante,* at 19–20, from 1844. Thomas Lynch was a successful businessman in New York. When he died, he had no will and no children. Shortly after he died, his brother Bernard and his niece (through another brother) Julia moved to New York from Ireland. The New York Legislature then passed a special statute giving Lynch's property to Julia Lynch, subject only to the rights of the "heirs at law of Thomas Lynch." 1 Sand. Ch., at 586. The legislature then passed another special statute giving Lynch's property to Bernard Lynch, save for "the claims of heirs of Thomas, and the existing rights of Julia Lynch." *Ibid.* Lynch's business partner, John Clarke, also claimed a right to property in his estate.

Bernard then brought a bill in equity against both Julia and Clarke. Julia cited the special statute giving her inheritance rights, but also argued that because she was born in the United States, she inherited all of Thomas's property and had other equitable entitlements. That argument turned on a state-law bar on aliens inheriting real property, so Julia argued that she was not an alien. She argued, among other things, that she was not an alien because she was in fact domiciled in the United States at the time of her birth: Her father "came here with an intention to remain, and thereby changed his domicil." *Id.*, at 632.

The assistant vice chancellor who was assigned the case held six days of argument, during which Julia Lynch's citizenship "was not then made a very prominent point." *Id.*, at 588. After argument, the assistant vice chancellor "became so impressed with the importance of the question upon the citizenship of Julia Lynch" that he asked for supplemental briefing on the issue. *Ibid.* He then wrote a long opinion explaining his theory of American citizenship, which concluded that Julia Lynch was not an alien, but a

citizen, and therefore entitled to inherit the property. Within a year, New York replaced the law that the assistant vice chancellor interpreted with a new law that simply made aliens eligible to inherit property.  See 1845 N. Y. Laws p. 94.  The State shut down his court two years later. See N. Y. Const., Art. XIV, §8 (1846) ("The offices of Chancellor, . . . Vice-Chancellor, Assistant Vice-Chancellor . . . are abolished"); 2 Lincoln, The Constitutional History of New York From the Beginning of the Colonial Period to the Year 1905, p. 152 (1905).

The Court's reverence for *Lynch* v. *Clarke* is not commensurate with its importance.  *Lynch* was not a precedent of this Court, or any federal court, or any state appellate court, or even a court of law.  Instead, it was decided by a New York "assistant vice-chancellor" in a court of equity's equivalent to a trial court.  The assistant vice chancellor, much like a magistrate judge, had the power to hear "preliminary motion[s] for the suppression of testimony" and cases "refer[red]" to him by the chancellor.  See 1845 New York Laws p. 263.  The assistant vice chancellor's opinion on Julia's citizenship was apparently not reviewed by any appellate court.  See W. Mayton, Birthright Citizenship and the Civic Minimum, 22 Geo. Immigration L. J. 221, 239–240 (2008).

*Lynch* also did not interpret the Citizenship Clause, a statute using the same language as the Citizenship Clause, or even a statute that remained in effect at the time of the Citizenship Clause.  Instead, it interpreted a New York state law.  The state law was replaced immediately after *Lynch*.  See 1 Sand. Ch., at 583, n. a., 620; 1845 N. Y. Laws p. 94.  If a "single, expressly limited opinion from a specialized intermediate [federal] court" does not establish a well-settled meaning that the Court can assume Congress incorporated into a federal statute that uses the same language, *Learning Resources, Inc.* v. *Trump*, 607 U. S. 229, 252

(2026), then a single state trial equity-court decision interpreting a different law certainly does not do so.[16]

*Lynch* also lacked staying power. By the time of the Citizenship Clause, New York's higher courts had all but abrogated it. In *Ludlam* v. *Ludlam*, a New York appellate court held that the children of those "traveling or sojourning abroad," "though born in a foreign country, are not born under the allegiance, and are an exception to the rule which makes the place of birth the test of citizenship." 31 Barb., at 503. That decision was affirmed by the New York Court of Appeals, which stated: "By the law of nature alone, children follow the condition of their fathers, and enter into all their rights. The place of birth produces no change in this particular." *Ludlam* v. *Ludlam*, 26 N.Y. 356, 368 (1863) (emphasis deleted); see also Mayton, 22 Geo. Immigration L. J., at 240 ("shortly thereafter, in *Ludlam* v. *Ludlam*, that state's highest court with all justices concurring spoke differently, saying that birthright citizenship depended on parentage rather than the 'boundaries of the place'"). When the New York Legislature authorized a committee to codify its laws in 1860, the codification defined birthright "citizens" as "[a]ll persons born in this state and domiciled within it, except the children of transient aliens and of alien public ministers and consuls." Political Code of New York §5.

———————

[16] New York also stood apart from the rest of the United States in its affinity for the feudal system on which the assistant vice chancellor's theory was based. See D. Ellis, Land Tenure and Tenancy in the Hudson Valley, 1790–1860, 18 Agricultural Hist. 75 (1944) (explaining that the Hudson Valley, with its "large manors and estates owned by a closely knit and politically powerful aristocracy," was "distinctive, if not unique, in American history"); Rothbard, Conceived in Liberty 534 ("As early as the turn of the eighteenth century, New York, in its large Hudson River manors, was the only colony where feudal landholding retained an important foothold"); C. Spencer, The Land System of Colonial New York, 16 Proceedings of N. Y. State Hist. Assn. 150, 151 (1917) (noting the "quasi-feudal tendency" in New York prior to the American Revolution).

THOMAS, J., dissenting

Then, "during the Fourteenth Amendment debates of the Thirty-Ninth Congress, *Lynch* went unmentioned. It was only during the Civil Rights Act [debates] that *Lynch* appeared—a single mention by a member who played no role in drafting the Fourteenth Amendment." Lash, 101 Notre Dame L. Rev., at 119 (footnote omitted); see Epstein, The Myth of Birthright Citizenship, at 80 ("At the time of the debates over the ratification of the Fourteenth Amendment, moreover, *Lynch* v. *Clarke* appeared to play no role"). So, while this Court's opinion invokes *Lynch* 13 times in 26 pages, the entire Reconstruction Congress in the combined course of deliberations over the Civil Rights Act and the Citizenship Clause mentioned it only once.

3

The third pillar of the Court's theory is *Wong Kim Ark*. The question before the Court today—whether the Citizenship Clause requires the President to recognize citizenship for the children of all lawful temporary visitors and illegal aliens—was not before the Court in *Wong Kim Ark*. Instead, the *Wong Kim Ark* Court held that someone born in America to parents domiciled in the United States was a citizen. It rejected the Government's argument that Wong's parents had to be citizens for him to be a citizen at birth.

The Citizenship Order is fully consistent with this decision. Under the Order, people like Wong remain citizens, and the Government today nowhere urges the position that it took in *Wong Kim Ark*. To the contrary, it invokes authorities that the Government in *Wong Kim Ark* opposed. Compare Brief for Petitioner 13–43 (arguing for domicile rule) with Brief for Appellant in *Wong Kim Ark*, O. T. 1895, No. 904, at 13–31 (arguing against domicile rule). The Court nonetheless leans heavily on dicta from the majority opinion in *Wong Kim Ark*, which it takes to have established that Wong's domicile was irrelevant, and that he—a

lifelong American—was indistinguishable from a person who had no meaningful ties to America.

The Court does not ordinarily put so much weight on past decisions' discussion of matters not before the Court. "It is a maxim not to be disregarded," this Court has always admonished, "that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens* v. *Virginia*, 6 Wheat. 264, 399 (1821). Thus, if they "go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Ibid.* "Instead, we emphasize, our opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." *National Pork Producers Council* v. *Ross*, 598 U. S. 356, 373–374 (2023). After all, "[t]he question actually before the Court is investigated with care, and considered in its full extent," but "[o]ther principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." *Cohens*, 6 Wheat., at 399–400. Cf. *Trump* v. *Cook*, 609 U. S. ___, ___, n. 3 (2026) (slip op., at 17, n. 3) ("[W]e review judgments, not statements in opinions" (internal quotation marks and alterations omitted)).

Nor is *Wong Kim Ark*'s dicta so clearly on the Court's side. After a long discussion with many internally inconsistent statements, *Wong Kim Ark*'s final statement of the rule comported more closely with the Citizenship Order's application to temporary visitors than with the Court's view. The *Wong Kim Ark* Court concluded that the Citizenship Clause grants citizenship to "all children here born of *resident* aliens, with the exceptions or qualifications" of (1) "children of foreign sovereigns," (2) children of foreign "ministers," (3) children "born on foreign public ships," (4) children "of enemies within and during a hostile occupation of part of our territory," and (5) "children of members of the

THOMAS, J., dissenting

Indian tribes owing direct allegiance to their several tribes." 169 U. S., at 693 (emphasis added). It then reaffirmed that "[t]he Amendment, in clear words and manifest intent, includes the children born within the territory of the United States, of all other persons, of whatever race or color, *domiciled* within the United States." *Ibid.* (emphasis added).

*Wong Kim Ark* also repeatedly emphasized that its holding was limited to domiciliaries. See Part I–E–3, *supra.* It did so seven times in the first paragraph and repeatedly after that. *Id.*, at 652. And, presciently, *Wong Kim Ark* itself invoked this Court's oft-repeated reminder that "general expressions" that "go beyond the case" should not "control the judgment in a subsequent suit when the very point is presented for decision." *Id.*, at 679 (internal quotation marks omitted). "This is not quite 'no, no, a thousand times no,' but should have sufficed to dissuade the [Court] from invoking the case with respect to the distinct legal and factual issues presented here." *Learning Resources*, 607 U. S., at 254–255, n. 6 (citation omitted).

It is not surprising that *Wong Kim Ark* limited its holding to domiciliaries. The Government in *Wong Kim Ark* stipulated that Wong was domiciled in the United States and argued that domicile was irrelevant. See Part I–E–3, *supra*; Brief for Appellant, O. T. 1895, No. 904, at 13–29. The Court thus had little reason to consider what rule would apply to a temporary visitor. The Court was hardly likely to upset the consensus that the Citizenship Clause required domicile in a case where the issue was irrelevant given Wong's domicile in this country. See Part I–E, *supra.*

If *Wong Kim Ark* were so "simple" in establishing the Court's rule as to temporary visitors, *ante,* at 16, that meaning was seemingly lost on many. As a Department of Justice report confirmed in 1910, a dozen years after *Wong Kim Ark*, "it has never been held, and it is very doubtful whether it will ever be held, that the mere act of birth of a child on

THOMAS, J., dissenting

American soil, to parents who are . . . temporarily in the United States, operates to invest such child with all the rights of American citizenship." Spanish Treaty Claims Comm'n, Final Report of William Wallace Brown, Assistant Attorney-General, p. 124. The Citizenship Clause's reference to "jurisdiction" "does not mean that jurisdiction to which the bodily form of the child is subject from the moment of its birth," but instead that "larger jurisdiction, which, though difficult to define, is well known and understood, the difference between the jurisdiction which is exercised over a visitor and that over one domiciled." *Id.*, at 125.

In the years following *Wong Kim Ark,* the Citizenship Clause was generally understood as limited to children born of "alien parents, not temporarily resident here, but permanently domiciled." Brannon 29. Nothing in *Wong Kim Ark* changed the consensus that "children born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction'" of the United States. Taylor, International Public Law, at 220; accord, *e.g.*, Hall, International Law, at 227 (1904) ("[I]t would seem that the children of foreigners in transient residence are not citizens"); 1 Wharton, Conflict of Laws 42–45 (1905) ("citizens" must be "domiciled"); Guthrie, Lectures, at 57 ("permanently domiciled and residing here"); Westlake, International Law, at 220 (when a father is "in the Union for a transient purpose," his children "born within it have his nationality"); Black, Handbook of American Constitutional Law, at 634 (3d ed. 1910) (no citizenship for child of "a stranger or traveler passing through the country, or temporarily residing here"); 1 Bellott, Leading Cases on International Law, at 183 ("[C]hildren . . . of foreigners in transient residence . . . are excluded from citizenship, even though born within the United States").

THOMAS, J., dissenting

4

As for the remainder of the Court's reasoning, much of it is self-defeating.

To begin, the Court invokes Frederick Douglass's statement that "[t]he Constitution knows all the human inhabitants of this country as 'the people.'" *Ante,* at 7 (quoting 2 Douglass 415). But, temporary visitors are not "inhabitants"; to be an inhabitant, a person must be domiciled. See T. Cooley, Constitutional Limitations 661 (2d ed. 1871) ("[O]ne is an inhabitant, resident, or citizen at the place where he has his domicile"); *Crawford* v. *Wilson*, 4 Barb. 504, 520 (NY 1848) ("Inhabitant is defined to be one who has his domicil in a place," "'as distinguished from an occasional lodger or visitor'"); *Sears* v. *Boston*, 42 Mass. 250, 251 (1840) ("the domicil, or the fact of being an inhabitant"); *Littlefield* v. *Inhabitants of Brooks*, 50 Me. 475, 478 (1862) ("where he was an inhabitant—where he had a domicil"). And, Frederick Douglass himself argued that blacks were citizens because they were not comparable to temporary visitors—they were not "aliens"; they were not "exiles"; and they were not "strangers." 2 Douglass 255–256. Instead, they were "Americans," he said, who—unlike temporary visitors—"owe equal allegiance to the same government." *Id.*, at 255, 265.

Likewise, the Court invokes Attorney General Bates's statement that persons born here were "*prima facie*" citizens. See *ante,* at 8. But, the Court does not seem to be aware that this phrase corresponds to the rule of domicile that the Court rejects. See *President and Fellows of Harvard College*, 22 Mass., at 375 ("[T]he place of birth" is "*prima facie* evidence of domicil"); see also, *e.g., Overseers of Readington* v. *Overseers of Tewksbury*, 2 N. J. L., at 289; Story on Conflict of Laws 45. If a person's parents were domiciled abroad, then the *prima facie* case was overcome. See Part I–B, *supra.*

THOMAS, J., dissenting

Beyond these statements, the Court mainly emphasizes that the children of temporary visitors owed a partial "allegiance" to and were owed partial "protection" from the sovereign. See, *e.g.*, *ante,* at 10, 17–19. That (undisputed) fact does not demonstrate that the children of these visitors were citizens. See Part I–B–2–b, *supra.* To the contrary, Senator Trumbull explained that the Civil Rights Act was written to avoid this very misunderstanding: The Act said "not subject to any foreign power" instead of "owing allegiance" to the United States precisely because temporary visitors owed a partial allegiance to the United States, and he did not want anyone to mistakenly conclude that the Act included the children of temporary visitors. Cong. Globe, 39th Cong., 1st Sess., at 572. The language chosen thus excluded temporary sojourners, who "continue[d] to owe allegiance to [their] native country." 1 Z. Swift, A System of the Laws of the State of Connecticut 164 (1795); accord, *Ludlam*, 31 Barb., at 503.

Finally, the Court relies on general statements without recognizing that those statements are also compatible with my view of the Citizenship Clause. The Citizenship Clause indeed followed the pre-existing law, see, *e.g.*, *ante*, at 9, but the pre-existing law was based on domicile, see Part I–A, *supra*; children born here to foreign parents indeed were generally citizens, see *e.g.*, *ante*, at 5, but that is because they were generally domiciled here, see Part I–A, *supra*; and citizenship did indeed almost always follow birthplace, see, *e.g.*, *ante*, at 8–9, but that is because birthplace almost always followed domicile, see Part I–A, *supra*.

B

The Court's responses to my view also undermine its own. The Court criticizes my view for depending on "the *parents*' status, not the *child's*." *Ante,* at 14. But, the Court's view depends on the "parents' status," too. The Court, for example, excludes from citizenship the children of

"representatives of foreign sovereigns" or enemy invaders. *Ante,* at 3, 15.  Unless newborn babies are serving as international diplomats, the Court's account thus turns on parents' status.  Along the same lines, the Court asks why "[w]ords appearing frequently in the Executive Order— 'mother,' 'father,' 'lawful,' 'temporary'—are absent from the Clause." *Ante,* at 22.  But, again, if that is a problem, then it is one for the Court's theory as well.  After all, the Court's exceptions—for "foreign representatives," "Indians," and invading "enemies"—do not appear in the Clause, either.  Finally, the Court suggests that "domicile" is a difficult concept to apply.  See *ante*, at 20.  But, "'[d]omicile' is, of course, a concept widely used in both federal and state courts for jurisdiction and conflict-of-laws purposes, and its meaning is generally uncontroverted." *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U. S. 30, 48 (1989).  And, the Court's concept poses its own administrability questions.  The Court never explains, for example, what happens when a child is born to a citizen and a diplomat or to a citizen and a member of an invading army.

   The Court also suggests that my interpretation of the Citizenship Clause is not consistent with the Civil Rights Act's "not subject to any foreign power" requirement because a foreign nation can purport to exercise power over its original citizens even after they establish a domicile here. *Ante,* at 23–24.  But, the Court's interpretation of the Citizenship Clause does not even attempt to be consistent with the Civil Rights Act's requirement, since the children of temporary visitors are clearly subject to the foreign power of their homeland.  See Part I–B–2, *supra.*  Regardless, the Court is wrong about domiciliaries' remaining "subject to" the foreign power of their country of birth.  Although their nation of origin might purport to exercise jurisdiction over them, the United States would not have had to recognize that authority as lawful once those persons were domiciled here.  See Part I–B–2, *supra.*

THOMAS, J., dissenting

The Court ultimately denigrates the evidence in support of my position as "scant." *Ante,* at 18. I see it differently. The Court cites little evidence from the Reconstruction Congress that gave us the Citizenship Clause. And, its other 19th-century evidence is slim in comparison. As for the evidence in support of my position, it is substantial. Representative Bingham, the architect of the Fourteenth Amendment, believed that the Citizenship Clause would not apply to the children of temporary visitors. Senator Trumbull, a principal champion of the Amendment, agreed. Jacob Howard, who introduced the Citizenship Clause, agreed. Congressman after Congressman during the legislative debates agreed. Congress in 1870 agreed. President Grant's Attorney General agreed. President Grant's Attorney General before that agreed. The Supreme Court in 1873 agreed. State legislatures agreed. Executive Branch decisionmakers over the course of multiple decades agreed. Justice Miller agreed. Thomas Cooley agreed. A battery of other eminent scholars agreed. And, the great Justice John Marshall Harlan, on three separate occasions, agreed. Once again, "I am quite comfortable in the company I keep." *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 772 (2007) (THOMAS, J., concurring).

V

Before concluding, I briefly address plaintiffs' argument that even if the Citizenship Order has at least some lawful applications consistent with the Citizenship Clause, it is not consistent with the statutory citizenship provision in force today. The Court gives no independent import to the statutory citizenship provision, and I would not, either.

From 1866 until 1940, the statutory citizenship provision required that a person claiming citizenship based on birth in the United States be "not subject to any foreign power." See 16 Stat. 144; 14 Stat. 27. That language from the Civil Rights Act, like the language of the Citizenship Clause,

THOMAS, J., dissenting

required that a person claiming citizenship have a domicile in the United States. See Part I–B–2–b, *supra*. So, both the statute and the Constitution required domicile until at least 1940. See Part I, *supra*.

The Nationality Act of 1940 codified the existing law by enacting the Citizenship Clause's text. "By the early 1930's, the American law on nationality . . . was expressed in a large number of provisions scattered throughout the statute books." *Perez* v. *Brownell*, 356 U. S. 44, 52 (1958). President Roosevelt designated a committee to review existing nationality laws and, as relevant here, "to codify those laws into one comprehensive nationality law." Revision and Codification of the Nationality Laws of the United States, Exec. Order No. 6115 (Apr. 25, 1933). As a result of that process, Congress enacted the Nationality Act in 1940. 54 Stat. 1137; see *Perez*, 356 U. S., at 56. The Nationality Act was the "first attempt ever made since the founding of our Republic to codify and unify all the laws of the United States relating to the important subjects of nationality and naturalization." G. Knight, Nationality Act of 1940, 26 A. B. A. J. 938 (1940).

A codification of existing law does not change the law unless it does so clearly. When legislatures "consolidate their statutes at large into a code," they "often revise the wording of the prior statute to provide for consistency of expression. But that revision does not result from legislative reconsideration of the substance of codified statutes." A. Scalia & B. Garner, Reading Law 257 (2012). The same is true for "legislative restyling exercises short of codification." *Ibid.* Such "new language does not amend prior enactments unless it does so clearly." *Ibid.*; see also, *e.g.*, *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 318 (1985); *Wingo* v. *Wedding*, 418 U. S. 461, 469, and n. 9 (1974); *Rainbow Nav., Inc.* v. *Department of Navy*, 783 F. 2d 1072, 1076 (CADC 1986) (Scalia, J., for the court).

THOMAS, J., dissenting

The Nationality Act's citizenship provision codified the Civil Rights Act's "not subject to any foreign power" requirement and the Citizenship Clause's "subject to the jurisdiction" requirement. It did so by borrowing language from the Citizenship Clause, which granted citizenship to all persons "born in the United States, and subject to the jurisdiction thereof." 54 Stat. 1138. By using language that tracked the Citizenship Clause, Congress did not clearly change the law. "It would be surprising to discover that Congress departed from the constitutional standard by enacting the exact constitutional language." S. Menashi, The Birthright Citizenship Debate, 49 Harv. J. L. & Pub. Pol'y 301, 313 (2026).

## VI

The Fourteenth Amendment was enacted in the wake of the Civil War, "with the one pervading purpose" of securing equal citizenship for the freed slaves. *Slaughter-House Cases*, 16 Wall., at 71. It was enacted, as Justice Harlan wrote, "to secure to a race recently emancipated" the "civil rights" that other citizens enjoyed. *Plessy*, 163 U. S., at 555–556.

This Court has time and again denied Americans that promise. Shortly after the Amendment was ratified, this Court deprived black citizens of the right to peaceably assemble and to keep and bear arms. See *United States* v. *Cruikshank*, 92 U. S. 542 (1876); see *McDonald*, 561 U. S., at 808–809 (THOMAS, J., concurring in part and concurring in judgment). A little later, in *Plessy*, the Court upheld the subjugation of black citizens in the form of state-coerced racial segregation. 163 U. S. 537. When it had an opportunity to correct that profound error, it did so narrowly. See *Brown* v. *Bd. of Ed.*, 347 U. S. 483, 494, and n. 11 (1954). It then used that very decision to justify busing American children to different schools based on their race. See *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1 (1971).

THOMAS, J., dissenting

And, until recently, this Court continued to selectively enforce our colorblind Constitution, including by allowing state-coerced racial discrimination in public education, *e.g.*, *Grutter* v. *Bollinger*, 539 U. S. 306 (2003), and compelling States to draw political districts on the basis of race, *e.g.*, *Allen* v. *Milligan*, 599 U. S. 1 (2023).

Meanwhile, the Court has repurposed the Fourteenth Amendment to protect its own set of preferred rights that the Reconstruction Congress never contemplated and that cannot find support in its text. Today, the Court does so again by recognizing a constitutional right to citizenship for the children of all foreign birth tourists and illegal aliens.

## VII

I am not sure that today's opinion will stand the test of time. The Citizenship Clause "added greatly to the dignity and glory of American citizenship." *Plessy*, 163 U. S., at 555 (Harlan, J., dissenting). Today's opinion devalues that citizenship. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

———————

No. 25–365

———————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* BARBARA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 30, 2026]

JUSTICE ALITO, dissenting.

This is one of the most important decisions in the history of the Court, and in my judgment, the Court has made a serious mistake. As interpreted by the Court today, the Fourteenth Amendment confers citizenship on virtually everyone who happens to be born in this country, including the children of "birth tourists," women who come here solely for the purpose of giving birth to a child and then promptly return home. Careful analysis of the text of the Fourteenth Amendment and the process that led to its adoption shows that it does not degrade the concept of United States citizenship in this way. Instead, the Fourteenth Amendment confers citizenship on only those children who, at birth, owe allegiance solely to this country.

Respecting this interpretation would not require uprooting the millions of children who were born here to mothers who entered or remained in this country illegally. Those children are not responsible for their parents' violation of our immigration laws, and their plight is the result of a long period during which a coterie of actors—Executive Branch officials, States and cities, and a variety of private groups—sent the message to would-be immigrants that our

ALITO, J., dissenting

immigration laws should not be taken too seriously. This message, coupled with ineffective or unenthusiastic enforcement, spurred massive illegal immigration and the growth of a large contingent of people who were born here to mothers unlawfully present in this country. Some members of this group have lived here for years, and they have a strong moral claim to be able to remain in the land where they grew up.

Congress can and should address their situation. The Fourteenth Amendment dictates who *must* be a citizen, but it does not address who *may* be a citizen by Act of Congress. Congress has conferred citizenship on many people who are not made citizens by the Fourteenth Amendment, including children born abroad to American citizen parents. These people and the millions of immigrants who have been naturalized are no less American than those who are fortunate enough to be born here.

For these reasons, the original meaning of the Fourteenth Amendment does not require inhumane results, and we should not adopt an erroneous interpretation of the Fourteenth Amendment simply out of fear of the consequences of "rocking the boat" or as a reaction to current immigration policy.

Nor should we take the position that our hands are tied by dicta in a sprawling 19th-century opinion that is, to put the point gently, very far from a model of careful judicial craftsmanship. Too much is at stake.

United States citizenship is precious. Anyone who has attended a ceremony where citizens are naturalized can see that message on the faces of those who take the citizenship oath. Before saddling the Nation with a medieval rule, we had better be certain the Constitution requires it.

The Court's account of the birthright-citizenship rule in American law is roughly as follows. After American independence, the British rule of birthright subjecthood was modified in just one way (to take account of Indians who

ALITO, J., dissenting

lived under tribal governance), but otherwise the rule was transplanted intact to American soil.  As modified, the rule was that a child born in this country is automatically an American citizen unless the child is born to tribal Indians or to a diplomat with immunity from legal process.  During the period before the Civil War, the rule's status was firm. After the war, Congress codified the rule in §1 of the Fourteenth Amendment.  And in *United States* v. *Wong Kim Ark*, 169 U. S. 649 (1898), this Court issued a binding precedent confirming what Congress had done.

Every step of this story is incorrect.  The Declaration of Independence repudiated the foundation on which the British rule was based.  See *infra*, at 5.  From 1776 until the eve of the Civil War, the status of the rule in this country was unsettled.  There is no evidence establishing that the Constitution's references to citizens incorporated the British rule, *infra*, at 5–8, and until the eve of the Civil War, there was little litigation about the meaning of American citizenship, *infra*, at 9–11.  After the war, Congress finally adopted a constitutional provision, §1 of the Fourteenth Amendment, making certain persons citizens at birth, but that provision differed substantially from the British rule.  It specified that a person born here is not a citizen unless his allegiance to the United States is unimpaired by any obligations to a foreign power.  *Infra*, at 11–22.  And while *Wong Kim Ark* included dicta suggesting that the Fourteenth Amendment incorporates the British rule, its actual holding was much narrower, *infra*, at 22–28, and under that interpretation, respondents' challenge to Executive Order No. 14160, Protecting the Meaning and Value of American Citizenship, fails, *infra*, at 36–39.

I
A

According to the Court, the Fourteenth Amendment's Citizenship Clause codified the British rule of birthright

ALITO, J., dissenting

subjecthood with only one new exception, which was needed to accommodate the unique status of American Indians. That is a curious claim, and it is ironic that the Court should embrace it only days before we celebrate the 250th anniversary of our Declaration of Independence, which emphatically renounced the foundation on which the British rule rested.

That rule did not concern "citizenship." There was no such thing as a "citizen" of England, Scotland, or Ireland. The inhabitants of the British Isles were the King's "subjects." As Sir Edward Coke explained in *Calvin's Case*, 7 Co. Rep. 1a, 77 Eng. Rep. 377 (K. B. 1608), they acquired that status automatically at birth, and they retained it, like it or not, until they died. *Id.*, at 4b, 77 Eng. Rep., at 382; see *id.*, at 9b, 77 Eng. Rep., at 388 (even a subject who abjures the realm "oweth the King his ligeance"). This status arose from a feudal understanding of the origin of governmental authority and the relationship between those who govern and those who are governed. The King's authority was understood to come from God. *Id.*, at 12b–13a, 77 Eng. Rep., at 390–391. As Coke put it, a King ruled by the law of nature. *Ibid.* And birth established the bond between King and subject, *id.*, at 4b, 77 Eng. Rep., at 382, just as birth establishes the bond between parent and child.

In *Calvin's Case*, the question was whether a man born in Scotland was a subject of King James I of England, who acceded to the thrones of both Scotland and England before the man's birth. *Id.*, at 2a, 77 Eng. Rep., at 379. In a famous speech to Parliament, James I forcefully explained his views about the source of his authority and his relationship with his subjects. The King, he proclaimed, sits "upon GOD[']s throne" and is the "father of his people." March 21, 1609 A Speech to the Lords and Commons of the Parliament at White-Hall, in The Political Works of James I, p. 307 (C. McIlwain ed. 1918).

ALITO, J., dissenting

This theory of monarchical power and the status of the people provided the foundation on which the rule of birth-right subjecthood stood. Just as a person automatically acquires at birth all that is entailed by the relationship between parent and child, a person born within the King's dominion automatically became the King's subject. *Calvin's Case*, 7 Co. Rep., at 4b, 77 Eng. Rep., at 382. This meant that the subject acquired a duty of obedience to the King, and the King owed a duty of protection to the subject. *Ibid.* This relationship was not based on consent, and a subject could not shed it. *Ibid.*; see *id.*, at 9b, 77 Eng. Rep., at 388.

In this system of soil and servitude, the Court sees "emancipation." *Ante*, at 26. But our Founders disagreed. The Declaration of Independence emphatically rejected the British theory of government. It proclaimed that governments "deriv[e] their just powers from the consent of the governed," not divine right. ¶2. And it "[a]bsolved" the people of the United States "from all Allegiance to the British Crown." ¶32.

With its foundation blown away, the British rule of birth-right subjecthood was not suited for easy incorporation into American law. Accord, *ante*, at 75–77 (THOMAS, J., dissenting). In addition to the incompatibility of its theoretical foundation, two distinctively American practical problems stood in the way.

The first was the problem of slavery and, more broadly, of race. In England itself, the number of slaves had never approached American dimensions. Just four years before the American Colonies declared independence, Lord Mansfield's decision in *Somerset* v. *Stewart*, Lofft. 1, 98 Eng. Rep. 499 (K. B. 1772), denied that slavery had any common-law foundation. See *id.*, at 19, 98 Eng. Rep., at 510 (proclaiming that slavery was "so odious, that nothing can be suffered to

ALITO, J., dissenting

support it, but positive law"). And it would soon disappear.[1] In the United States, on the other hand, nearly 700,000 lived in slavery—roughly one-fifth of the country's population—according to the first census in 1790. And since the contemporary definition of a citizen was a "freeman of a city; . . . not a slave," 1 S. Johnson, A Dictionary of the English Language (4th rev. ed. 1773), it was obvious that neither the Articles of Confederation nor the Constitution, both of which allowed slavery to continue, recognized the members of this sizeable population as citizens.

Even for the free black population of the United States, there was substantial opposition to application of the British rule. Many States, both in the South and Midwest, restricted the rights traditionally associated with citizenship—such as the ability to settle, vote, and serve as a witness in court—to white residents.[2] And there was some federal support for this understanding of citizenship.[3] In Britain, on the other hand, as the Court notes, the common law did not take account of race. *Ante*, at 5–6.

The second problem was the unique legal status of Indian tribes in the United States. Under the Clause of the Constitution allocating seats in the House of Representatives and Presidential electors, "Indians not taxed" were excluded from the body politic and thereby denied citizenship. Art. I, §2, cl. 3. This provision did not require census takers to determine whether individual Indians owed or paid taxes. Instead, the phrase referred to those Indians who retained their traditional way of life. They lived in their own communities under tribal law and enjoyed the

---

[1] See W. Cotter, The Somerset Case and the Abolition of Slavery in England, 79 History 31, 33, and nn. 6–8 (1994).

[2] See, *e.g.*, Ind. Const., Art. XIII (1851); Ill. Const., Art. VI, §1 (1848); Mo. Const., Art. III, §26 (1820); 1783 Md. Acts ch. 23, §3.

[3] Under the Naturalization Act of 1790, only a "free white person" could become a citizen. Ch. 3, 1 Stat. 103; but see 37 Annals of Cong. 83 (1820) (Senator Holmes arguing that "[f]ree blacks are citizens").

"privilege of total immunity from State taxation." *The Kansas Indians*, 5 Wall. 737, 756 (1867); see also *Worcester* v. *Georgia*, 6 Pet. 515, 559–561 (1832). It is hard to find estimates of the size of this segment of the population at the end of the 18th century, but it was certainly significant.

The existence of these two big carveouts refutes any argument that the British rule was transplanted without modification to American soil. Accord, *ante*, at 62–63 (THOMAS, J., dissenting). And any attempt to plant some version of that rule here also faced the problem of applying it to a Nation that, unlike Britain, had a written Constitution and a federal system.

In Britain, the rule of birthright subjecthood was part of the common law and thus could be changed by Parliament whenever it chose. If the rule was transplanted across the Atlantic, would it have a similar status here? Would it be part of the common law that state legislatures or courts could alter or abandon? See *Van Ness* v. *Pacard*, 2 Pet. 137, 144 (1829) (Americans adopted "only that portion [of the common law] which was applicable to their situation").

Alternatively, did the rule have some status under federal law? Numerous provisions of the Constitution use the term "citizen." See Art. I, §2, cl. 2 (qualifications of Members of the House of Representatives); Art. I, §3, cl. 3 (qualifications of senators); Art. II, §1, cl. 5 (Presidential eligibility); Art. III, §2, cl. 1 (subjects of jurisdiction); Art. IV, §2, cl. 1 (privileges and immunities). Did all these provisions incorporate the British rule of birthright subjecthood?

In this case, because we are concerned with the meaning of citizenship under the Constitution, it is the second alternative that is important for present purposes. In *Lynch* v. *Clarke*, 1 Sand. Ch. 583 (N. Y. Ch. 1844), a decision on which the Court, respondents, and many *amici* heavily rely, the assistant vice-chancellor of New York suggested that the Constitution's references to "citizen" incorporated the

ALITO, J., dissenting

British rule, *id.*, at 647, 655–657, but that is far from obvious.

Nothing in the records of the Constitutional Convention supports that conclusion, and the British rule would be a poor fit as an interpretation of the term "citizen" in the provisions governing the qualifications of Members of Congress and the President. An early draft of the Constitution provided that a Representative must have been a "'citizen of the United States'" for at least three years, but there was opposition to this provision. 2 Records of the Federal Convention of 1787, p. 216, n. 3 (M. Farrand ed. 1911). One delegate argued that three years was not enough, in part because "a rich foreign Nation, for example Great Britain, might send over her tools who might bribe their way into the Legislature for insidious purposes." *Id.*, at 216. In response, the delegates voted to require seven years' citizenship for Representatives and nine years' citizenship for Senators.

The Presidential Eligibility Clause, Art. II, §1, cl. 5, had a similar aim, but it went even further. Not only does it require 14 years' residence, it also requires that a President be a citizen from birth. Its purpose was to prevent a person with possible foreign loyalties from becoming President,[4] and the British rule hardly seems consistent with that aim.

───────────

[4] On July 25, 1787, John Jay sent George Washington a letter suggesting that it would be "wise & seasonable to provide a strong check to the admission of Foreigners into the administration of our national Government; and to declare expresly that the Command in chief of the american army shall not be given to, nor devolve on, any but a natural *born* Citizen." Letter from J. Jay to G. Washington (July 25, 1787), in 3 Records of the Federal Convention of 1787, at 61. Shortly thereafter, the phrase was added. In his Commentaries on the Constitution, Joseph Story explained that the purpose of the natural-born citizenship provision was to "cu[t] off all chances for ambitious foreigners, who might otherwise be intriguing for the office; and interpos[e] a barrier against those corrupt interferences of foreign governments in executive elections." 3 Commentaries on the Constitution of the United States §1473, p. 333 (1833).

ALITO, J., dissenting

## B

No case concerning the meaning of the term "citizen" in any constitutional provision reached the Supreme Court until *Dred Scott* v. *Sandford*, 19 How. 393 (1857). Before then, the British rule did figure in a handful of antebellum Supreme Court decisions, but none of these addressed any constitutional question, and most appear to have regarded the British rule as part of state law on eligibility to inherit property. See *Inglis* v. *Trustees of Sailor's Snug Harbour in City of New York*, 3 Pet. 99, 120–127 (1830); *Shanks* v. *Dupont*, 3 Pet. 242, 245–250 (1830); *Lessee of Levy* v. *McCartee*, 6 Pet. 102, 109 (1832).

Not only were there no Supreme Court decisions on the constitutional question, there was not much litigation of any kind on the question of United States citizenship. Both *Lynch* in 1844, 1 Sand. Ch., at 663, and an 1862 opinion by Attorney General Bates, 10 Op. Atty. Gen. 382, 383, expressed surprise at this dearth. And in our time, when the difference between citizenship and alienage is a hot issue, this dearth may seem very strange. But some obvious explanations come readily to mind.

The question of citizenship came up regularly in cases in which the jurisdiction of a federal court was invoked based on diversity of citizenship, but the issue in those cases was whether one or more of the parties were citizens of a particular State, not whether they were citizens at all. A party wishing to challenge federal jurisdiction had no incentive to argue that an adverse party was an alien because both Article III of the Constitution and §11 of the Judiciary Act of 1789, 1 Stat. 78, conferred jurisdiction over cases between citizens and aliens. Therefore, an adverse party who showed that a supposedly diverse citizen was actually not a citizen at all would have confirmed the jurisdiction he sought to oust.

As for the other constitutional provisions that use the term "citizen," it appears that the question simply did not

come up.  A reason why the issue did not arise regarding the qualifications of Members of Congress may be that foreign-born individuals who were interested in holding office could easily become citizens.  Under the Naturalization Act of 1790, a foreigner became an American citizen simply by proving two years of residence and good moral character. Act of Mar. 26, 1790, 1 Stat. 103–104.

In the years before the Civil War—and indeed, until many years thereafter—the distinction between citizens and aliens meant less than it does today.  During that period, immigration was unrestricted, so aliens could come and stay as long as they wanted.  M. LeMay, An Overview of Immigration to the United States: Founding to 1865, in 1 Transforming America: Perspectives on U. S. Immigration 1 (2013).  And in an era when transatlantic travel was slow, unpleasant, expensive, and sometimes perilous, it is likely that the vast majority of those who sailed across the Atlantic intended to remain.

If that was their choice, naturalization, as noted, was easy.  And if for whatever reason a person who intended to make a permanent home here did not do what was needed to apply for naturalization, the lack of citizenship did not matter as much as it would in later years.  In some places, aliens could even vote and hold elective office.  *Id.*, at 17.

Whatever the reasons, the issue of citizenship came up in only a few cases, and except for those involving the question of citizenship for free black people, the cases did not involve questions of much public importance.  Legal treatises, to be sure, included comments on birthright citizenship, but those comments were not informed by judicial decisions.

The important point for present purposes is that during the antebellum period, there was no settled understanding about the meaning of citizenship under the Constitution. And there certainly was no settled understanding about the citizenship of a child born on United States soil to parents

ALITO, J., dissenting

whose presence in the country was unlawful. That was a situation that could not have occurred.

## II
### A

After the Civil War, Congress faced enormous challenges, and one of these was ensuring that all black Americans, both the newly freed slaves and those who were free before the war, would be treated as citizens of the United States and of the States in which they lived. Congress addressed that issue in the landmark Civil Rights Act of 1866 and then again in the Fourteenth Amendment. For the first time in the Nation's history, these enactments provided a national rule on citizenship, and the meaning of that rule is the question that the Court now addresses.

In tackling that question, an avowedly textualist Court should start by carefully examining the text of the Citizenship Clause of the Fourteenth Amendment. *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 378 (2024) ("[W]e begin as always with the precise text of the Constitution"); *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. 215, 235 (2022) ("Constitutional analysis must begin with 'the language of the instrument'" (quoting *Gibbons* v. *Ogden*, 9 Wheat. 1, 189 (1824))); see, *e.g.*, *District of Columbia* v. *Heller*, 554 U. S. 570, 576 (2008) (beginning with an analysis of the Second Amendment's text).

That Clause states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

Thus, birthright citizenship has two separate elements. First, a person must be "born in the United States," and second, he or she must be "subject to the jurisdiction thereof." It is therefore critical to ascertain the meaning of "subject to the jurisdiction thereof." And that is no easy task because, as we have often remarked, jurisdiction is a

term of many meanings. *Wilkins* v. *United States*, 598 U. S. 152, 156 (2023). We must therefore determine which one applies here.

If "subject to the jurisdiction" of the United States had been a term of art during Reconstruction, we would presumably hold that the phrase has that meaning in the Fourteenth Amendment. See, *e.g.*, *George* v. *McDonough*, 596 U. S. 740, 746 (2022). But that phrase was not a term of art, and the Court does not claim it was.

If the Citizenship Clause set out specifically named exceptions to the general rule of citizenship by birth, our job would be easy; we would follow those exceptions. But the Citizenship Clause is framed differently. It sets out a general rule: Citizenship is not conferred upon a person born in the United States unless that person is also "subject to the jurisdiction" of the United States. By its terms, that rule applies across the board. And when a legislative body chooses to adopt a generally worded rule, we apply it in all circumstances that fall within the rule, not just those that were on the minds of the legislators at the time of adoption. *NLRB* v. *SW General, Inc.*, 580 U. S. 288, 306 (2017); *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79 (1998); *Brogan* v. *United States*, 522 U. S. 398, 403 (1998). We approach constitutional interpretation similarly. *Ante*, at 5–7 (KAVANAUGH, J. concurring in judgment and dissenting in part).

So what does the phrase "subject to the jurisdiction thereof" mean? Unfortunately, the text of the Fourteenth Amendment does not provide a definitive answer, but it supplies two valuable clues.

First, §1 of the Fourteenth Amendment uses the word "jurisdiction" twice—once in the Citizenship Clause and once in the Equal Protection Clause—and the wording of the two clauses differs. The Citizenship Clause applies to those "*subject to* the jurisdiction" of the United States, whereas the Equal Protection Clause applies to "any person *within*

ALITO, J., dissenting

[a State's] jurisdiction." When Congress uses disparate language (especially in the same provision), we presume that the difference matters. *Pulsifer* v. *United States*, 601 U. S. 124, 149 (2024); *Southwest Airlines Co.* v. *Saxon*, 596 U. S. 450, 457–458 (2022); A. Scalia & B. Garner, Reading Law 170 (2012). Therefore, we must presume that the scope of the two provisions is different. Accord, *ante*, at 64 (THOMAS, J., dissenting).

Second, the phrase "subject to the jurisdiction" of the United States applies not only to those who are born in this country but also to those who are "naturalized." After all, Congress would not include both qualifiers unless they were both doing some work. See *Bufkin* v. *Collins*, 604 U. S. 369, 386 (2025). Accordingly, there must be some people who are naturalized but are not "subject to the jurisdiction" of the United States. In other words, whatever "subject to the jurisdiction" of the United States means, it must mean something that is not inherent in naturalization.

## B

### 1

Although the text of the Fourteenth Amendment provides these clues, we must look beyond *that text* to find a full explanation of the phrase "subject to the jurisdiction" of the United States. The terms of the 1866 Civil Rights Act (CRA) provide that explanation. The CRA includes its own citizenship clause, and the circumstances surrounding Congress's adoption of the CRA and the Fourteenth Amendment make clear that the two provisions were understood to be substantively the same. Accord, *ante*, at 26–31 (THOMAS, J., dissenting).

The 39th Congress debated the CRA from January to March 1866, when it was passed and sent to President Johnson for his signature.[5] Congress debated the

—————

[5] President Johnson vetoed the bill, but Congress overrode the veto in April 1866.

14                    TRUMP *v.* BARBARA

Fourteenth Amendment from April to June 1866, when it was adopted and sent on to the States.  Thus, during a 6-month period, the same Congress debated two provisions that addressed the very same question and adopted them both.  Those circumstances in themselves make it highly unlikely that the two provisions differed in substance.

In addition, one of the chief reasons for the adoption of the Fourteenth Amendment was to prevent the CRA from being held unconstitutional. (President Johnson had cited the unconstitutionality of the CRA as one of the reasons why he vetoed it.  See Cong. Globe, 39th Cong., 1st Sess., 1680 (1866).)  If the CRA had granted birthright citizenship to persons who were not entitled to citizenship by birth under the Fourteenth Amendment, there would still have been doubts about the CRA's constitutionality.  So at a minimum, the Fourteenth Amendment's text had to be at least as generous as its CRA counterpart.  Moreover, following the ratification of the Fourteenth Amendment, Congress reenacted the CRA in 1870.  16 Stat. 144.  That reenactment would have been pointless if the CRA's test for birthright citizenship were less generous than the Fourteenth Amendment's.  For all these reasons, it is abundantly clear that the tests for birthright citizenship in the Fourteenth Amendment and the CRA were substantively identical.

I therefore turn to the text of the CRA's citizenship provision.  It provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States."  §1, 14 Stat. 27.

That language preserved two exceptions that were well-known and well-accepted at the time.  The first was for the children of diplomats.  The second was for Indians who had not left their traditional way of life and continued to live with other members of their tribes under the governance of tribal leaders.

ALITO, J., dissenting

The exclusion of these "tribal Indians" from citizenship followed from Article I's Apportionment Clause, which says that congressional "Representatives and direct Taxes shall be apportioned among the several States . . . according to their respective Numbers . . . excluding Indians not taxed." §2, cl. 3.  In the Constitution, just as during the Revolution, taxation and representation went hand in hand.  Indians who lived apart under tribal rule were not considered part of the political community.  As Chief Justice Marshall explained, Indian tribes were "domestic dependent nations." *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831).  Chancellor Kent provided a similar description of Indians' status in the early Republic: "Though born within our territorial limits, the Indians are considered as born under the dominion of their tribes.  They are not our subjects, born within the purview of the law, because they are not born in obedience to us.  They belong, by birth, to their own tribes." *Goodell* v. *Jackson ex dem. Smith*, 20 Johns. 693, 712 (N. Y. Ct. Corr. Errors 1823) (emphasis deleted).  Because Indians who lived apart under tribal rule were not considered part of the political community, they did not receive representation, and they were not taxed.  Due to this status, it appears to have been accepted that tribal Indians and their children, although born on U. S. soil, were not citizens.

The other exception—for the children of diplomats—was one that had been recognized under the British rule and was endorsed by leading authorities on the law of nations. E. de Vattel, The Law of Nations §217, p. 103 (1797).  This was a minuscule category at best, and Congress could have preserved the exception with narrow language applicable only to the members of that group.  For example, it could have said something like this: "[A]ll persons born in the United States ~~and not subject to any foreign power~~, excluding Indians not taxed **and the children of foreign diplomats**, are hereby declared to be citizens of the United States."  Congress did not take that approach.  It chose

ALITO, J., dissenting

instead to identify what it understood to be the characteristic that called for the exception and to deny birthright citizenship to anyone who shares that characteristic. That characteristic, as Congress saw it, was being "subject to any foreign power."

With this understanding of the CRA's citizenship test in mind, we may return to the text of the Fourteenth Amendment. When Congress framed the citizenship test in the Fourteenth Amendment, it consolidated the CRA's two exceptions to citizenship by birth—for "Indians not taxed" and those "subject to any foreign power." The Fourteenth Amendment used the phrase "subject to the jurisdiction" of the United States to cover both of those exceptions. Therefore, a person who is "subject to any foreign power" is not "subject to the jurisdiction" of the United States within the meaning of the Fourteenth Amendment. This unique formulation uses the term "jurisdiction" in a very specific sense. It refers to a form of jurisdiction that is exclusive, that is not in any way limited by any power possessed by any foreign country.

The children of diplomats were not subject to this complete jurisdiction because they were citizens or subjects of the countries represented by their fathers and thus bore duties to those countries. Likewise, tribal Indians were not subject to the United States' exclusive jurisdiction because they were bound to obey tribal law. But they were certainly subject to the jurisdiction of the United States in a different sense of the concept. That is, they were subject to regulation by the Federal Government. After all, their tribes were "domestic *dependent* nations," *Cherokee Nation*, 5 Pet., at 17 (emphasis added), and even though the Government allowed tribes a large measure of self-government, it consistently asserted its jurisdiction to intervene.

In 1817, for example, federal criminal jurisdiction was extended to many crimes committed within the Indian country, Act of Mar. 3, 1817, ch. 92, 3 Stat. 383, and the Indian

ALITO, J., dissenting

Trade and Intercourse Act of 1834, §25, 4 Stat. 733, extended that jurisdiction. In addition, treaties repeatedly described tribes as within the "jurisdiction" of the United States. *E.g.*, Treaty Between the United States and the Navajo Tribe of Indians, Sept. 9, 1849, 9 Stat. 974 (ratified Sept. 24, 1850); Treaty Between the United States and the Utah Indians, Dec. 30, 1849, 9 Stat. 984 (ratified Sept. 9, 1850); Treaty Between the United States and the Apache Nation of Indians, July 1, 1852, 10 Stat. 979 (ratified Mar. 23, 1853). Likewise, this Court held that Indians were "within our jurisdiction and subject to our laws." *United States* v. *Coxe*, 18 How. 100, 104 (1856). Thus, tribal Indians were subject to the jurisdiction of the United States in the sense that they could be and were governed by federal law, but they were not subject exclusively to federal law because they were also governed by tribal law. For that reason, their children did not become citizens at birth.

This understanding of the phrase "subject to the jurisdiction thereof" also explains why naturalized citizens must foreswear all other allegiances when they become United States citizens. From the earliest days of our Republic until now, Congress has required naturalized citizens to "renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the applicant was before a subject or citizen." 8 U. S. C. §1448(a); see Act of Jan. 29, 1795, ch. 20, 1 Stat. 414 ("he doth absolutely and entirely renounce and abjure all allegiance and fidelity to every foreign prince, potentate, state or sovereignty . . . whereof he was before a citizen or subject"). Such an oath would not be necessary if the Constitution permitted anything less than exclusive jurisdiction.

In sum, the Fourteenth Amendment confers citizenship on a person who is born in this country or naturalized only if that person is also "not subject to any foreign power."

18                          TRUMP *v.* BARBARA

2

The Court interprets "subject to the jurisdiction thereof" differently. In its view, the phrase simply means subject to the laws that apply to everyone who is present within the country's borders. See *ante*, at 10–11. That interpretation, however, presents fatal problems.

First, it gives the Fourteenth Amendment's citizenship test a meaning that plainly differs from that in the Civil Rights Act, even though it is beyond any reasonable dispute that Congress did no such thing. Accord, *ante*, at 26–31, 63–64 (THOMAS, J., dissenting). To justify its departure from the Civil Rights Act, the Court argues that the Act "raises more questions than answers" and that the Fourteenth Amendment "'better' expresses the views of the Reconstruction Congress." *Ante*, at 24. But, as I see it, deciding whether someone is "subject to any foreign power" raises far fewer questions than deciding whether that person is "subject to the jurisdiction" of the United States. The Court's commitment to avoiding the straightforward text of the Civil Rights Act strongly suggests that something is amiss.

Second, the Court cannot explain why the Fourteenth Amendment did not confer citizenship on children born in the United States to tribal Indians. As explained, federal law governed those children and their parents to the extent the Federal Government wished. If the Court were right that the Citizenship Clause applies to anyone who is born here and is subject to our laws, then the Fourteenth Amendment would have conferred citizenship on all tribal Indians. But the exception for tribal Indians was well-established at the time and remained until Congress eliminated it by statute. See Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253 ("That all non-citizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States").

Third, the Court cannot explain why the phrase "subject to the jurisdiction" of the United States applies to naturalized citizens. All naturalized citizens, like everyone else who is present in this country, must obey the law, so if that phrase meant what the Court thinks, it is superfluous. By contrast, if it means not being "subject to any foreign power," it serves an identifiable purpose and explains why the naturalization statutes, both before and after the adoption of the Fourteenth Amendment, required those seeking naturalization to renounce allegiance to any other country.

For these reasons, the Court's interpretation of the Fourteenth Amendment's Citizenship Clause fails on textualist grounds.

3

The Court does not confront these problems because it pays little attention to the constitutional text. Instead of performing its own textual analysis, the Court leans on precedent that glosses the text. *Ante*, at 10–12. But none of the cases it cites analyzed the text of the Fourteenth Amendment's Citizenship Clause.

The Court first cites *Lynch*, but as JUSTICE THOMAS comprehensively explains, any reliance on *Lynch* is misplaced. *Ante*, at 78–81 (dissenting opinion).

Next, the Court turns to *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 147 (1812), which held that a "ship of war" of a "friendly power" could enter a United States port without the risk of seizure. Neither that holding nor the reasoning in Chief Justice Marshall's opinion for the Court has any bearing on the meaning of the terms of the Fourteenth Amendment's Citizenship Clause.

The question in *Schooner Exchange* concerned the circumstances under which a sovereign is deemed under the law of nations to have implicitly waived part of its otherwise complete sovereignty over its territory. The Fourteenth Amendment, however, does not waive any part of the

20                     TRUMP *v.* BARBARA

ALITO, J., dissenting

United States' sovereignty.  It is true that the Government
has waived its sovereign right to subject covered diplomats
and their dependents to legal process, but that is done by a
statute, 22 U. S. C. §254a *et seq.*, that implements treaty
obligations and respects long-established norms of interna-
tional law.  Neither that statute, nor any treaty into which
the United States has entered, nor any international law
norm requires the United States to confer birthright citi-
zenship on any child born here to alien parents.

4

The interpretation of the Fourteenth Amendment's Citi-
zenship Clause set out above is based entirely on the text
and legal context of that Amendment and the Civil Rights
Act of 1866.  It does not depend in any way on the record of
the debates on those two enactments.  But to the extent that
congressional debates on the Fourteenth Amendment and
the Civil Rights Act are probative, they strongly support my
textual interpretation.

The clearest evidence was provided when the Fourteenth
Amendment's Citizenship Clause was presented in the Sen-
ate.  As originally drafted, the Fourteenth Amendment did
not define citizenship.  See Cong. Globe, 39th Cong., 1st
Sess., 2286.  Senator Jacob Howard introduced an amend-
ment that remedied that problem.  *Id.*, at 2890.  Senator
Lyman Trumbull, the author of the citizenship clause in the
Civil Rights Act, explained just what the new amendment
meant: "The provision is, that 'all persons born in the
United States, and subject to the jurisdiction thereof, are
citizens.'  That means 'subject to the complete jurisdiction
thereof.' . . . ***What do we mean by 'subject to the juris-
diction of the United States?'  Not owing allegiance to
anybody else.  That is what it means***."  *Id.*, at 2893 (em-
phasis added).  This language, he said, was "better than the
language in the civil rights bill," but the "object to be ar-
rived at is the same."  *Id.*, at 2894.  Senator Howard

ALITO, J., dissenting

"concur[red] entirely" in Senator Trumbull's interpretation. *Id*., at 2895. Thus, the authors of the two major provisions defining United States citizenship agreed that birthright citizenship required complete allegiance.

Other senators quickly agreed. Senator Doolittle called the Civil Rights Act the "forerunner of this constitutional amendment" and said the "civil rights bill undertook to do this same thing" as the Fourteenth Amendment. *Id*., at 2896. Senator Reverdy Johnson, a member of the Joint Committee on Reconstruction and former Attorney General, pointed out that "all that this amendment provides is that all persons born in the United States *and not subject to some foreign Power*—for that, no doubt, is the meaning of the committee who have brought the matter before us— shall be considered as citizens of the United States." *Id*., at 2893 (emphasis added). So too Senator Williams remarked that he understood "the words here, 'subject to the jurisdiction of the United States,' to mean fully and completely subject to the jurisdiction of the United States." *Id*., at 2897.[6] Public commentary on the Citizenship Clause exhibited a similar understanding. K. Lash, Prima Facie Citizenship, 101 Notre Dame. L. Rev. 101, 161 (forthcoming 2026).

Those who disagree with this interpretation have not found any statement in which another Senator expressly disputed Senator Howard's and Senator Trumbull's interpretation of the amendment. They muster a collection of statements that provide some support for their position, but it is a mistake to attribute too much weight to extemporaneous oral statements, which are often phrased in ways that are not precise. And a single member's interpretation of a provision may not be shared by a majority.

I do not suggest that we should base our decision in this case on statements made during the legislative debates on

———————
[6] There was no substantive debate on the Citizenship Clause in the House of Representatives.

ALITO, J., dissenting

the Fourteenth Amendment and the Civil Rights Act.  Reliance on any form of legislative history is always problematic for reasons that are familiar.  See A. Scalia, A Matter of Interpretation 29–37 (1997).  "[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."  *SW General*, 580 U. S., at 307.  Here, the only form of legislative history we have consists of floor statements.

We should base our decision on the firm ground provided by the constitutional text, but if we look beyond the text, the congressional debates and public commentary confirm that the Citizenship Clause requires complete allegiance.

### III

After the ratification of the Fourteenth Amendment, Supreme Court cases quickly acknowledged the interpretation set out above.  Accord, *ante,* at 36–38 (THOMAS, J., dissenting).  In the *Slaughter-House Cases*, 16 Wall. 36 (1873), the Court wrote that the Amendment's Citizenship Clause "was intended to exclude from its operation *children of . . . citizens or subjects of foreign States born within the United States*."  *Id*., at 73 (emphasis added); see also *Minor* v. *Happersett*, 21 Wall. 162, 167–168 (1875) (expressing "doubts" about the citizenship of children who are born to non-citizen parents).  And in *Elk* v. *Wilkins*, 112 U. S. 94 (1884), Justice Gray's opinion for the Court held that the Citizenship Clause requires "not merely" that a person born in the United States be "subject in some respect or degree to the jurisdiction of the United States," but that he be "*completely subject to [the United States'] political jurisdiction*" and owe the country his "*direct and immediate allegiance.*"  *Id*., at 102 (emphasis added).  For that reason, John Elk, despite being "born within the territorial limits of the United States," did not have a valid claim to citizenship by birth because he had been born on a reservation to tribal Indians.  *Ibid.*  Indian tribes, the opinion explained, "were alien

nations," and their members "owed immediate allegiance to the several tribes." *Id*., at 99. Although Elk had "voluntarily separat[ed] himself from his tribe and tak[en] up his residence" among the general public, he was born "owing immediate allegiance" to the tribe, and as a result, was not entitled to birthright citizenship under the Fourteenth Amendment. *Id*., at 99, 102.

That was the state of the Court's case law until *Wong Kim Ark* turned it in a different direction. That case provides the strongest support for today's decision, but its holding is not controlling, and I would not allow the meaning of American citizenship to be forever dictated by the opinion's dubious dicta. *Wong Kim Ark* cautioned against assigning too much weight to dicta, 169 U. S., at 679, and it is appropriate to apply that same advice to the opinion in *Wong Kim Ark* itself.

The Court leans heavily on *Wong Kim Ark*, which certainly displayed the fruit of considerable research on a range of subjects. But it showed little respect for precedent. Justice Gray, the author of *Elk*, 112 U. S. 94, also wrote *Wong Kim Ark*, but he brushed *Elk* aside on the flimsy ground that it "concerned only members of the Indian tribes" and thus had no bearing on other children. *Wong Kim Ark,* 169 U. S., at 682.

*Wong Kim Ark*'s treatment of the text of the Fourteenth Amendment and its relationship with the Civil Rights Act's citizenship test was no better. Indeed, in reading the opinion, it is hard to escape the conclusion that it aimed to divert as much attention as possible from what those provisions actually say. The discussion of those provisions is broken up and interspersed with disquisitions on other matters.

When the opinion finally turns to the text of the Fourteenth Amendment, it summarily concludes that "'subject to the jurisdiction thereof'" in the Citizenship Clause has the same meaning as the phrase "'within its jurisdiction'"

24                    TRUMP *v.* BARBARA

in the Equal Protection Clause." *Id.*, at 687. But the opinion makes no effort to explain why Congress might have chosen to use different language in two places within the same provision to express the same concept. As we have often noted, we usually presume that "'differences in language . . . convey differences in meaning.'" *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. 685, 698 (2022); see, *e.g.*, *Pulsifer*, 601 U. S., at 149; *Saxon*, 596 U. S., at 457–458. Nor does the opinion explain why *Elk* had interpreted "subject to the jurisdiction thereof" very differently.

As for the phrase "not subject to any foreign power" in the Civil Rights Act, *Wong Kim Ark* tries two different tacks. First, it suggests that the phrase means the same thing as "subject to the jurisdiction thereof" in the Fourteenth Amendment. See 169 U. S., at 675. But if, as the opinion maintains, "subject to the jurisdiction thereof" essentially means subject to civil and criminal liability for breaking the law, see *id.*, at 685–687, then "subject to the jurisdiction thereof" does *not* mean the same thing as "not subject to any foreign power." Everyone within the country's borders (except those with diplomatic immunity) may be held civilly or criminally liable for violations of the law. But many aliens within our territorial limits are also "subject to [a] foreign power," *i.e.*, their home country, because they must follow that country's laws when they are abroad. Some countries—Mexico, for example—even mandate military service by those living abroad.[7] So in ordinary usage, being within the United States and having an obligation to obey U. S. law while here is definitely not the same as not being "subject to any foreign power."

*Wong Kim Ark*'s fallback argument is no better than the first. The opinion speculates that Congress might have

───────────

[7] Ley del Servicio Militar, Arts. 11, 26(b), 43 Diario Oficial de la Federación [DOF] 30–08–1940, Últimas reformas DOF 23–01–1998 (Mex. 1998).

ALITO, J., dissenting

thought that "not subject to any foreign power" trimmed the birthright-citizenship rule too much and that this accounts for Congress's use of different language in the Fourteenth Amendment. *Id*., at 688. That suggestion flies in the face of all the reasons previously mentioned why the citizenship tests in the Civil Rights Act and the Fourteenth Amendment must be understood to be substantively identical.

That is the extent of *Wong Kim Ark*'s analysis of the terms of the Fourteenth Amendment's citizenship test, and I would not carve an interpretation of the Citizenship Clause in stone based on such dubious dicta.

And dicta it is. Sometimes it is not easy to determine the exact contours of a decision's holding, but the opinion in *Wong Kim Ark* obviates that problem. At the end of the opinion, the Court clearly spells out exactly what it held:

> "[A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but ***have a permanent domicil and residence in the United States***, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States." *Id*., at 705 (emphasis added).

Thus, the holding of the case was limited to a child born in the United States to parents who were not citizens but had established "a permanent domicil and residence" here. Many other key passages in the opinion confirm this fact:

- "[W]hen the parents are domiciled here[,] birth establishes the right to citizenship," *id*., at 692;

- The Citizenship Clause "includes the children born, within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States," *id*., at 693;

ALITO, J., dissenting

- "Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States," *ibid.*;
- "[S]ubjects of the Emperor of China, but domiciled in the United States, . . . must be held to be subject to the jurisdiction of the United States," *id.*, at 696.

The Court dismisses these pointed and repeated references to domicile, arguing that domicile was merely an incidental fact and not an element of the holding. *Ante*, at 24–25. But Justice Gray had a good reason for pointing out that *Wong Kim Ark*'s parents had established their domicile here. A person's domicile is the place where he or she intends to live indefinitely. *E.g.*, *Ennis* v. *Smith*, 14 How. 400, 422–423 (1853); *Mitchell* v. *United States*, 21 Wall. 350, 352 (1875). Therefore, the fact that they had established domicile here meant that they wanted to make the United States their home.

It is telling that Justice Gray's statement of the holding also mentioned that Wong Kim Ark and his parents were Chinese. The British birthright-subjecthood rule did not take account of the race or nationality of the alien to whom a child was born within the King's domain. See *Calvin's Case*, 7 Co. Rep., at 5b–6a, 77 Eng. Rep., at 383–384. So if the opinion aimed to adopt the British rule (with the one new exception for tribal Indians), there was no need whatsoever for the holding to say anything about the race of Wong Kim Ark or his parents. Yet it did so. And not only that, the opinion spent many paragraphs describing statutes, court decisions, and debates in Congress about the plight of Chinese immigrants. *Wong Kim Ark*, 169 U. S., at 694–704. The opinion also properly stressed that the fundamental objective of the Fourteenth Amendment was to protect the rights of people of all races. *Id.*, at 676, 692–693.

ALITO, J., dissenting

When we understand the situation Wong Kim Ark and his parents faced, their domicile in the United States takes on a special meaning. If they had been white or black, they could have applied for naturalization.[8] But because they were Chinese, the law forbade their naturalization. *Id.*, at 701. By establishing domicile, they had done everything within their power to express their desire and intent to become Americans. If the Court had not interpreted the Citizenship Clause in the way set out in the holding, the result would have been a population permanently caught in limbo. The Chinese immigrants who were lawfully present before the enactment of the Chinese Exclusion Act in 1882, as well as all their descendants, could never become citizens no matter how much they wanted to be Americans, no matter how deep their roots in this country, and no matter how substantial their contributions to our society.

*Wong Kim Ark* is therefore best understood as holding that people who are lawfully present here, establish the United States as their intended permanent home, and do everything within their power to become United States citizens can be seen as no longer subject to any foreign power.[9] Thus, their children are born citizens under the Fourteenth Amendment. That interpretation of *Wong Kim Ark* is

---

[8] See Naturalization Act of 1870, ch. 254, §7, 16 Stat. 256 (extending naturalization laws to people "of African nativity and to persons of African descent").

[9] The majority accuses me of creating an ad hoc exception to the rule of complete allegiance for those who have done everything in their power to become United States citizens. *Ante*, at 24, and n. 6. But that is a surprising line of attack for the majority. After all, this exception comes from *Wong Kim Ark*—a decision the majority fully embraces. *Wong Kim Ark*, in turn, had to recognize this exception to effectuate the Fourteenth Amendment's protections in the face of the discriminatory Chinese Exclusion Act. Regardless, as far as exceptions are concerned, the Court has more to explain than I do. The Court has not offered any satisfactory explanation for how the feudal rule it champions coheres with the new, distinctly American situations regarding Indians, slaves, and free blacks.

ALITO, J., dissenting

consistent with the decision's statement of its holding; it can be reconciled with the language of the Fourteenth Amendment and the Civil Rights Act; and for the Chinese Americans of Wong Kim Ark's time, it was the interpretation that best implemented the Fourteenth Amendment's promise of racial equality.

IV

*Wong Kim Ark* benefited Chinese Americans, but its impact on other immigrants was limited. For decades after that decision, immigration remained largely unregulated. During World War I, however, the Federal Government began to limit the flow of immigrants. In 1917, Congress passed a law that excluded all Asians, implemented a literacy test, and included a long list of criteria for admission. Ch. 29, 39 Stat. 874–878. Later laws, most notably the discriminatory Immigration Act of 1924, continued this trend by imposing quotas based on immigrants' country of origin. See ch. 190, 43 Stat. 153. From that time until the enactment of the Immigration and Nationality Act of 1965, immigration, both legal and illegal, was light, and the number of Americans born abroad shrank from 13.9 million in 1920 (when the population was just over 100 million) to less than 10 million in the 1960s (when the population grew to over 200 million).[10] After 1965, however, immigration increased dramatically, and the problem of illegal immigration grew.

The story of illegal immigration unfolds in four parts. First, illegal immigration emerged as a notable problem in the 1970s. Second, the Federal Government tried to deal with this problem in 1986 by implementing employer sanctions and amnesty for millions of immigrants, but that attempt failed. Third, the Federal Government—with help

———————

[10] Dept. of Commerce, Bureau of Census, S. Azari, V. Jenkins, J. Hahn, & L. Medina, The Foreign-Born Population in the United States: 2022, 2 (2024), https://www2.census.gov/library/publications/2024/demo/acsbr-019.pdf (archived at https://perma.cc/FPE7-L546).

ALITO, J., dissenting

from this Court—blocked border States from implementing their own solutions to a problem that hit them particularly hard. Meanwhile, other States, counties, and cities designated themselves "sanctuary jurisdictions," thus encouraging illegal immigration. Finally, as a result of these developments, the number of illegal immigrants in this country exploded.

A

Illegal immigration emerged as a national problem in the 1970s, after Congress passed the Immigration and Nationality Act in 1965. That Act eliminated immigration quotas based on national origin and replaced them with a preference-based immigration system that included an overall cap of 290,000 immigrant visas per year. 79 Stat. 911, 921. But demand for visas vastly outstripped supply, thus encouraging migrants to subvert the legal process. B. Montoya, Diplomatic History of US Immigration During the 20th Century 52–53 (2024).

Many immigrants entered or remained illegally for economic reasons. In the United States, opportunities abounded "to pick crops and do other 3D (dirty, dangerous, and demeaning) jobs." S. Martin, A Nation of Immigrants 212 (2d ed. 2021) (Martin). American employers were all too willing to hire employees who would work for less than the minimum wage and without the benefit of laws protecting employee rights. *Id.*, at 210–212. Yet even these poor working conditions surpassed those in the home countries of many immigrants. C. Bon Tempo & H. Diner, Immigration: An American History 281–283 (2022) (Bon Tempo). This situation created a strong incentive for immigration—both legal and illegal.

As a result, immigration, both legal and illegal, soared. Demographers generally assumed that the size of the illegal-immigrant population in 1960 was "negligible." J. Robinson, Estimating the Approximate Size of the Illegal Alien

ALITO, J., dissenting

Population in the United States by the Comparative Trend Analysis of Age-Specific Death Rates, 17 Demography 159, 170 (1980). By the end of the 1970s, however, a conservative estimate of the number of illegal immigrants was 3 million. *Id.*, at 160.

B

Early efforts to solve the illegal-immigration problem failed. In 1977, President Carter proposed an immigration overhaul that floundered due to opposition from his own party's core constituencies, including labor unions, Hispanic groups, and environmentalists. Martin 215.

In 1986, more than 20 years after passage of its last major immigration bill, Congress agreed to do something about illegal immigration. It passed the Immigration Reform and Control Act of 1986 (IRCA). See 100 Stat. 3359. This Court, in an opinion by Justice Stevens, described IRCA as a "major statutory response to the vast tide of illegal immigration that had produced a 'shadow population' of literally millions of undocumented aliens in the United States." *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479, 481 (1991). IRCA made it unlawful "to hire, or to recruit or refer for a fee . . . an alien knowing the alien is an unauthorized alien." 8 U. S. C. §1324a(a)(1). To implement this program, IRCA required employers to review documents establishing identity (such as a driver's license), employment authorization (such as a Social Security card), or both (such as a U. S. passport). §1324a(b); see also *Kansas* v. *Garcia*, 589 U. S. 191, 196 (2020) (describing IRCA employment-verification system). IRCA also increased funding for border security and immigration enforcement. See 100 Stat. 3381.

IRCA balanced harsher enforcement with a plan to legalize the status of millions who were living in the United States illegally. See 8 U. S. C. §§1160, 1255a. Immigrants could obtain legal status in two ways. First, they could file an application showing that they had resided in this

country continuously since before 1982, had been physically present here since the date IRCA became law (November 6, 1986), and would be admissible if they were coming legally. §1255a(a). Second, they could certify that they had resided in the United States for at least a year, had worked in agriculture for at least 90 days, and were admissible. §1160(a). Given the less stringent criteria for the latter legalization pathway, it proved much more popular. The number of applications under the agricultural pathway "far exceeded estimates," at least in part because of fraud. Martin 225–226. Ultimately, almost 2.7 million illegal immigrants obtained legal status under the two pathways. P. Orrenius & M. Zavodny, Do Amnesty Programs Reduce Undocumented Immigration? Evidence from IRCA, 40 Demography 437 (2003) (Orrenius).

Despite IRCA's ambitious aims, it failed to curb illegal immigration. The work-verification and employer-sanction system did not eliminate the strong economic incentive for illegal immigration. E. Cohen, Illegal 157 (2020). Immigrants easily forged, stole, or shared documents, like photoless driver's licenses and Social Security cards, to provide "verification" of identity and employment authorization to their employers. Martin 266–267. And the law supplied little reason for employers to smoke out these fraudulent documents. On the contrary, "if an employer requested additional documentation, he or she faced penalties imposed to ensure that employers did not discriminate against foreign-looking or -sounding workers." *Id*., at 267. Underenforcement of IRCA rendered its employer sanctions "nearly toothless." Bon Tempo 306. IRCA's increased border enforcement did not help either. Although IRCA may have caused a short-term decrease in migration, the law "failed to discourage undocumented immigration in the long run." Orrenius 448.

Congress has not passed comprehensive immigration legislation since 1986, in large part because voices across the

ALITO, J., dissenting

political spectrum have criticized any attempts at serious reform. For example, President George W. Bush's immigration-reform proposal met with skepticism from conservatives who argued that it amounted to amnesty for illegal immigrants. Martin 293. Meanwhile, liberals and labor unions criticized the plan for not going far enough to address illegal immigrants' plight. *Id.*, at 293–294.

C

When Congress failed to solve the illegal-immigration problem, States stepped in. California led the way in 1994 with Proposition 187. That law stated "[e]very law enforcement agency in California shall fully cooperate with the United States . . . regarding any person who is arrested if he or she is suspected of being present in the United States in violation of federal immigration laws." §4. Proposition 187 also excluded illegal immigrants from public social services, publicly funded healthcare services, and—most controversially—public education from elementary school through university. §§6–8. Although California voters overwhelmingly approved Proposition 187, the measure never went into effect. A Federal District Court enjoined the law, and then a new Governor settled the lawsuit. See *League of United Latin American Citizens* v. *Wilson*, 908 F. Supp. 755 (CD Cal. 1995); P. Gulasekaram & S. Karthick Ramakrishnan, The New Immigration Federalism 51–53 (2015).

As illegal immigration continued to climb, States tried to lessen its effects. For example, Arizona passed a law in 2007 that allowed courts to suspend or revoke business licenses for those who employed illegal immigrants. *Chamber of Commerce of United States of America* v. *Whiting*, 563 U. S. 582, 591 (2011). The Chamber of Commerce sued, arguing the law was preempted, but this Court disagreed. *Id.*, at 587, 593.

ALITO, J., dissenting

Following that victory in this Court, States worked to ameliorate the illegal-immigration problem. In 2008 alone, 13 States passed laws punishing employers for hiring unauthorized workers. Martin 298. Arizona went further in 2010 with a law that punished illegal immigrants for working or failing to register. *Arizona* v. *United States*, 567 U. S. 387, 392–394 (2012). The law also gave law enforcement the ability to arrest, based on probable cause, those suspected of violating the immigration laws, and required verification of individuals' immigration status during stops, detentions, and arrests. *Id.*, at 394. At the United States' urging, the Court held that federal law largely preempted Arizona's efforts. *Id.*, at 400–415; but see *id.*, at 440–441 (ALITO, J., concurring in part and dissenting in part) (arguing that the Arizona law was largely consistent with federal law).

The litigation between Arizona and the United States inaugurated an era in which the Federal Government and States resisted each other's efforts to address illegal immigration. Texas, in particular, repeatedly challenged federal immigration policies that the State alleged increased illegal immigration. But the State met with little success in this Court. The trouble began when Texas unsuccessfully challenged the 2021 termination of an earlier administration's border-enforcement policies. *Biden* v. *Texas*, 597 U. S. 785, 801–807 (2022). The State also lost in this Court when it tried to stop the Government's de-prioritization of immigration enforcement against some criminal aliens. *United States* v. *Texas*, 599 U. S. 670, 673–674 (2023). This Court thus greenlighted a policy that prohibited immigration officials from making enforcement decisions based solely on criminal convictions "no matter how serious." *Texas* v. *United States*, 40 F. 4th 205, 214 (CA5 2022) (*per curiam*).

For its part, the Federal Government sued to stop Texas from implementing its own solutions to illegal immigration. When illegal entrants overran Texas border towns, the

34                    TRUMP *v.* BARBARA

ALITO, J., dissenting

State erected barbed wire fencing, but Border Patrol officers cut or displaced the fencing. As the lower courts found and a video confirms, the federal officers installed a climbing rope on the Texas side of the river and made no effort to turn back a stream of migrants who were wading across the Rio Grande. Instead of processing the entrants, border officers simply told them to walk a mile or more without supervision to the nearest immigration processing center.[11] Then, from the comfort of chambers more than 1,000 miles from the southern border, this Court sided with the Federal Government, allowing immigrants to pour into the State. See *Department of Homeland Security* v. *Texas*, 601 U. S. ___ (2024). Likewise, the Government sought to stop Texas from criminalizing illegal entry or reentry into the State. See *United States* v. *Texas*, 601 U. S. ___ (2023). Although the Court denied that application, the Federal Government's message was clear: Even in the midst of a crisis, self-help is not an option. In short, the Executive Branch and this Court left border States—the ones that bear the "brunt of the country's illegal immigration problem," *Arizona*, 567 U. S., at 436 (Scalia, J., concurring in part and dissenting in part)—practically defenseless against illegal immigration.

Meanwhile, other States, counties, and cities encouraged illegal immigration by becoming sanctuary jurisdictions. These jurisdictions prohibit their law-enforcement officers from cooperating with federal immigration officials. M. Delgado, Sanctuary Cities, Communities, and Organizations 106 (2018) (Delgado). They often refuse to share information with federal immigration officers or to honor the Federal Government's requests to briefly extend the detention of those suspected of being in the country illegally. L. Collingwood & P. Gonzalez O'Brien, Sanctuary Cities 6–7

--------

[11] Application to Vacate Injunction Pending Appeal in *Department of Homeland Security* v. *Texas*, O. T. 2023, No. 23A607, p. 5a.

ALITO, J., dissenting

(2019) (Collingwood); see *United States* v. *Texas*, 599 U. S.,
at 715 (ALITO, J., dissenting). Many also prohibit police of-
ficers from asking about immigration status. Collingwood
6. San Francisco passed some of the first such ordinances
in the 1980s. Martin 310. After 2008, the number of juris-
dictions with sanctuary policies increased significantly.
*Ibid.* According to a list published by the Department of
Justice, 11 States and the District of Columbia, 3 counties,
and 18 cities are sanctuary jurisdictions.[12] But the number
is likely significantly higher. See, *e.g.*, Delgado 129–131
(listing over 150 sanctuary jurisdictions); J. Vaughan & B.
Griffith, Map: Sanctuary Cities, Counties, and States, Cen-
ter for Immigration Studies (Mar. 10, 2026),
https://cis.org/Map-Sanctuary-Cities-Counties-and-States
(archived at https://perma.cc/TM8N-HNSF) (listing over
200 sanctuary jurisdictions); Collingwood 167–168 (listing
54 sanctuary cities).

D

Congress's failure to act, the Executive Branch's enforce-
ment policies and frequent opposition to state solutions,
and some jurisdictions' policies have resulted in a massive
increase in the number of illegal immigrants living in this
country. According to leading demographers at Pew Re-
search Center, the illegal-immigrant population grew by
more than 2 million between 2022 and 2023, bringing the
total number of illegal immigrants in this country to 14 mil-
lion. J. Passel & J. Krogstad, Pew Research Center, U. S.
Unauthorized Immigrant Population Reached a Record 14
Million in 2023, p. 4 (Aug. 21, 2025) (Passel). Demogra-
phers estimate that 9% of all births in the United States in

––––––––
[12] Dept. of Justice, Office of Atty. Gen., U. S. Sanctuary Jurisdiction
List Following Executive Order 14287: Protecting American Communi-
ties from Illegal Aliens (Oct. 31, 2025), https://www.justice.gov/ag/us-
sanctuary-jurisdiction-list-following-executive-order-14287-protecting-
american-communities (archived at https://perma.cc/8YRU-F6UH).

36                    TRUMP *v.* BARBARA

ALITO, J., dissenting

2023 were to mothers who were in the country illegally or on a temporary basis.[13]

These numbers are striking, and after 2023 the trend appears to have intensified. Between July 2023 and March 2024, the overall foreign-born population of the United States increased from 48.5 million to 51.6 million—"an unprecedented increase of 3 million immigrants in nine months. Much of this growth was driven by the admission of unauthorized immigrants with temporary deportation protections." Passel 20.

\* \* \*

As a result of the events of the past 50 years, the United States now has a huge contingent of people who entered or remained in this country illegally, as well as a large group of people who were born here to such parents. The Court's interpretation of the Fourteenth Amendment makes all the members of this latter group citizens. Many of those who have grown up here now have a strong moral claim to be allowed to remain, but that is a matter that the Fourteenth Amendment, when properly interpreted, leaves to Congress.

V

As shown in Part II, *supra*, a person who is born in the United States is made a citizen by the Fourteenth Amendment only if that person was also "subject to the jurisdiction" of the United States. And that phrase means subject to the jurisdiction of the United States alone and not "subject to any foreign power."

---

[13] J. Passel & D. Fahmy, Pew Research Center, About 9% of U. S. Births in 2023 Were to Unauthorized or Temporary Legal Immigrant Mothers (Mar. 31, 2026), https://www.pewresearch.org/short-reads/2026/03/31/about-9-of-us-births-in-2023-were-to-unauthorized-or-temporary-legal-immigrant-mothers/ (archived at https://perma.cc/3SFR-4Q97).

ALITO, J., dissenting

A great many persons who are born here to illegal immigrant parents fail this test because at birth they are automatically made nationals of their parents' native country and, as a result, incur duties to that country. This means that they are "subject to a foreign power" and are thus not "subject to the jurisdiction" of the United States within the meaning of the Fourteenth Amendment.

This is illustrated by the laws of countries on the list of those from which the greatest number of illegal immigrants come.[14] Mexico is at the top of that list, and under Mexico's constitution, the child of a Mexican parent can become a Mexican national at birth and acquires certain duties to the government. See Political Constitution of the United Mexican States, Arts. 30, 31 (1917). Among these are the obligation to receive military training and to join the National Guard. Art. 31.

Guatemala is second on the list, and its constitution also confers Guatemalan nationality on a person born abroad to a Guatemalan parent. Political Constitution of the Republic of Guatemala, Art. 144 (1993). All Guatemalan nationals owe certain duties to the government. Art. 135. At the age of 18, a Guatemalan national automatically becomes a Guatemalan citizen, Art. 147, and thereby acquires additional obligations, Art. 136.

El Salvador is also among the top five, and its constitution provides that "[c]hildren of a Salvadoran father or mother, born in a foreign country," are Salvadorans by birth. Constitution of El Salvador, Art. 90 (2014). Upon reaching the age of 18, these children incur an obligation to

———————

[14] See Office of Homeland Security Statistics, U. S. Department of Homeland Security, B. Baker & R. Warren, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022, p. 15 (Apr. 2024), https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf (archived at https://perma.cc/VB5R-PU2M).

38                    TRUMP *v.* BARBARA

serve in the military, Art. 215, as well as other duties, including the duty "[t]o serve the State in conformity with the law." Art. 73. Many other countries among the top 10 have similar laws. See, *e.g.*, Constitution of Honduras, Arts. 23, 40 (2013); Constitution of the Philippines, Art. II, §4; Art. IV, §1 (1987); Nationality Law of the People's Republic of China, Art. 5 (1980).

Respondents' claim in this case is that Executive Order No. 14160 is unconstitutional on its face. To prevail on this facial claim, they must show that "no set of circumstances exists under which the [Executive Order] would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). And because the order is valid as applied to nationals from the countries discussed above, the claim should fail. In all likelihood, the Executive Order is also constitutional as applied to nationals from a great many other countries, but no such showing is needed here.

Indeed, showing merely that the Executive Order is valid as applied to a child born to a birth tourist would be enough to defeat respondents' facial claim. That is why the Court goes out of its way to hold that even a child born to a mother who is here for only a brief time is a citizen under the Fourteenth Amendment. *Ante*, at 3–4, 19–20.

The Court's interpretation is not only contrary to the original meaning of the Fourteenth Amendment, it produces grotesque results. While foreigners who wish to immigrate lawfully must sometimes wait for many years, a child born here to a birth tourist is automatically a citizen.

The Court's interpretation also has national-security implications. Accord, *ante*, at 56 (THOMAS, J., dissenting). Suppose that a person's only connection to this country is that he was born here to a mother who was present just long enough to give birth and then quickly returned to her native country. Suppose that country is a strategic adversary or enemy of the United States. Suppose the child never visited the United States while growing up and was

ALITO, J., dissenting

inculcated with hatred of this country. According to the Court, that person is a citizen of the United States. He can enter and leave the country as he pleases. He can travel the world on a United States passport. Even if he plots to harm this country, he cannot be deprived of his status as a citizen, at least under current precedent. See *Vance* v. *Terrazas*, 444 U. S. 252, 259–260 (1980).

The Court's interpretation saddles this country with an ancient British rule that even the United Kingdom has abandoned,[15] as have other countries whose legal systems share the same pedigree.[16]

The Court's interpretation preserves a powerful incentive to enter or remain in this country illegally. Immigrants naturally prefer affluent countries where economic opportunities are available. Other than Canada, the United States will be the only affluent nation where birth alone is enough to establish citizenship.[17]

If the Fourteenth Amendment required these results, the country would have to live with them or amend the Constitution. But the Fourteenth Amendment does not include the rule the Court now imposes on the country. In my judgment, the Court has made a mistake that will seriously affect the country's future.

For that reason, I respectfully dissent.

––––––––––

[15] British Nationality Act of 1981, ch. 61, pt. I, §1.

[16] See Australian Citizenship Act of 2007, No. 20, 2007, pt. 2, div. 1, §12; New Zealand Citizenship Act of 1977, Pub. Act 1977, No. 61, pt. 1, §6.

[17] D. DeSilver, Pew Research Center, U. S.-Style Birthright Citizenship Is Uncommon Around the World (Mar. 31, 2026), https://www.pewresearch.org/short-reads/2026/03/31/us-style-birthright-citizenship-is-uncommon-around-the-world/ (archived at https://perma.cc/4DHU-X85D); International Monetary Fund, GDP Per Capita, Current Prices (2026), https://www.imf.org/external/datamapper/NGDPDPC@WEO/OEMDC/ADVEC/WEOWORLD/LUX (archived at https://perma.cc/DU7F-7XYW).

GORSUCH, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 25–365

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* BARBARA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 30, 2026]

JUSTICE GORSUCH, dissenting.

At the heart of today's dispute lie two competing views of the Fourteenth Amendment's Citizenship Clause. On one account, the Clause incorporated the English common law rule of *jus soli* (literally, the "right of the soil"). That rule, developed in feudal times, had more to do with being a subject than a citizen. It was based on the notion that a "man owed personal service to the lord of the soil, the same as his master owed it to the king; and it was born with the child and only ended in the grave." 2 Cong. Rec. 3282 (1874); see also 1 W. Blackstone, Commentaries on the Laws of England 369 (1768); *ante*, at 2–4 (majority opinion). On the other account, the Clause adopted a distinctly American settler's view of citizenship. One that promises the full "dignity and glory of American citizenship" to any child born in this country to parents who have made this Nation their permanent home, regardless of their race, religion, or national origin. *Plessy* v. *Ferguson*, 163 U. S. 537, 555 (1896) (Harlan, J., dissenting); see also *ante,* at 1–3 (THOMAS, J., dissenting). To my eye, the latter understanding better accords with the Clause's original public meaning and that leads me to join JUSTICE THOMAS's dissent.

I write only to emphasize a few points. First, the understanding JUSTICE THOMAS and I share of the Citizenship Clause is consistent with this Court's holding in *United*

2                    TRUMP *v.* BARBARA

*States* v. *Wong Kim Ark*, 169 U. S. 649 (1898). That case involved parents born in China who had made their home in this country lawfully, even though they never became naturalized citizens and statutes then in effect made that impossible. See *id.*, at 652, 701. The question the Court faced was whether the parents' child, born in this country, was himself a citizen. The government argued that the child was not a citizen because his parents were not. *Id.*, at 666. This Court—rightly—rejected the government's position. Throughout history, many other nations have restricted citizenship by birth to the children of citizens. See *ante,* at 13, n. 1 (THOMAS, J., dissenting). But the American settler's view of citizenship reflected in the Citizenship Clause is not so parsimonious. What matters isn't whether a child's parents are citizens. What matters is whether they (and, by law, their child at birth) have made this place their home and are thus "domiciled within the United States." *Wong Kim Ark*, 169 U. S., at 693.

    Second, respondents chose to pursue a facial challenge to the executive order at issue in this case and secured below a preliminary injunction barring every one of the order's potential applications. Under this Court's precedents, we can sustain that injunction only if "no set of circumstances exists" in which the order may be applied lawfully. *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). That is a demanding standard, and it is not met here. Among other things, the executive order holds that children born to temporary visitors in this country, whether here lawfully or unlawfully, are not citizens. And at least to that extent, the order is consistent with the Citizenship Clause as JUSTICE THOMAS and I read it. By definition, temporary visitors to this country do not choose to make a permanent home here, and their children thus cannot claim the privilege of citizenship. Because the executive order is lawful at least to this extent, respondents' facial challenge must fail. See *ibid.*; *ante*, at 56–57 (THOMAS, J., dissenting).

GORSUCH, J., dissenting

Finally, just because the executive order has some lawful applications and can survive a facial challenge does not mean it is lawful across the board and immune from narrower legal challenges.  Besides addressing temporary visitors, the order also denies the benefits of citizenship to children born in this country to parents who make their permanent home here, but do so in defiance of federal immigration laws.  The government insists that aspect of the order can survive any possible legal challenge, too, because individuals can secure domicile in this country only if they do so in compliance with federal law.  See *ante,* at 57–58, n. 10 (THOMAS, J., dissenting).

About that, however, I harbor doubts.  Perhaps *Wong Kim Ark* does not squarely foreclose the government's position.  After all, that case addressed a child born to parents who lawfully resided in this country.  Still, I wonder:  Is a child born here to parents who have long chosen to make this Nation their permanent home not a citizen under the Fourteenth Amendment solely because his parents' presence violates statutory law?  If those parents are not domiciled here, then where *are* they domiciled?  And if the answer is nowhere, how can we reconcile that conclusion with this Court's longstanding recognition that every person is domiciled somewhere?  See *Desmare* v. *United States*, 93 U. S. 605, 610 (1877).  Because the executive order is not facially invalid, these questions may not be properly before us. But their answers are undeniably important to a Nation committed to a view of citizenship open to all children born here to parents who can call this country their home.